No. 13-99001

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHN EDWARD SANSING,

Petitioner-Appellant,

vs.

CHARLES L. RYAN, Director,
Arizona Department of Corrections, *et al.*,

Respondents-Appellees.

On Appeal from the United States District Court
District of Arizona
Case No. 2:11-cv-01035-SRB

## REPLACEMENT OPENING BRIEF OF APPELLANT

JON M. SANDS
Federal Public Defender

Jennifer Y. Garcia (Arizona Bar No. 021782)
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816 telephone
(602) 889-3960 facsimile

COUNSEL FOR PETITIONER-APPELLANT

# Table of Contents

Table of Authorities ............................................... **Error! Bookmark not defined.**

Introduction ............................................................................1

Jurisdictional Statement ..........................................................1

Statement of the Issues Presented for Review ...........................2

Certified Issues.......................................................................2

Uncertified Issue ....................................................................3

Statement of the Case..............................................................3

    I.      Factual Background.......................................................4

    II.     The Crime.................................................................13

    III.   Procedural History......................................................17

Summary of the Argument......................................................22

Standard of Review................................................................24

Argument..............................................................................25

Certified Issues.....................................................................25

Claim One ............................................................................25

    Sansing was denied the right to a jury trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution ..................25

    I.      The deprivation of a jury sentencing had a substantial and injurious effect on Sansing's sentence. ................................................25

Claim Two.............................................................................44

    Sansing was denied effective assistance of counsel during the penalty phase of his capital murder trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution because counsel failed to investigate and present mitigating evidence. ....................44

    I.      Legal standard ........................................................45

    II.     The PCR court's determination is not entitled to deference..................47

    III.   Trial counsel's performance was deficient to Sansing's prejudice.........63

i

Claim Seven .................................................................................75

    The trial court and the Arizona Supreme Court violated Sansing's Eighth and Fourteenth Amendment Rights to the consideration of all relevant mitigating evidence when, contrary to clearly established federal law, they refused to consider mitigating factors that did not have a "causal nexus" to the crime. ..............................................75

    I.    Arizona's causal nexus test violated Sansing's constitutional rights under the Eighth and Fourteenth Amendments. ..........................75

    II.    The state courts violated Sansing's rights when they applied an unconstitutional causal nexus test to his mitigation................................79

    III.    This error had a substantial and injurious effect on Sansing's sentence. ...................................................86

Claim Eight ................................................................................91

    Sansing's guilty plea was not knowing, intelligent, or voluntary because the written factual basis established an aggravating factor without Sansing's waiver of privilege against self-incrimination, in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. ..............................................91

Claim Twelve ................................................................................97

    The trial court violated Sansing's rights under the Eighth and Fourteenth Amendments to the United States Constitution when it failed to find and/or consider the victim's daughter's wishes as a mitigating factor................................................97

Uncertified Issue ........................................................................102

Claim Four ...............................................................................102

    Sansing was denied effective assistance of counsel in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution because trial counsel failed to properly advise Sansing about the consequences of his plea, stipulated factual basis, and sentencing stipulation. ..............................................102

    I.    Facts of claim ....................................................103

    II.    Legal argument....................................................104

Conclusion ...............................................................................109

Statement of Related Cases ..................................................................111

Certificate of Compliance ...................................................................112

Certificate of Service .........................................................................113

## Table of Authorities

**Federal Cases**

*Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007) .................................................. 87

*Ainsworth v. Woodford*, 268 F.3d 868 (9th Cir. 2001) .......................................... 74

*Alcala v. Woodford*, 334 F.3d 862 (9th Cir. 2003) ................................................. 24

*Alleyne v. United States*, 133 S. Ct. 2151 (2013) ........................................... 27, 28

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) ....................................................... 28

*Sansing v. Arizona*, 526 U.S. 954 (2002) ................................................................ 25

*Bloom v. Calderon*, 132 F.3d 1267 (9th Cir. 1997) ............................................... 66

*Booth v. Maryland*, 482 U.S. 496 (1987) ..................................................... 100, 101

*Boykin v. Alabama*, 395 U.S. 238 (1969) ........................................... 92, 93, 95, 97

*Brady v. United States*, 397 U.S. 742 (1970) ......................................................... 93

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) ....................................................... 101

*Carey v. Musladin*, 549 U.S. 70 (2006) ............................................................... 100

*Caro v. Calderon*, 165 F.3d 1223 (9th Cir. 1998) ........................................... 47, 66

*Clark v. Murphy*, 331 F.3d 1062 (9th Cir. 2003) ................................................... 24

*Clemons v. Mississippi*, 494 U.S. 738 (1990) ................................. 87-88, 88, 100

*Cole v. Dretke*, 265 F. App'x 380 (5th Cir. 2008) ................................................. 89

*Coleman v. Calderon*, 210 F.3d 1047 (9th Cir. 2000) ........................................... 87

*Correll v. Ryan*, 539 F.3d 938 (9th Cir. 2008) ........................................... 55, 58, 59

*Douglas v. Woodford*, 316 F.3d 1079 (9th Cir. 2003) ........................................... 65

*Duncan v. Ornoski*, 528 F.3d 1222 (9th Cir. 2008) ....................................... 55, 60

*Eddings v. Okla.*, 455 U.S. 104 (1982) ......................................................... *passim*

*Tennard v. Dretke* , 542 U.S. 274 (2004) .............................................................. 77

*Estelle v. Smith*, 451 U.S. 454 (1981) .................................................................... 92

*Fry v. Pliler*, 551 U.S. 112 (2007) ....................................................... 33, 101, 102

*Gregg v. Georgia*, 428 U.S. 153 (1976) ................................................................. 93

*Hendricks v. Calderon*, 70 F.3d 1032 (9th Cir. 1995) ........................................... 46

*Hildwin v. Florida*, 490 U.S. 638 (1989) ............................................................... 88

*Hurst v. Florida*, 136 S. Ct. 616 (2016) .......................................... 28, 29, 87, 88

*Johnson v. Zerbst*, 304 U.S. 458 (1938) .......................................................... 92, 97

*Kennedy v. Louisiana*, 554 U.S. 407 (2008) .......................................................... 76

*Kennedy v. Louisiana*, 554 U.S. 945 (2008) .......................................................... 76

*Kotteakos v. United States*, 328 U.S. 750 (1946) .................................................. 32

*Lambright v. Schriro*, 490 F.3d 1103 (9th Cir. 2007) ...................................... 65, 78

*Lambright v. Stewart*, 241 F.3d 1201 (9th Cir. 2001) ............................................ 74

*Lockett v. Ohio*, 438 U.S. 586 (1978) ..................................................... 76, 98, 100

*Lopez v. Schriro*, 491 F.3d 1029 (9th Cir. 2007) .................................................. 24

*Mayfield v. Woodford*, 270 F.3d 915 (9th Cir. 2001) ............................................ 47

*McCarthy v. United States*, 394 U.S. 459 (1969) .............................................. 92, 93

*McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015) .......................................... *passim*

*McKoy v. North Carolina*, 494 U.S. 433 (1990) ................................................... 84

*McMann v. Richardson*, 397 U.S. 759 (1970) ....................................................... 45

*Merolillo v. Yates*, 663 F.3d 444 (9th Cir. 2011) .................................................. 32

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) .......................................................... 53

*Murdaugh v. Ryan*, 724 F.3d 1104 (9th Cir. 2013) ...................... 26, 27, 28, 30, 32

*Padilla v. Kentucky*, 559 U.S. 356 (2010) .......................................................... 105

*Panetti v. Quarterman*, 551 U.S. 930 (2007) ................................................. 78, 100

*Parker v. Matthews*, 132 S. Ct. 2148 (2012) ........................................................ 96

*Payne v. Tennessee*, 501 U.S. 808 (1991) .......................................................... 101

*Penry v. Lynaugh*, 492 U.S. 302 (1989) ..................................................... 47, 76, 85

*Porter v. McCollum*, 558 U.S. 30 (2009) ............................................................. 85

*Pulido v. Chrones*, 629 F.3d 1007 (9th Cir. 2010) .............................................. 33

*Ring v. Arizona*, 536 U.S. 584 (2002) ............................................................ *passim*

*Rompilla v. Beard*, 545 U.S. 374 (2005) .................................................. 61, 69, 74

*Sansing v. Arizona*, 536 U.S. 954 (2002) ............................................................ 19

*Sansing v. Arizona*, 542 U.S. 939 (2004) ............................................................ 20

*Scott v. Schriro*, 567 F.3d 573 (9th Cir. 2009) ..................................................... 99

*Silva v. Woodford*, 279 F.3d 825 (9th Cir. 2002) ................................................. 24

*Skipper v. South Carolina*, 476 U.S. 1 (1986) ......................................... 98, 99, 100

v

*Smith v. Texas*, 543 U.S. 37 (2004) ....................................................... 77

*Spaziano v. Florida*, 468 U.S. 447 (1984) ............................................. 88

*Stankewitz v. Woodford*, 365 F.3d 706 (9th Cir. 2004) .......................... 64, 65, 108

*Strickland v. Washington*, 466 U.S. 668 (1984) ................................. *passim*

*Styers v. Ryan*, 811 F.3d 292 (9th Cir. 2015) ......................................... 89

*Styers v. Schriro*, 547 F.3d 1026 (9th Cir. 2008) ................................... 90

*Summerlin v. Schriro*, 427 F.3d 623 (9th Cir. 2005) ............................. 66

*Tennard v. Dretke*, 542 U.S. 274 (2004) ........................................... 47, 82, 84, 85

*Torrey v. Estelle*, 842 F.2d 234 (9th Cir. 1988) .................................... 96

*Turner v. Duncan*, 158 F.3d 449 (9th Cir. 1998) .................................... 47

*United States v. Ruiz*, 710 F.3d 1077 (9th Cir. 2013) ........................... 36, 37

*Valerio v. Crawford*, 306 F.3d 742 (9th Cir. 2002) ............................... 32

*Wallace v. Stewart*, 184 F.3d 1112 (9th Cir. 1999) ....................... 47, 64

*Walton v. Arizona*, 497 U.S. 639 (1990) ............................................. 84

*Wiggins v. Smith*, 539 U.S. 510 (2003) ........................................... *passim*

*Williams v. Ryan*, 623 F.3d 1258 (9th Cir. 2010) ............................. 89, 90

*Williams v. Taylor*, 529 U.S. 362 (2000) ......................................... *passim*

*In re Winship*, 397 U.S. 358 (1970) .................................................... 29

*Woodford v. Visciotti*, 537 U.S. 19 (2002) ......................................... 84

## Federal Statutes & Rules

28 U.S.C. § 811-12 ............................................................................ 78

28 U.S.C. § 2241 ................................................................................. 1

28 U.S.C. § 2254(d) ..................................................................... *passim*

28 U.S.C. § 1291 ................................................................................. 1

28 U.S.C. § 1651 ................................................................................. 1

Fed. R. App. P. 32 ............................................................................ 112

## State Cases

*Ex parte Smith*, No. AP-74,228, 2007 WL 1839892 (Tex. Crim. App. June 27, 2007) ...................................................................................... 89, 104

*Hurst v. State*, 202 So. 3d 40 (Fla. 2016) ........................................... 29

*Rauf v. State*, 145 A.3d 430 (Del. 2016) ............................... 29

*State v. Bocharski*, 189 P.3d 403 (Ariz. 2008) ...................... 39

*State v. Bolton*, 896 P.2d 830 (Ariz. 1995) ..................... 34, 104

*State v. Canez*, 42 P.3d 564 (Ariz. 2002) ........................ 31, 43

*State v. Canez*, 74 P.3d 932 (Ariz. 2003) .............................. 43

*State v. Cropper*, 76 P.3d 424 (Ariz. 2003) ........................... 31

*State v. Djerf*, 959 P.2d 1274 (Ariz. 1998) ........................... 83

*State v. Finch*, 46 P.3d 421 (Ariz. 2002) .............................. 40

*State v. Finch*, 68 P.3d 123 (Ariz. 2003) ......................... 31, 41

*State v. Gretzler*, 659 P.2d 1 (Ariz. 1983) ............................ 38

*State v. Hoskins*, 14 P.3d 997 (Ariz. 2000) ........................... 84

*State v. Jones*, 72 P.3d 1264 (Ariz. 2003) ............................ 31

*State v. Lacy*, 929 P.2d 1288 (Ariz. 1996) ............................ 39

*State v. Lee*, 944 P.2d 1204 (Ariz. 1997) ............................. 79

*State v. Lehr*, 67 P.3d 703 (Ariz. 2003) .............................. 31

*State v. Martinez*, 999 P.2d 795 (Ariz. 2000) ........................ 69

*State v. Montano*, 77 P.3d 1246 (Ariz. 2003) ................ 31, 37, 38

*State v. Moody*, 94 P.3d 1119 (Ariz. 2004) ....................... 30, 31

*State v. Murdaugh*, 97 P.3d 844 (Ariz. 2004) .................... 20, 26

*State v. Nordstrom*, 77 P.3d 40 (Ariz. 2003) .................... 31, 43

*State v. Pandeli*, 65 P.3d 950 (Ariz. 2003) ........................... 31

*State v. Phillips*, 67 P.3d 1228 (Ariz. 2003) ......................... 31

*State v. Poland*, 698 P.2d 183 (Ariz. 1985) .......................... 37

*State v. Prince*, 250 P.3d 1145 (Ariz. 2011) ......................... 40

*State v. Ring (Ring III)*, 65 P.3d 915 (Ariz. 2003) .............. *passim*

*State v. Ross*, 886 P.2d 1354 (Ariz. 1994) ............................ 79

*State v. Sansing (Sansing II)*, 77 P.3d 30 (Ariz. 2003) ......... *passim*

*State v. Sansing*, 26 P.3d 1118 (Ariz. 2001) ..................... *passim*

*State v. Soto-Fong*, 928 P.2d 610 (Ariz. 1996) ....................... 38

*State v. Styers*, 254 P.3d 1132 (Ariz. 2011) ..................... 90, 91

*State v. Trostle*, 951 P.2d 869 (Ariz. 1997) ........................... 99

*State v. Tucker*, 68 P.3d 110 (Ariz. 2003) ........................... 43

*State v. Wallace*, 272 P.3d 1046 (Ariz. 2012) ....................... 39

*State v. Wallace*, 728 P.2d 232 (Ariz. 1986) ........................ 37

*State v. Wallace*, 773 P.2d 983 (Ariz. 1989) ....................... 84

## State Statutes & Rules

Ariz. Rev. Stat. § 13-703 ........................................ 27, 81, 102

Ariz. Rev. Stat. § 13-752 ............................................... 96

Ariz. R. Evid. 802 .................................................... 109

**Introduction**

This case has received intense scrutiny from the media and the public. While the attention is understandable due to the tragic and difficult-to-understand circumstances of the crime, John Edward Sansing is more than this terrible act he committed while under the influence of crack cocaine. Unfortunately for everyone involved, from the time of Sansing's birth, he was on a crash course toward the situation that led to the crime. As discussed below, his childhood full of neglect and abuse led to his drug and alcohol use in early adolescence and his teenage years, and he repeated the dysfunctional and damaging patterns from his childhood in his own family. Perhaps due to the nature of the crime, the state and district courts failed to remedy numerous violations of Sansing's federal constitutional rights and he deserves a fair hearing in this Court.

**Jurisdictional Statement**

Sansing is an indigent death-row prisoner in the custody of the Arizona Department of Corrections. On February 7, 2013, the United States District Court for the District of Arizona entered a final order denying Sansing's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (ER 5.) The district court had jurisdiction over this case pursuant to 28 U.S.C. §§ 2241 and 2254. Following the district court's order, Sansing filed a timely notice of appeal. (ER 1.) This Court has jurisdiction over the appeal pursuant to 28 U.S.C. §§ 1291, 1651, and 2253.

1

**Statement of the Issues Presented for Review**

*Certified Issues*

Claim One

Sansing was denied the right to a jury trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

Claim Two

Sansing was denied effective assistance of counsel during the penalty phase of his capital murder trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution because counsel failed to investigate and present mitigating evidence.

Claim Seven

The trial court and the Arizona Supreme Court violated Sansing's Eighth and Fourteenth Amendment Rights to the consideration of all relevant mitigating evidence when, contrary to clearly established federal law, they refused to consider mitigating factors that did not have a "causal nexus" to the crime.

Claim Eight

Sansing's guilty plea was not knowing, intelligent, or voluntary because the written factual basis established an aggravating factor without Sansing's waiver of privilege against self-incrimination, in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

Claim Twelve

The trial court violated Sansing's rights under the Eighth and Fourteenth Amendments to the United States Constitution when it failed to find and/or consider the victim's daughter's wishes as a mitigating factor.

*Uncertified Issue*

Claim Four

Sansing was denied effective assistance of counsel in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution because trial counsel failed to properly advise Sansing about the consequences of his plea, stipulated factual basis, and sentencing stipulation.

## Statement of the Case

This appeal arises from the district court's denial of a petition for writ of habeas corpus.[1] Sansing pled guilty to first-degree murder, kidnapping, armed robbery, and sexual assault, and was sentenced to death by his trial judge. *State v. Sansing*, 26 P.3d 1118 (Ariz. 2001), *supplemented by* 77 P.3d 30 (Ariz. 2003). After exhausting his state appeals, Sansing filed a federal habeas petition in the

---

[1] In addition to filing a writ of habeas corpus, Sansing also filed a motion for evidentiary development in which he sought to expand the record to include a report by Dr. Robert Heilbronner who evaluated him in 2011. (PSER 34-46.) Dr. Heilbronner provided diagnostic impressions of Major Depressive Disorder, recurrent, severe with paranoid features (by history); Psychostimulant Dependence and Abuse; Intermittent Explosive Disorder; Cognitive Disorder, NOS; and R/O Post Traumatic Stress Disorder, chronic from childhood. (PSER 45.) Among the other documents included in the motion was a police report of the residence at 3846 West Alice burglarized between the dates of March 5 and 7, 1998 (PSER 47-50); a declaration signed by Sansing's son, Joshua Sansing, describing Sansing's drug use and the events of the offense (PSER 1-2); a 1989 child neglect police report involving Sansing's mother Glenda and younger half-sister Loretta that resulted in 11-year-old Loretta being transported to a foster home (PSER 24-32); and several marriage and divorce documents connected to Glenda (PSER 3-23). The district court denied Sansing's motion to expand the record when it denied the relevant claims. (ER 82-83.)

3

district court. (Dist. Ct. ECF No. 35.) The district court denied Sansing's petition (ER 5), issued judgment in the case (ER 4), and granted five certificates of appealability (ER 83). Sansing filed a timely notice of appeal from the district court's judgment. (ER 1.)

## I.    Factual Background

In the two years immediately after Glenda and Allen Sansing were married as teenagers, they had two children together: Allen and Patsy. (ER 367; ER 348.) Glenda and Allen later separated because Glenda became pregnant during an affair with another man while Allen was deployed by the military. (ER 348.) Just two months after Allen returned from deployment and sought a divorce, Glenda gave birth to her third child, Susan. (ER 348.) Before the divorce was finalized, the two briefly reunited. (ER 348.) Glenda became pregnant again, and gave birth to her fourth child, John Edward Sansing. (ER 348.)

Shortly after Sansing's birth, Glenda left Utah and moved her four children back to her family in Alabama. (ER 348.) Sansing did not see his father again until he was seventeen years old. (ER 351.) In Alabama, Glenda received food stamps and welfare, and lived in low-income housing. (ER 345; ER 348.) Even with food stamps, the children often did not have enough food. Glenda used the food stamps to buy her own favorite foods, which she carefully monitored. If the children took some of Glenda's food, they were whipped. (ER 360; ER 986-87.) The children

were not permitted to eat anything from the family's refrigerator. (ER 1023-24.) The utilities were frequently turned off, and as a result, there was often no water, heat, or food in the home. (ER 995; ER 1023.)

Glenda heavily abused alcohol. (ER 381.) During the week, Glenda left her children at home alone while she went to work or went out partying, and she would put the oldest siblings, who were only ten and eleven years old at the time, in charge of their siblings while she was gone. (ER 348; ER 373.) Despite the lack of money for food and utilities, Glenda always had enough money to go out partying, "do her dancing," and "get her bouffant hairdo." (ER 994-95; ER 1023.)

Glenda married a second time, to Silas "Junior" Skinner, a widower with three daughters. (ER 349.) Glenda and Skinner drank "all the time." (ER 384.) Skinner was physically abusive toward Glenda, and she was emotionally and verbally abusive towards him. Glenda and Skinner would fight often, and the fights could last for days. (ER 384.) During these fights, the children were often forced to sit on the couch and watch Skinner beat their mom. (ER 983-84.) Sansing and his siblings witnessed their mother being beaten, choked, knocked out of a chair, shoved out the front door, and, more than once, watched her break a window and cut herself to get back into the house. (ER 385.) The children could hear their mother screaming, but they were not allowed to move. (ER 385.) The children would scream at Skinner, telling him to "leave my mom alone." (ER 386.) Skinner

5

would look at them with "fire in his eye" and tell them to "get their ass back on the couch." (ER 386.) In one incident, Glenda jumped out of a car after she was "smacked" by Skinner, and he ran over her legs with the car. (ER 384; ER 328.) All the children were screaming, including Sansing. Skinner went back and picked Glenda up, and they acted like nothing happened. (ER 384.) Skinner would chase Glenda through the nearby woods while they yelled at each other. (ER 385.)

On other occasions, Sansing and his siblings were made to sit outside on the curb until the fighting ended. (ER 386.) They would wait for hours, sometimes through the night or in rainstorms, often missing meals. Their mother would not allow them to eat until the fight was over because the food they had was Skinner's food. The children would go inside in the morning to change clothes and go to school. (ER 983-85; ER 1018; ER 386.) These fights often did not end until Glenda was taken to the hospital by ambulance. She would demand that the kids go to the hospital with her. (ER 385; ER 312.) After she was released from the hospital, she and Skinner would leave "arm in arm." He was never put in jail for any of his assaults on Glenda. (ER 385)

In addition to the constant drinking and domestic violence of his parents, Sansing himself was subjected to both physical and verbal abuse. Sansing remembers "craters" on his head from being hit with a spoon for not eating his vegetables at mealtime. (ER 391.) Skinner paddled and slapped the children;

6

Glenda hit them with hickory switches or grabbed them by the arm and dug her fingernails into their skin, leaving bruises. (ER 391.) She forced the siblings to choose which switch she would use on the child she was about to beat. (ER 391-92.) Glenda was always tired, either from working or after a night out on the town. The children were not allowed to play outside, but if they woke her up, "there would be hell to pay." (ER 392.) She yelled at the children constantly. (ER 392.) Glenda and Skinner divorced when Sansing was ten years old. (ER 349.)

After Glenda's divorce from Skinner, Glenda had men over to their house regularly. She kept her bedroom door open while she had sex with these men, and the children could see and hear them. (ER 373-74.) The family moved frequently. Allen and Patsy were responsible for the younger children, including getting them ready for school, bathing them, bedtimes, cleaning their rooms, and fixing whatever food they had to eat. (ER 372-373; ER 312.) Allen stole from his mother's purse to purchase food or school lunch for the family, and sometimes he stole food for his siblings from stores. Welfare workers or police deputies came to the house on several occasions and found the home in unacceptable condition, where only the "bare essentials" were being provided. (ER 360; ER 373; ER 379.)

Sansing's relationships with his siblings were an additional source of dysfunction because they also emotionally and physically abused him. Allen was five years older than Sansing, and was considerably larger and stronger. Allen

7

would hit Sansing's head against the wall, pinch him so hard it hurt, and slap his face. (ER 397-98.) Allen often dared Sansing to steal cigarettes, and Sansing would do it to "fit into the crowd." (ER 402.) Sansing felt unattached to his siblings because they picked on him, manipulated him into stealing things, physically dominated and threatened him, or ignored him. (ER 416.) There was also sexual abuse and incest within the family. Glenda's maternal uncle molested Patsy and other female cousins. When Patsy told her grandmother, she refused to discuss it and told Patsy not to talk about it. (ER 401.) When Glenda found out about it, she blamed Patsy, saying that she should not have worn a nightgown. (ER 401.) Later, Allen began molesting his sister Patsy. Allen also tried to molest Susan, but she "freaked" when he attempted it, and this scared him off. (ER 401.)

When Glenda went out, Sansing's siblings had friends over to their house to party. They drank alcohol and smoked cigarettes and marijuana with their friends, and "John was right there with us." (ER 402.) He was ten to twelve years old. Allen's friends dared Sansing to smoke marijuana or drink alcohol, and he did. (ER 403.) Sansing's sister Susan found Sansing "high on marijuana" when he was about eleven years old and "caught him sniffing gas and glue on occasion." (ER 403.) The experience of being high on glue was like things would go in slow motion; he would get "tunnel vision." (ER 404.) The high made him feel happy, but quickly dissipated, so he would do more. (ER 404.) Sansing was depressed and

alone much of the time. (ER 380; ER 431.) He would earn money from cutting grass and would give some to his mother and use the rest for drugs. When this was not enough, however, he stole or hung out with others who had drugs. (ER 404.) Marijuana settled his nerves, relaxed him, and helped him "deal with life." (ER 404.) As a teenager, he took pills, including amphetamines, and he tried acid and crystal methamphetamine, which he obtained through friends. (ER 404.) Sansing was lonely when he did not have drugs to use, and if he was not able to get drugs, it would make him angry. He said that, "being high made me cheerful, so (I) wanted more of it. (I) would be happy all day, get along all day." (ER 405 (alteration in original).)

One year after Glenda's divorce from Skinner, when Sansing was eleven years old, Glenda married Roy Dooley. (ER 374.) Dooley "was mean, been in jail, toted a straight blade, liked his whiskey." (ER 988.) Dooley was an alcoholic, and Glenda and Dooley had a physically abusive relationship. (ER 374.) Dooley also beat both Sansing and Allen. (ER 988-90.) When he got drunk, he would force Sansing or Allen to physically fight him in the backyard so that he could show them "what a real man can do." (ER 989.) Although Allen was about sixteen years old at the time, and played football, Sansing was only eleven and was small for his size. (ER 989-90.) Dooley would take a belt, pick Sansing up, and then hit him until Dooley got tired. (ER 990.) Once, when all the kids were playing together,

Dooley went over and jerked Sansing by the arm and "beat him with a belt all the way to the house," leaving him covered in bruises. (ER 1029-30.) Glenda gave birth to another daughter named Loretta during this relationship, but Dooley did not believe Loretta was his child. Glenda and Dooley divorced shortly thereafter. (ER 374; ER 349.)

Around this time, Sansing engaged in two petty burglaries: On a dare, Sansing broke into an apartment, was caught, and put on probation. While on probation, he broke into the local school and was placed in Roebuck Detention Center when he was thirteen years old. (ER 375-76.) Sansing was a constant target for bullies at Roebuck. (ER 1088.)

School was not an escape for Sansing. He was given at least two IQ tests as a child, one revealing an IQ of 75 (ER 306), and the second placing him in the "borderline range of mental ability" (ER 1146). His intelligence was in the range between mental retardation and the lowest level of normal functioning. (ER 366.) Sansing liked school when he started, but it quickly turned into a frustrating and hopeless situation for him. (ER 317; ER 406.) In elementary school he tried to learn his lessons and was told to do his work without receiving help. He found his math homework, including multiplication and division, "hard to do." (ER 407.) Sansing "seemed to get basic stuff in first and second grade," but found it hard to learn to tie his shoes and he did not like to read. (ER 407.) In middle school, he

found the subjects "hard." (ER 408.) He would listen to his teachers and not understand them. (ER 408.) They would "tell me something, and 10 minutes later I couldn't tell you what they told me." (ER 408.) He would read something, but not understand it. From the sixth grade on, he never really comprehended or understood the material. (ER 408.) Sansing's standardized test scores were more than two grade levels behind his actual grade in reading, spelling, and language (ER 308), and he met the criteria for a learning disability, yet never received any special education services or assistance. (ER 408.)

At Roebuck, he completed the eighth grade. (ER 410.) After his release from Roebuck when he was fifteen, he was promoted to the ninth grade. Although he was living with Glenda at the time, he apparently did not immediately enroll when high school started that year. (ER 307.) When he did enroll in school, he failed all of his subjects and quit school the following year. (ER 410.)

After Sansing left school, Glenda and her fourth husband Floyd Smith bought him a bus ticket and sent him to Utah to live with his father. (ER 351.) Within months, Sansing's father caught him selling marijuana with Patsy's boyfriend and kicked him out. (ER 351; ER 378.) Sansing was just sixteen years old. (ER 378.) He moved in with Patsy and her boyfriend, who supported and enabled his drug use through their own use and addiction. (ER 378.) At times the

11

three were homeless and sought shelter and food from local authorities. Sansing, still a teenager, slept on the floor, and they all used drugs. (ER 378.)

When Sansing was seventeen years old, he met fifteen-year-old Kara Lamphere. (ER 351.) Kara became pregnant within two months of meeting Sansing, and they got married and had four children in the next four years. (ER 351-52; ER 417.) Sansing and Kara, who both had serious substance abuse problems, squandered Kara's trust fund from a settlement to support their rampant addictions to alcohol, marijuana, and methamphetamine. Sansing's drug use had become his only way of coping with stress. (ER 417.)

In 1995, Sansing moved his family to Arizona to live with Patsy. (ER 352.) In the months preceding the crime, their drug use escalated. To buy drugs, Sansing sold most of their belongings and stole purses. (ER 1108.) The little money Sansing and Kara earned also went to drugs. (ER 437.) He would smoke methamphetamine daily, engaging in binges in which he would stay awake for three or four days at a time. (ER 425-26; ER 436-37.) Patsy and her husband introduced Sansing and Kara to crack cocaine, and it took over their lives. (ER 404.) About a month before the crime, crack cocaine became Sansing's drug of choice. (ER 437.) He repeated the same binging process he had developed with methamphetamine. In fact, in the four days before the crime occurred, Sansing and

Kara had smoked between $750 and $2000 worth of crack cocaine. (ER 343; ER 353.)

## II. The Crime

On February 24, 1998, Kara went to work while Sansing stayed at home with the kids. (ER 1334-35.) Sansing asked Kara to steal $20 from her job to buy more crack cocaine. (ER 888; ER 437.) While Kara was at work, Sansing called her two or three times to discuss getting more drugs. (ER 1335.) During one of those calls, Sansing explained to Kara that he had unsuccessfully tried to obtain an advance on his paycheck. (ER 1336.) Later, Sansing called Kara to tell her that he had obtained a $20 rock of crack cocaine as an advance from their drug dealer and was smoking it then. (ER 1337.) Kara informed Sansing that she was unable to steal $20. (ER 437.) On the phone, Sansing sounded "hyped up" and "anxious." (ER 1224.) Around the same time, Sansing called a local church and asked that a food box be delivered to their home. (ER 1337; ER 1401.) Sansing had previously been able to trade a turkey for a $20 rock of crack cocaine, and he hoped to do the same with this food delivery. (ER 437.)

Kara arrived home from work around 3:30 p.m. (ER 437.) Sansing was nervous, pacing, and agitated. (ER 1224.) Sansing was not acting as he had on previous occasions after smoking crack cocaine. (ER 1225.) Sansing was "cold," as if he was "in another world" and "spac[ed] out." (ER 1225.) "It wasn't my

13

husband. It wasn't his normal. Even though he has smoked crack before, he wouldn't act the way he did that day." (ER 1225.)

High on crack cocaine and needing to find a way to pay for the drugs he had already smoked, Sansing and Kara discussed a plan to steal a purse from whoever delivered the church's food box. (ER 1340; ER 437.) They would do this by sending one of the children out to the person's car to steal her purse while Kara and Sansing distracted the person in the house. (ER 437; ER 888.) The testimony at trial established that the only plan was to rob the victim. (*See* ER 1300; ER 1340.) After discussing their plan, Sansing and Kara smoked some more crack cocaine. (ER 1341; ER 437.)

That afternoon, the victim delivered two food boxes to the Sansing house. (ER 1341-42.) She walked into the kitchen with one box and was followed by Kara carrying the other box. (ER 1342.) As she talked with Kara, one of the Sansing children went out to her car to steal her purse. (ER 437; ER 888.) However, the victim's car was locked and the children came in the home to inform Sansing that the plan would not work. (ER 438.) Sansing made a hand gesture to Kara apparently indicating that they could not get the purse. (ER 438.) High on crack cocaine, Sansing became irrationally worried that the victim knew what his hand gesture meant and that he was doing something illegal. (ER 438.) Sansing became

14

convinced that the victim would call the police regarding his drug use. (ER 438-39.)

Because he was on drugs and under stress, he perceived the victim as a threat. "Complete blackness" came over him and everything went dark. (ER 438.) Sansing's heart began racing so fast that he felt as though he was going to die, and he began having a psychotic response to the drugs. (ER 426; ER 438.) He could not see the victim anymore, but just saw the outline of her figure. (ER 438.)

Sansing's cognitive impairments, coupled with the crack cocaine, led him to act in an irrational and violent manner. He overreacted to the non-existent threat he perceived and grabbed the victim from behind. (ER 438.) He threw her to the floor and proceeded to tie her up. (ER 438; ER 1345-46.) During this time Kara was yelling at Sansing, but he could not respond. (ER 438.) After Sansing tied up the victim and placed a sock in her mouth, he hit the victim on the head with sufficient force to knock her unconscious. (ER 1353-55.) The brain damage to the victim from that blow was such that she likely never regained consciousness. (ER 1253.)

Still high and paranoid, Sansing began to panic. (ER 438-39.) He looked out of the window frequently, convinced that police were on their way. He decided to move the victim's truck. (ER 1365-66; ER 438-39.) When he returned, he moved the unconscious victim to his bedroom, where he covered her with clothing. (ER 1356; ER 1366.) Sansing and Kara then called their drug dealer to buy more crack

cocaine. (ER 439.) They traded some of the victim's jewelry for the drugs and smoked again. (ER 439.)

Displaying even more highly irrational thinking, Sansing decided that if he made the crime look like a robbery and rape, then police might think that someone else attacked the victim. (ER 439.) Consequently, Sansing raped and stabbed the victim. (ER 1362.) At some point, Sansing again called his drug dealer and smoked more crack cocaine. (ER 439; ER 1367-70.) Sansing took the victim's body to the backyard and placed her between the fence and a shed. (ER 1307.) However, the fence was less than five feet tall and anyone "could just walk up to it from the alley and look over" and see the victim's body there. (ER 1307.)

The next morning, Sansing went to work. (ER 1373.) As his high wore off and he came out of his psychosis, Sansing was intensely remorseful for what he had done. He left work and went to his sister Patsy's house to confess what he had done and called his mother before turning himself in to law enforcement. (ER 1189.) After Patsy talked to their father Allen, Allen contacted the police, and Patsy told Sansing that the police were on their way to arrest him. (ER 1189-90.) Sansing made no attempt to escape or evade arrest. (ER 1190.) He waited until the police arrived at Patsy's home and peacefully walked outside to be arrested. (ER 1190.)

16

## III.    Procedural History

### A.    Trial

Only six months after the crime, Sansing appeared before the trial court to enter a guilty plea admitting to first-degree murder and other dangerous offenses, with the state seeking the death penalty and having offered no plea agreement. On the first day of the sentencing phase, trial counsel Emmet Ronan entered a stipulation with the state containing the hearsay statements of the Sansings' children. (ER 1107.) In those statements, the children say they knew their father planned to rob the victim. (ER 1108.) In addition, the stipulation contains a hearsay statement that Sansing allegedly made to a news reporter wherein he says the victim was conscious when he returned from moving her truck. (ER 1110.) The state alleged three aggravating circumstances: that the defendant had convictions for serious offenses, had committed the murder in expectation of pecuniary gain, and had committed the offense in an especially cruel, heinous, or depraved manner. (ER 1380.) The state called several witnesses to prove the aggravating circumstances.

The medical examiner testified that the victim died from multiple stab wounds and blunt force head trauma. (ER 1274.) He testified that while it was possible that the victim could have regained consciousness after sustaining that blow to her head, he doubted she would have. (ER 1253.) In addition, Kara

17

testified against Sansing in exchange for a lighter sentence. (ER 1376.) With respect to cruelty, Kara initially testified that the victim made no statement during the sexual assault. (ER 1360.) The prosecutor impeached her with an earlier statement to the police that she heard the victim speak to Sansing during the sexual assault. (ER 1360.) Once impeached with her prior statement, Kara testified that the victim was conscious during the sexual assault. (ER 1360-61.)

Ronan did not submit testimony from any witnesses in mitigation, and did not present testimony or reports from any expert witnesses or from family members regarding Sansing's abusive upbringing. Glenda, Patsy, Allen, and Kara were all present at the hearing, but Ronan did not question them about the horrific abuse and neglect Sansing suffered as a child, Sansing's struggles as a result of his cognitive deficits, or what they witnessed of Sansing's drug abuse and addiction. Instead, Ronan merely allowed the family members to make brief statements pleading the court for mercy.

Trial counsel directed a mitigation specialist to prepare a report on Sansing's personal history, but then presented no testimony, lay or expert, about the results of that investigation. Counsel submitted a sentencing memorandum arguing against the alleged aggravating factors, but acted in apparent ignorance of both the plea agreement's written factual basis and the sentencing stipulation. (*See* ER 1149-69; ER 1401; ER 1105-11.)

18

The judge found two aggravating circumstances had been proven beyond a reasonable doubt and imposed a sentence of death, expressly relying on the factual basis to Sansing's plea and the stipulation in finding the cruelty factor. (ER 258-261.) The judge found that the few factors proposed by Sansing as mitigating circumstances, when balanced against the especially cruel manner in which the victim was murdered, were not sufficiently substantial to call for leniency. (ER 270.)

## B. Direct Appeal Proceedings

In Sansing's first direct appeal opinion, the Arizona Supreme Court struck down the trial court's finding of the pecuniary gain aggravating circumstance, but upheld Sansing's death sentence after finding that the mitigation presented was not substantially sufficient to overcome the sole remaining aggravating circumstance. *State v. Sansing*, 26 P.3d 1118, 1131 (Ariz. 2001) ("*Sansing I*"). (ER 246.) The Supreme Court granted Sansing's subsequent petition for certiorari, remanding his case for further consideration in light of *Ring v. Arizona*, 536 U.S. 584 (2002). *See Sansing v. Arizona*, 536 U.S. 954 (2002) (mem.). (ER 216-20.) On remand, Sansing's case was consolidated with those of thirty-one other capital defendants whose cases were not yet final, and the Arizona Supreme Court ultimately concluded that the *Ring* error in all the cases was not structural, but was subject to harmless error analysis. *State v. Ring*, 65 P.3d 915 (Ariz. 2003).

19

Following supplemental briefing in Sansing's case, the Arizona Supreme Court found the *Ring* error to be harmless and, once again affirmed his death sentence. *State v. Sansing*, 77 P.3d 30 (Ariz. 2003) ("*Sansing II*"). (ER 103-27.) When considering Sansing's motion for reconsideration of this decision, the Arizona Supreme Court was equally divided, with two justices voting for remand, two voting against, and one recusing himself. (ER 1112.) Because the court was equally divided, it denied the reconsideration motion. (ER 1112.) Notably, Sansing was one of only two cases in which the Arizona Supreme Court found the *Ring* error to be harmless. *See also State v. Murdaugh*, 97 P.3d 844, 862 (Ariz. 2004). In more than twenty other cases, the court vacated the death sentences and remanded the cases for jury resentencing. The Supreme Court denied Sansing's petition for certiorari from this opinion. *Sansing v. Arizona*, 542 U.S. 939 (2004). (ER 102.)

## C.     Post-Conviction Relief ("PCR") Proceedings

Following briefing from Sansing and the state, the PCR court found that Sansing's claim of ineffective assistance of trial counsel was colorable and ordered an evidentiary hearing. (ER 101.) The court denied relief on all other claims. (ER 101.) Following a four-day evidentiary hearing on the ineffectiveness of trial counsel, the PCR court denied relief. (ER 85-99.) The Arizona Supreme Court issued a one-word denial of Sansing's petition for review, and issued a warrant of execution. (ER 84.)

20

### D. District Court Proceedings

Following initial filings in the district court, the court appointed undersigned counsel to represent Sansing and issued a stay of the warrant of execution. (Dist. Ct. ECF No. 7; Dist. Ct. ECF No. 8.) By order of the court, Sansing was required to file his petition for writ of habeas corpus just five months after counsel was appointed, well before the AEDPA statute of limitations had expired. (Dist. Ct. ECF No. 22; Dist. Ct. ECF No. 35.) After further briefing, the court denied relief on each of Sansing's claims, granted five certificates of appealability, and entered judgment against him. (ER 5-83; ER 4.) Sansing timely appealed to this Court. (ER 1.)

Pursuant to this Court's scheduling orders, the parties filed the opening, answering, and reply briefs. (Ninth Cir. ECF Nos. 10-2, 21-1, 33.) On January 7, 2016, the Court ordered the parties to file supplemental briefing addressing the effect of *McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015) (en banc), on the issues in this case. (Ninth Cir. ECF No. 38.) Because Respondents-Appellees intended to file a petition for certiorari from that opinion, the parties filed a joint motion to stay the briefing schedule pending the outcome of that petition and the Court granted it. (Ninth Cir. ECF Nos. 41, 42.) After certiorari was denied, the parties filed a joint status report, and the Court issued an order striking the previously filed briefs and ordering the parties to file replacement briefs. (Ninth Cir. ECF No. 44.) This

21

replacement opening brief is timely filed in accordance with this Court's order of February 8, 2017. (Ninth Cir. ECF No. 50.)

## Summary of the Argument

Sansing raises five claims that were certified for appeal by the district court, and one that has not yet been certified.

First, the Arizona Supreme Court erred in finding that the *Ring* error in Sansing's case was harmless and by denying him a resentencing by jury. There was a clear question of fact regarding the evidentiary basis of the sole aggravating factor. Furthermore, there was compelling mitigating evidence improperly discounted by the state courts which could have lead a rational juror to return a life sentence.

In addition, Sansing was denied the effective assistance of counsel when his trial counsel failed to investigate, develop, and present significant and compelling evidence in mitigation of Sansing's crime. Counsel did not conduct a reasonable mitigation investigation, and although he consulted with several experts, he failed to provide them with the materials necessary to conduct their evaluations. He did not present any expert testimony at sentencing and did not call any witnesses, choosing instead to have Sansing and three of his family members ask the court for mercy. Sansing was prejudiced by this failure because the evidence that trial

counsel did not present could have been enough to call for leniency or to compel the Arizona Supreme Court to remand his case for a jury resentencing.

Sansing was also deprived of his Eighth Amendment right to individualized sentencing when both the trial court and the Arizona Supreme Court failed to consider and give appropriate effect to his mitigation evidence because it was not causally connected to the crime. This violation had a substantial and injurious effect on his sentence.

Furthermore, because of counsel's ineffective advice during his plea proceedings, Sansing's plea was not knowingly, intelligently, or voluntarily given. Had Sansing known that agreeing to the factual basis and sentencing stipulation would both waive his rights against self-incrimination at the penalty phase and incorrectly establish the only aggravating factor, he would not have agreed to them and there is a reasonable probability that the outcome of sentencing and the Arizona Supreme Court's review would have been different.

Next, the state courts erred in failing to consider the victim's daughter's wishes regarding Sansing's sentence. Under Supreme Court precedent, the victim's daughter's wishes constituted relevant mitigating evidence because they could have reasonably been found to warrant a sentence less than death and should have therefore been considered with the other mitigation evidence when determining whether the mitigation was sufficiently substantial to call for leniency.

23

Finally, Sansing was denied effective assistance of counsel during his plea negotiations because counsel failed to advise Sansing of the consequences of his plea, factual basis, and sentencing stipulation. Counsel improperly advised Sansing to sign an incorrect factual basis and sentencing stipulation that were not needed for his guilty plea and that conclusively established the sole aggravating factor in his case.

## Standard of Review

This Court reviews *de novo* a district court's denial of habeas relief. *Lopez v. Schriro*, 491 F.3d 1029 (9th Cir. 2007); *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003), *overruled on other grounds by Hedlund v. Ryan*, 815 F.3d 1233 (9th 2016). It reviews the district court's factual findings for clear error. *Alcala v. Woodford*, 334 F.3d 862, 868 (9th Cir. 2003). Claims alleging ineffective assistance of counsel are mixed questions of law and fact, and are reviewed *de novo*. *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002). Sansing's federal habeas corpus petition was filed after April 24, 1996, and is therefore governed by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 ("AEDPA")

**Argument**

*Certified Issues*

**Claim One**

**Sansing was denied the right to a jury trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution**

This claim was raised and denied on direct appeal. *State v. Ring* (*Ring III*), 65 P.3d 915, 933-36 (Ariz. 2003); *State v. Sansing* (*Sansing II*), 77 P.3d 30, 33-39 (Ariz. 2003). The district court denied it on the merits. (ER 11-29.)

## I. The deprivation of a jury sentencing had a substantial and injurious effect on Sansing's sentence.

Sansing was sentenced to death by an Arizona judge, who made the findings regarding the aggravating and mitigating factors and decided whether the mitigation was sufficiently substantial to call for leniency. (*See* ER 255-71.) In Sansing's direct appeal, the Arizona Supreme Court affirmed Sansing's sentence even though it struck one of the two aggravating factors during its independent review. *Sansing I*, 26 P.3d at 1124, 1131. Sansing filed a petition for writ of certiorari from this opinion; the United States Supreme Court granted certiorari based on *Ring v. Arizona*, 536 U.S. 584 (2002), vacated the judgment, and remanded the case to the Arizona Supreme Court. *Sansing v. Arizona*, 526 U.S. 954 (2002) (mem.).

25

Following the remand, the Arizona Supreme Court consolidated Sansing's case with the other 26 defendants whose cases were not yet final at the time the *Ring* opinion was issued. *See Ring III*, 65 P.3d 915. The court then decided that *Ring* error could be reviewed for harmlessness, *id.* at 933-36, and issued a separate opinion in Sansing's case finding the *Ring* error harmless as applied to him, *Sansing II*, 77 P.3d at 39. Sansing's case was one of only two cases in which the Arizona Supreme Court found the error harmless. *See also State v. Murdaugh*, 97 P.3d 844 (Ariz. 2004). In Murdaugh's case, this Court reversed the district court's denial of Murdaugh's federal habeas petition as to this claim, and directed the district court to grant Murdaugh a writ of habeas corpus and remand the case to the state courts for a new sentencing. *Murdaugh v. Ryan*, 724 F.3d 1104, 1121 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 2840 (2014). Sansing's case should be reversed for the same reasons that Murdaugh was granted relief, because the state court's unreasonable application of *Ring* had a substantial and injurious effect on the sentence in his case.

## A. The district court incorrectly applied Ring when analyzing this claim.

The district court denied this claim after only reviewing the state court's analysis of the (F)(6) aggravating factor, and after finding that, "[t]o the extent the Arizona Supreme Court chose to include review of mitigation as part of its harmless error analysis, it did so as a matter of state law." (ER 29.) The district

26

court's conclusion was based on its determination that *Ring II*, 536 U.S. 584, only requires a jury to determine the aggravating factors in a capital case. (ER 29.) Such an analysis is flawed because, under the Arizona capital sentencing structure, *Ring II* requires that a jury review both the aggravating and mitigating factors to determine whether a death sentence is justified. *See Murdaugh*, 724 F.3d at 1115 ("In [*Ring*], the Supreme Court described several determinations that had to occur under Arizona law before a defendant became death-eligible, including the judge's determination that 'there are no mitigating circumstances sufficiently substantial to call for leniency."); *see also id.* at 1117 (explaining that under *Apprendi* and its progeny, "how a fact is labeled is irrelevant to the *Apprendi* analysis . . . [i]t is the *effect* that dictates whether a jury must determine it" (emphasis added) (internal citations omitted)); *see also Allyene v. United States*, 133 S. Ct. 2151, 2155 (2013) (reaffirming the principle that any fact that has the effect of increasing the penalty for a crime must be submitted to the jury).

Under Arizona's sentencing scheme, the trier of fact not only has to find the presence of at least one aggravating factor, but also has to "determine whether mitigating circumstances call for leniency." *Ring III*, 65 P.3d at 946. Thus, to qualify for the death penalty, the sentencing judge had to find "at least one aggravating circumstance *not outweighed* by one or more mitigating factors." *Id.* at 935 (citing Ariz. Rev. Stat. 13-703(E)) (emphasis added). This Court correctly

concluded that, under the Supreme Court's holdings in *Ring II* and *Apprendi*, "the existence or absence of a mitigating circumstance was thus a finding of fact upon which the 'increase of a defendant's authorized punishment [was] contingent.'" *Murdaugh*, 724 F.3d at 1115 (quoting *Ring II*, 536 U.S. at 602).

The correctness of this Court's holding has been exemplified by the recent decision in *Hurst v. Florida*, 136 S. Ct. 616 (2016), which held that the failure to require a jury to determine the relative weight of aggravating and mitigating factors beyond a reasonable doubt violates the Sixth Amendment right to a jury trial as well as the Fourteenth Amendment Due Process Clause. *Id.* at 621. The Court reiterated the Sixth Amendment's basic requirement that "any fact that 'expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict' is an 'element' that must be submitted to a jury." *Hurst*, 136 S. Ct. at 621 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494 (2000)). The *Hurst* Court emphasized that under *Ring*, 536 U.S. 584, this principle applies with equal force to death penalty sentencing statutes: "The Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." *Id.* at 619. The Court also recognized that under *Alleyne*, 133 S. Ct. at 2156, a defendant's Sixth Amendment right, "in conjunction with the Due Process Clause, requires that each element of a crime be proved to a jury beyond a reasonable doubt." *Id.* at 621.

*Hurst* stated what prior Sixth Amendment precedent had already laid out—it

is not enough that a jury find the existence of at least one aggravating factor beyond a reasonable doubt; a determination regarding the relative weight of aggravating and mitigating circumstances is also a factual finding necessary to a defendant's eligibility for a sentence of death. 136 S. Ct. at 622; *see also Rauf v. State*, 145 A.3d 430 (Del. 2016) (per curiam) (striking down Delaware's capital sentencing scheme on the basis of *Hurst* and determining that the Sixth Amendment requires a jury to find, beyond a reasonable doubt, each aggravating circumstance and that aggravation outweighs mitigation in order to impose a death sentence); *Hurst v. State*, 202 So. 3d 40, 57 (Fla. 2016) (finding that *Hurst* "mandates that all the findings necessary for the imposition of a death sentence are 'elements' that must be found by a jury" and holding that "before the trial judge may consider imposing a sentence of death, the jury in a capital case must unanimously and expressly find all the aggravating factors that were proven beyond a reasonable doubt . . . [and] unanimously find that the aggravating factors outweigh the mitigating circumstances"). *Hurst* built upon *Ring* and *Apprendi* but it did not create new law; the requirement of proof beyond a reasonable doubt has been entrenched in our system since at least *In re Winship*, 397 U.S. 358 (1970). This decision illustrates the clear error in the district court's analysis, and clarifies that Arizona Supreme Court's analysis of the mitigating factors was not simply a matter of state law.

29

Furthermore, the establishment of an aggravating factor is often directly intertwined with the mitigating factors presented. *See* 724 F.3d at 1115-16. In this case, the sole aggravating factor was whether the murder was especially cruel, heinous, or depraved. (ER 235-40.) *Sansing I*, 26 P.3d at 1127-29. However, Sansing also presented evidence that he was severely impaired due to the high quantities of crack cocaine he had ingested. (ER 244.) *Id.* at 1130. Thus, if a jury found such mitigating evidence credible, it would directly affect whether Sansing's actions were cruel or heinous and depraved, or just a result of his impaired and unreasonably paranoid thinking as a result of his drug use. *See, e.g.*, *State v. Moody*, 94 P.3d 1119 (Ariz. 2004).

And, the *Murdaugh* Court's analysis is in line with the Arizona Supreme Court's own application of the *Ring II* decision. In light of *Ring II*, the Arizona Supreme Court issued an opinion in a consolidated appeal to resolve outstanding issues. *Ring III*, 65 P.3d 915. One such issue included the State's argument that if one aggravating factor—such as prior convictions or the victim's age—had been established beyond a reasonable doubt, harmless error review is complete and the sentence must be upheld. *Id.* at 942. The Arizona Supreme Court rejected such a "narrow reading of *Ring II*," in part, because it ignored the actual sentencing scheme in Arizona. *Id*. The court reiterated that "[n]either a judge, under the superseded statutes, nor the jury, under the new statutes, can impose the death

30

penalty unless that entity concludes that the mitigating factors are not sufficiently substantial to call for leniency." *Id.* at 943 (citations omitted). The state court went on to find that "[t]he process involved in determining whether mitigating factors prohibit imposing the death penalty plays an important part in Arizona's capital sentencing scheme." *Id.* Thus, the Arizona Supreme Court held that the presence of one or more aggravating factors "does not, in itself, establish that a defendant's capital sentence resulted from harmless error." *Id.*

In fact, in numerous cases in which the Arizona Supreme Court reviewed possible *Ring* errors, the court remanded for a jury sentencing, despite finding that one or more aggravating factors were established beyond a reasonable doubt. *See*, *e.g.*, *State v. Montano*, 77 P.3d 1246 (Ariz. 2003); *State v. Lehr*, 67 P.3d 703 (Ariz. 2003); *State v. Finch*, 68 P.3d 123 (Ariz. 2003); *Moody*, 94 P.3d 1119; *State v. Nordstrom*, 77 P.3d 40 (Ariz. 2003); *State v. Cropper*, 76 P.3d 424 (Ariz. 2003); *State. v. Phillips*, 67 P.3d 1228 (Ariz. 2003); *State v. Pandeli*, 65 P.3d 950 (Ariz. 2003); *State v. Cañez*, 42 P.3d 564 (Ariz. 2002); *State v. Jones*, 72 P.3d 1264 (Ariz. 2003). These cases were remanded solely because a jury might decide that the mitigation presented called for leniency despite the established aggravating factors. *See Lehr*, 67 P.3d at 705; *Pandeli*, 65 P.3d at 953.

Thus, the district court's focus on the reasonableness of the (F)(6) aggravating factor ignores the possibility that, even if such a factor was

31

established, Sansing's mitigation could well have overcome that single aggravating factor and resulted in a life sentence. Just as in *Murdaugh*, "because the existence or absence of mitigating circumstances directly affected whether [Sansing] was death eligible under Arizona law, he had a right to have a jury decide those facts." *Murdaugh*, 724 F.3d at 1116.

### B. Under the proper harmless error analysis, a rational jury could have assessed the aggravation and mitigation in a way that called for leniency.

This Court reviews whether the *Ring* error was harmless under the *Brecht* harmlessness inquiry, which in this case asks "whether the absence of a jury as factfinder at the penalty stage 'substantially and injuriously' affected or influenced the outcome. In other words, [this Court] ask[s] whether a rational jury could have found that the facts called for leniency." *Murdaugh*, 724 F.3d at 1118. If a court is in "grave doubt" about whether a *Brecht* error occurred, benefit of the doubt must be given to the petitioner. *Merolillo v. Yates*, 663 F.3d 444, 454 (9th Cir. 2011) (citation omitted). Because Respondents bear the risk of the error, they must provide "fair assurance" that not even a single juror would have found a life sentence appropriate. *See Valerio v. Crawford*, 306 F.3d 742, 762-63 (9th Cir. 2002). The question under *Brecht* is not whether there was sufficient evidence to support the death penalty, but whether the lack of a jury may have affected the outcome. *See Kotteakos v. United States*, 328 U.S. 750, 764-65 (1946).

32

Here, the district court analyzed whether the error was harmless by asking whether the Arizona Supreme Court's harmless error analysis was objectively unreasonable. (*See* ER 26-29.) However, the Supreme Court expressly rejected such an approach in *Fry v. Pliler*, 551 U.S. 112 (2007). Under *Fry*, federal habeas courts should not ask whether the state court's harmless error analysis was unreasonable under AEDPA, but rather should assess whether the complete lack of a jury had a substantial and injurious effect upon the death sentence. *Id.* at 120. This is because the "substantial and injurious" test of *Brecht* subsumes the AEDPA inquiry so that, if the error was substantial and injurious, it was unreasonable to find it harmless under the AEDPA. *Id.* Therefore, this Court must "apply the *Brecht* test without regard for the state court's harmlessness determination." *Pulido v. Chrones*, 629 F.3d 1007, 1012 (9th Cir. 2010) (citing *Fry*, 551 U.S. at 121-22).

### 1. Cruelty Factor

#### a. Question of fact regarding the victim's consciousness

The Arizona Supreme Court found the *Ring* error to be harmless as to the cruelty aggravating factor. Under Arizona law, cruelty cannot be established unless the State proves beyond a reasonable doubt that the victim was conscious during the attack. (ER 235.) *Sansing I*, 26 P.3d at 1127. A defendant need not prove that the victim was unconscious; rather, if the evidence is *inconclusive* about whether the victim was conscious during the infliction of violence, under Arizona law, the

sentencer may not find cruelty. *State v. Bolton*, 896 P.2d 830, 851 (Ariz. 1995).

The Arizona Supreme Court unreasonably discounted the clear question of fact relating to the victim's consciousness, upon which the finding of cruelty rests. The State's medical examiner testified at trial that, shortly after the victim was bound, she was hit in the head with a club that would have rendered her unconscious. When probed by the State about the possibility of the victim regaining consciousness, the medical examiner stated, "Is it possible, yes. I wasn't there. Is it possible? Yes, *but I doubt it.*" (ER 1253 (emphasis added).) Far from beyond a reasonable doubt, the expert opinion of the medical examiner himself was that, while possible, it was highly doubtful that the victim ever regained consciousness.

The only testimony suggesting that the victim was conscious during the rest of the attack came from Kara, who testified against Sansing in exchange for a lighter sentence. Kara told the police that she heard the victim speak to Sansing during the sexual assault. However, at the sentencing hearing, Kara testified that the victim made no statement during this time and the prosecutor impeached Kara with her earlier statement. (ER 1360.) Yet, Kara's subsequent testimony completely contradicted her account that the victim spoke. For instance, she testified that Sansing had placed a sock in the victim's mouth prior to the sexual assault. (ER 1353.) She also testified that the victim was unconscious after Sansing

34

hit her in the head prior to the sexual assault, verifying the medical examiner's testimony. (ER 1354.) Kara's credibility was further called into question because much of her other testimony was also inconsistent with the evidence presented. For instance, Kara denied that her children helped Sansing in any way during the crime, even after the prosecutor confronted her with contradictory statements her children made to a therapist. (ER 1227-28.) Thus, a rational juror could have certainly believed the state medical examiner's testimony and discounted Kara's testimony in light of her questionable credibility and the fact that she was also high on crack cocaine at the time of the crime.

In its post-*Ring* opinion, the Arizona Supreme Court pointed to Sansing's admissions and stipulations as conclusive fact that the victim was conscious during the entire attack.[2] (ER 111.) *Sansing II*, 77 P.3d at 35. Sansing's factual basis for his guilty plea stated that when he returned from moving the victim's truck, "the victim was still conscious." (ER 1401.) However, even if this factual basis did establish that the victim regained consciousness, there is no indication that she maintained consciousness, with such a massive head wound, until the time of the sexual assault. Between the time that he moved the truck and the sexual assault, Sansing called his drug dealer, the drug dealer came over to his house, and Sansing bought and smoked crack cocaine. (ER 439; ER 1367-70.) Thus, there is a question

---

[2] Sansing also challenges both the validity of this plea and the effectiveness of his counsel in advising him about the plea in this brief. *See* Claims 4 and 8, *infra*.

35

of fact as to how much time passed before the sexual assault occurred. Given that a rational juror could find that the victim's consciousness was not established beyond a reasonable doubt, the lack of a jury had a substantial and injurious effect on Sansing's sentence.

In fact, the Arizona Supreme Court's pre-*Ring* opinion itself makes clear that the victim's consciousness is an issue of fact. On direct appeal, the majority found "the testimony of the five eyewitnesses to be more persuasive than that of the medical examiner," and, therefore, "[t]he evidence provide[d] substantial support for the sentencing judge's findings." (ER 238-39.) *Sansing I*, 26 P.3d at 1128. While a pre-*Ring* analysis allowed for an affirmance based on credibility determinations and "substantial support," a harmless error analysis does not. Credibility determinations are an issue of fact that must be given to a jury. *United States v. Ruiz*, 710 F.3d 1077, 1082 (9th Cir. 2013).

The district court found that it was not unreasonable for the Arizona Supreme Court to adopt Kara and Sansing's statements about the consciousness of the victim over the medical examiner's testimony. (ER 27-28.) However, under a harmless error analysis, the question is not whether it was reasonable for the state court to so find but rather whether no rational juror could have viewed the evidence differently. Under the correct analysis, the lack of a jury at sentencing had a substantial and injurious effect.

36

### b. Cruelty based on the initial struggle.

The district court makes much of the fact that the victim's consciousness at the time of the rape was inconsequential because she was conscious for the initial attack. (ER 28.) The district court holds that the Arizona Supreme Court's finding of cruelty based on the victim's suffering during the initial struggle was not objectively unreasonable. (*Id*.) There are several problems with that conclusion.

First, while the victim need not have been conscious for every wound inflicted for cruelty to apply under Arizona law, if the victim was not conscious *at the time of death*, a finding of cruelty is inappropriate. *See, e.g.*, *State v. Wallace*, 728 P.2d 232, 237 (Ariz. 1986); *State v. Poland*, 698 P.2d 183, 200 (Ariz. 1985). Second, whether a trier of fact *could* find cruelty based on the initial attack is an entirely different question than whether any rational juror *would* have found cruelty established based on that initial struggle. A rational juror, who determined that the victim was unconscious after the initial blow to the head, could reasonably conclude that a finding of cruelty was inappropriate based solely on that initial struggle. For example, in *State v. Montano*, 77 P.3d 1246 (Ariz. 2003), the defendant stabbed another prisoner 179 times. The Arizona Supreme Court found that "whether [the victim] lost consciousness before the stabbings began or thereafter presents a question of fact," and, therefore, "Montano is entitled to a jury determination of this issue" because even though the victim was clearly conscious

during the initial struggle and was screaming from pain, the state court could not definitively say what a rational juror would have decided. *Id*. at 1249-50. Just like *Montano*, Sansing was entitled to a jury determination of this question of fact.

## 2. Heinous or Depraved Factors

In its pre-*Ring* opinion, the Arizona Supreme Court found it unnecessary to address the heinous or depraved factors after finding the cruelty factor existed. (ER 239-40.) *Sansing I*, 26 P.3d at 1129. However, in the post-*Ring* opinion, the majority went on to find beyond a reasonable doubt that any reasonable jury would have found the heinousness and depravity factor. (ER 115-16.) *Sansing II*, 77 P.3d at 36. The factor was based on the findings of gratuitous violence and the helplessness of the victim. (ER 113-14.) *Id*. at 35-36. However, helplessness by itself is not sufficient to find heinousness and depravity. (ER 113.) *Id*. at 35.

Under Arizona case law, gratuitous violence means violence beyond the murderous act itself. *State v. Gretzler*, 659 P.2d 1, 11 (Ariz. 1983); *see also State v. Soto-Fong*, 928 P.2d 610 (Ariz. 1996). As the court itself acknowledged, there were essentially two different criminal "purposes" during this crime that were separated by at least an hour. (ER 233.) *Sansing I*, 26 P.3d at 1127. Thus, the initial blow to the head of the victim was not a part of the murderous act itself. Furthermore, with respect to the stab wounds, the Arizona Supreme Court has previously found that when it is difficult to determine which of multiple wounds

was the fatal one, it cannot determine whether the injuries were inflicted beyond those necessary to cause death. *See State v. Wallace*, 272 P.3d 1046, 1049-51 (Ariz. 2012); *State v. Bocharski*, 189 P.3d 403, 421 (Ariz. 2008); *State v. Lacy*, 929 P.2d 1288, 1302 (Ariz. 1996). Here, it is impossible to determine which of the three stab wounds were fatal and, thus, the Arizona Supreme Court could not have properly found beyond a reasonable doubt that any juror would have concluded that gratuitous violence was inflicted. Given that a rational jury could have determined the heinousness and depravity factor differently, the lack of a jury had a substantial and injurious effect on Sansing's sentence.

### 3. Mitigating Factors

Finally, the Arizona Supreme Court addressed harmlessness in regard to the mitigating circumstances. (ER 116) *Sansing II*, 77 P.3d at 36. The majority found beyond a reasonable doubt that no jury would have found that Sansing established the statutory mitigating circumstance of impaired capacity due to drug impairment. (ER 116-21.) *Id*. at 36-38. The sentencing judge had found the following non-statutory mitigating factors: 1) impairment from the use of crack cocaine at the time of the offense; 2) difficult childhood; 3) lack of education; 4) acceptance of responsibility and remorse; and 5) family support. (ER 122.) *Id.* at 39. The Arizona Supreme Court found beyond a reasonable doubt that no jury would have found

39

that the non-statutory mitigating factors were sufficient to call for leniency. (ER 124.) *Id.*

With respect to the statutory mitigating circumstance, a defendant need only prove its existence by a preponderance of the evidence, *Sansing I*, 26 P.3d at 1130 (ER 243), meaning that Sansing need only have presented evidence showing that it was more likely than not that the mitigating circumstance existed. *See State v. Prince*, 250 P.3d 1145, 1165 (Ariz. 2011). The Arizona Supreme Court found that Sansing failed to prove the statutory mitigating factor for two main reasons: (1) an expert did not testify that drugs affected his behavior; and (2) he took steps to avoid detection. (ER 116-21.) *Sansing II*, 77 P.3d at 37-38.

First, while expert testimony regarding drug intake could have corroborated the proffered evidence in Sansing's case, the lack thereof does not mean that the impairment was nonexistent or that a jury could not view the evidence differently. For instance, in *State v. Finch*, 46 P.3d 421, 428-29 (Ariz. 2002), the Arizona Supreme Court originally found that Finch's use of crack cocaine on the night of the murder, history of substance abuse, and difficult childhood did not significantly impair his capacity to appreciate the wrongfulness of his conduct. Finch did not present any expert testimony in support of his mitigation. However, when reviewing for *Ring* error, the Arizona Supreme Court found that a reasonable jury may have found additional mitigating factors or weighed Finch's mitigation

differently despite the fact that the court had already held that two aggravators had been established. *Finch*, 68 P.3d at 125-26. Clearly expert testimony is not required for a jury to view the evidence differently.[3]

Second, rather than demonstrating a carefully calculated plan to commit a crime and avoid detection, Sansing's actions were indicative of a crack cocaine user who was very high, impaired, and desperate to obtain more drugs. All the testimony at trial established that Sansing's plan was to rob the victim. (*See* ER 1300; ER 1340.) Instead, Sansing made a series of irrational decisions in a drug-impaired state. Sansing began to panic and look out of the window frequently. In a feeble attempt to "avoid detection," Sansing decided to move the victim's truck to only a few blocks down from his house. (ER 1354.) Sansing called his drug dealer twice during the duration of this crime to obtain more drugs. (ER 1367-70; ER 439.) Sansing, in his impaired thinking, believed that, after attacking the victim, the way to make the situation better would be to make it look like a rape/robbery/beating. (ER 1361-62; ER 1229-30.)

Finally, after stabbing the victim, Sansing left her body in the bedroom, covered with clothes, for four to five hours. (ER 1366.) He made no plans to try to dispose of the body or cover up his crime. Ultimately, his concealment of the victim's body consisted of moving the victim to his own backyard and piling

---

[3] The failure to present expert testimony on Sansing's drug use was a result of ineffective assistance of counsel. *See* Claim Two, *infra*.

41

debris on her body, which could be seen by anyone looking over the five-foot fence. (ER 1307.) Sansing made no other attempt to conceal the body or avoid detection. In fact, after coming out of his drug-induced impairment, Sansing was overcome by guilt, quickly confessed, and turned himself in. (ER 1189-90.) His actions the following day support a finding that Sansing was a drug addict who was mentally impaired and a reasonable juror could have found that his actions met the statutory mitigating circumstance of impaired capacity.

Even assuming that a jury would have found these factors to only amount to non-statutory mitigation, as the sentencing judge did, it is unreasonable to find that no rational juror could have weighed the mitigation factors differently.[4] The majority found that Sansing presented "only minimal testimony about his drug use on the day of the murder." (ER 118.) *Sansing II*, 77 P.3d at 37. However, Sansing presented evidence that he had ingested over $750 in crack cocaine in the four days leading up to the murder. (ER 353.) A jury could view that as being more substantial than the court did. Furthermore, a jury could have given more weight to Sansing's difficult childhood and low to borderline IQ. (ER 348-51.) What is more, when confronted with his crimes, Sansing confessed, pleaded guilty, and showed deep remorse to the victim's family. (ER 1203-15.) Sansing, unlike most capital

---

[4] This is especially true given that the Arizona Supreme Court used an unconstitutional "causal nexus" test to discount most of Sansing's mitigation. *See* Claim Seven, *infra*. Without such a requirement, a rational jury could have found that the mitigation presented was sufficient to call for leniency.

defendants, accepted responsibility for his crime. This is a fact that can sway juries. As Chief Justice Jones stated in his dissent, "this court is [not] authorized to speculate on what a jury *might* have done." (ER 126.) *Sansing II*, 77 P.3d at 40 (Jones, C.J., dissenting) (emphasis in original). The court should have remanded Sansing's case for a jury sentencing.

Furthermore, a review of the Arizona Supreme Court's other cases remanded for resentencing in light of *Ring* clearly demonstrate that a rational juror could have viewed Sansing's mitigation as sufficient to overcome the one aggravator present in this case. For instance, in *State v. Cañez*, 42 P.3d 564 (Ariz. 2002), the Arizona Supreme Court found that Cañez's evidence of brain damage, mental illness, and retardation was conflicting and was not worthy of leniency. *Id.* However, on remand, this conflicting evidence required resentencing because it could have been viewed differently by a jury. *State v. Cañez*, 74 P.3d 932, 936-37 (Ariz. 2003). Again, Sansing's evidence could also have been viewed very differently by a jury.

Similarly, in *State v. Tucker*, 68 P.3d 110 (Ariz. 2003), the Arizona Supreme Court decided that a jury could have found that "Tucker's good character and rehabilitation potential" were worthy of leniency, even though Tucker's evidence on these factors came solely through the testimony of his mother. *Id.* at 123. Tucker offered no evidence of mental illness or drug use at the time of the crime.

43

Surely "good character" evidence, given on behalf of someone who murdered three people, would not be given more weight by a jury than direct evidence that a defendant, like Sansing, had been using large amounts of crack cocaine at the time of the crime and was suffering from some type of cocaine-induced psychosis. (*See* ER 353; ER 442-43.)

Because a reasonable jury could have assessed both the single aggravating factor in this case as well as all of the mitigation differently, the lack of a jury had a substantial and injurious effect on Sansing's death sentence and he is entitled to relief.

## Claim Two

**Sansing was denied effective assistance of counsel during the penalty phase of his capital murder trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution because counsel failed to investigate and present mitigating evidence.**

This claim was raised in Sansing's PCR proceedings, and the Arizona Supreme Court summarily denied Sansing's petition for review. (ER 84.) The courts' rejection of this claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding." 28 U.S.C. §§ 2254(d)(1) and (2). The district court denied this claim on the merits. (ER 56.)

## I. Legal standard

"'[T]he right to counsel is the right to the effective assistance of counsel.'" *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771, n.14 (1970)). In *Strickland*, the Court recognized that the right to counsel is necessary to protect the fundamental right to a fair trial. *Id.* at 684. Having a lawyer "present at trial alongside the accused, however, is not enough to satisfy the constitutional command." *Strickland*, 466 U.S. at 685.

The Court promulgated a two-part test for determining ineffective assistance of counsel in *Strickland*. *Id.* at 687. First, the defendant must demonstrate that counsel's performance was "deficient," meaning that counsel's errors were "so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* While the Court found that more specific guidelines were not appropriate and that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms," *id.* at 688, the Court also explained that counsel has a duty to make reasonable investigations and that strategic choices made after less than complete investigation are only reasonable to the extent that professional judgment would support such limits to investigation, *id.* at 690-91.

45

The second prong of the *Strickland* test is prejudice. "[T]o establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (quoting *Strickland*, 466 U.S. at 694). When assessing counsel's conduct, and more particularly the impact of that conduct on the reliability of the proceedings, counsel's deficiencies must be considered cumulatively as opposed to item-by-item. *See, e.g.*, *Strickland*, 466 U.S. at 695; *Williams v. Taylor*, 529 U.S. 362, 397 (2000).

The failure to present mitigating evidence during the sentencing phase of a capital case constitutes deficient performance because competent counsel would have made an effective case for mitigation. *See Wiggins*, 539 U.S. at 535. The failure to investigate evidence of a client's mental condition as a mitigating factor in a sentencing-phase hearing, without a supporting strategic reason, constitutes deficient performance. *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995). An attorney's actions must be examined according to what was known and reasonable at the time the attorney made his choices. *Id.* at 1036.

When the investigation uncovers facts that require the services of an expert to explain their significance, the Sixth Amendment requires counsel to obtain an

46

expert. It is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence. *Williams*, 529 U.S. at 399; *Tennard v. Dretke*, 542 U.S. 274, 276 (2004) (citing *Penry v. Lynaugh*, 492 U.S. 302 (1989)). Counsel has "an obligation to conduct an investigation which will allow a determination of what sort of experts to consult. Once that determination has been made, counsel must present those experts with information relevant to the conclusion of the expert." *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999); s*ee also Mayfield v. Woodford*, 270 F.3d 915, 927-28 (9th Cir. 2001); *Wallace v. Stewart*, 184 F.3d 1112, 1118 (9th Cir. 1999); *Turner v. Duncan*, 158 F.3d 449, 456 (9th Cir. 1998).

## II. The PCR court's determination is not entitled to deference.

The PCR court denied relief on this claim, concluding that trial counsel did not render deficient performance and that no reasonable jury could find that mitigation evidence adduced during the penalty phase was sufficient to call for leniency. In addition, the PCR court made separate factual determinations upon which it based its conclusions. Many of these factual determinations are unreasonable in light of the record presented. The PCR court's adjudication of this claim resulted in a decision that was both an unreasonable application of clearly established law and based on an unreasonable determination of the facts in light of

the evidence presented, and therefore that adjudication is not entitled to any deference under AEDPA. (*See* ER 85-99.)

## A.    Unreasonable determinations of fact

If this Court finds that any one of these determinations of fact upon which the state court based its decision was an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d), review of Sansing's claim is *de novo*.

## 1.    Provision of Records to Trial Experts

During the PCR evidentiary hearing, Ronan conceded that he could not recall providing records to Dr. Menendez, but stated it was his practice to do so. (ER 92-93.) The PCR court found no reason to believe that Ronan had deviated from his standard practice in this case and assumed that he had performed reasonably. (ER 93.) The district court agreed, noting that while there were factual discrepancies in Dr. Menendez's report, there was no evidence that counsel had failed to provide her with background materials. (ER 49.) The court stated that counsel could have given the records to Dr. Menendez but she failed to review them, and nothing in the record suggests that counsel failed to provide background records to the other two trial-stage experts. (ER 49.) The trial court's findings here were objectively unreasonable, and the district court's conclusion otherwise was incorrect.

48

At the hearing, Ronan testified that while his ordinary practice was to give experts a variety of records, he has no specific recollection of having done so here (ER 600), and, in fact, the expert report from Dr. Menendez "[c]ertainly raises a question" about whether she had the records (ER 581). Ronan further acknowledged the contradictions between Dr. Menendez's report and the records that existed in Sansing's case. For example, Dr. Menendez stated that Sansing was "an average student." (ER 299.) This is inconsistent with Sansing's school and testing records, which show that he received primarily Ds and Fs in every subject other than gym. (ER 304; ER 305.) Dr. Menendez wrote that Sansing was treated well by his mother and stepfathers (ER 298), which is grossly inconsistent with the reports of physical abuse and neglect in his social history (ER 610-12). Ronan acknowledged that the discrepancies between the report and available data supported an assessment that Dr. Menendez did not have Sansing's records. (ER 612.) There is no evidence in the record to support the PCR court's conclusion otherwise, therefore it was based on an unreasonable determination of the facts.

The district court's analysis is likewise unsupported because even assuming its conjecture is correct, if Ronan had supplied Dr. Menendez with the appropriate records, it would still constitute deficient performance to rely on her conclusions that were entirely contrary to the mitigation evidence provided. This expert had been retained apparently to evaluate Sansing for learning disabilities—any

49

reasonable counsel would have realized that the expert had made factual statements inconsistent with the very evidence she had been asked to evaluate. The district court's conclusion otherwise is unsupported by the record and erroneous.

### 2. Testimony Regarding Sexual Assault

The PCR court also unreasonably stated that, "[s]ignificantly, Sansing smiled as he described to Dr. Bayless the reason why he committed the rape: he saw Trudy Calabrese's vaginal area." (ER 91.) The court's adoption of Dr. Bayless's testimony on this issue was unreasonable in light of the other evidence presented, and the district court applied an incorrect standard to its analysis of the state court's finding.

Dr. Bayless testified that Sansing moved the unconscious victim:

[t]o the bedroom and then apparently he decided at that point that he was going to rape her. Her dress flew up, apparently, saw her vaginal area. Made a statement to me that really made me quite angry. I asked, you know, because one of my associates was with me at the time of the interview, and he said to me in a way—he did not know he angered me, by the way—but because I asked him: Why? What made you do that? What made you rape her?

He smiled at me, he kind of went, you know. Meaning that seeing a vaginal area would make me do such a thing, which really angered me, because I'm not like that.

(ER 890.)

Dr. Bayless testified that when asked why he raped her, Sansing made a hand motion, which Dr. Bayless interpreted to mean "seeing a vaginal area would

50

make me do such a thing." (ER 890.) Dr. Bayless never said Sansing actually told him that seeing the victim's vaginal area motivated him to sexually assault her, so the state court's adoption of his interpretation of a hand gesture was objectively unreasonable.

Moreover, the court's adoption of Dr. Bayless's account was unreasonable because it found Dr. Bayless's account more credible than the other experts. The court was aware (as was Dr. Bayless) that the victim was not wearing a dress. (ER 1311.) Furthermore, Sansing has recounted the facts of the crime many times, and has never told anyone that he raped the victim because he saw her vaginal area, has never made any hand gesture suggesting such a motive, and has never said she was wearing a dress. Dr. Bayless wrote a six-page, single-spaced report in which he makes no mention of this interaction with Sansing. (ER 1087-92.) Similarly, both Dr. Bayless and his associate took detailed notes of Dr. Bayless's interview with Sansing that do not include statements by Sansing that he got excited when he saw the victim's vaginal area or when her dress came up. (*See* ER 939; ER 1093-102.[5])

---

[5] In Sansing's motions for evidentiary development in the district court, he included a declaration from this associate, Shalene Kirkley. In the declaration, Kirkley stated that she was present during Dr. Bayless's evaluation and interview of Sansing, that Sansing had not made this statement, and that she remembers "being surprised and embarrassed" when Dr. Bayless made this statement during his testimony "because that was a big misstatement for [her] supervisor to make." (PSER 33.) Despite relying on Dr. Bayless's testimony in denying this claim (ER 41-42 (quoting the state court's finding that Dr. Bayless was more credible than the

The PCR court had before it, on the one hand, a version of the facts as told by Dr. Bayless, which was factually incorrect, and Dr. Bayless's clearly emotional and unprofessional reaction to Sansing—and on the other hand, a version of the facts told by: the client himself, who had pled guilty; his wife; his children; every other psychological expert who interviewed him; the police reports; and the medical examiner's report. And yet, the PCR court credited Dr. Bayless's version. (ER 91.) This was an unreasonable determination of the facts in light of the record. The district court's decision on this claim was also erroneous because, as discussed at length below, it relied on an improper standard for evaluating prejudice from witness testimony and because it discounted Sansing's argument on this point by stating that the PCR court's discussion of this "fact" "played no significant role in its ultimate findings concerning counsel's representation." (ER 53-54.) This is directly contradicted by the plain language in the court's order, finding it "significant" that Sansing allegedly "smiled as he described to Dr. Bayless the reason why he committed the rape: he saw Trudy Calabrese's vaginal area." (ER 91.)

### 3. Witness Credibility

The PCR court also found that Dr. Bayless's testimony was "more credible and more persuasive" than the opinions of Drs. Miller, Lanyon, and French. (ER

defense experts and citing this testimony)), the district court denied Sansing's request to expand the record to include this document (ER 56).

91.) Given the record the court had before it, that determination was unreasonable. While this Court must defer to the PCR court's determination, "[d]eference does not by definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). In addition to Dr. Bayless's testimony about the dress and Sansing's statement about motive described above, the PCR court had several other reasons to doubt his credibility.

For example, Dr. Bayless testified, "At no time since all this was [Sansing] suffering from any kind of mental illness whatsoever." (ER 892.) However, Dr. Bayless himself diagnosed Sansing with both cocaine dependence and personality disorder. (*See* ER 1092.) Later, Dr. Bayless was asked, "Is personality disorder a mental illness?" He equivocated, "Well, is it mental—well, it's in the DSM. I mean it is a mental illness, yes." (ER 897.) Regarding how much cocaine Sansing had consumed before the crime, Dr. Bayless wondered, "How much cocaine could he have actually done, given the cost of cocaine on the streets." (ER 919.) He testified that he had "no information" about Sansing's crack usage before the crime, despite his testimony that he spent thirty hours reviewing documents in preparation for this case, including the report by Pam Davis in which she indicated that the Sansings had consumed $750 worth of cocaine in the four days preceding the crime. (ER

53

919-21.) When confronted with this inconsistency, Dr. Bayless did not back down and instead asserted that $750 worth is "not a lot of cocaine" and "he did not tell me. He only told me he smoked cocaine that day." (ER 921.)

At one point, PCR counsel asked Dr. Bayless a question about cocaine-induced psychosis, then started to ask, "And would your answer change at all if . . . ." (ER 924.) Dr. Bayless interrupted, responding, "It would probably not," before any question was asked. (ER 924.) Dr. Bayless had personal feelings about the defendant and demonstrated this both at the deposition and the hearing. His testimony was unprofessional and incredible, and the court's finding that his testimony was more credible and persuasive than the testimony of Drs. Miller, French, and Lanyon was an unreasonable determination of the facts in light of the record presented.

The district court's decision on this issue was likewise incorrect. It held that it could not redetermine the credibility of the hearing witnesses and thus Sansing could not show that the state court's credibility findings were objectively unreasonable. (ER 53-54.) However, both the state and district courts used an improper standard when analyzing the credibility of witnesses as part of the prejudice determination. Rather than accept the testimony of one witness over another based on credibility determinations, "the [] court's role was not to evaluate the evidence in order to reach a conclusive opinion" as to the mitigation presented.

54

*Correll v. Ryan*, 539 F.3d 938, 952 n.6 (9th Cir. 2008). Instead, the court "should have decided only whether there existed a 'reasonable probability' that 'an objective fact-finder' in a state sentencing hearing would have concluded, based on the evidence presented," that the mitigation evidence was proven. *Id.* As this Court has made clear, the question is whether there is a reasonable probability that the expert testimony would have affected the outcome. *See Duncan v. Ornoski*, 528 F.3d 1222, 1240-41, 1244 (9th Cir. 2008). Accordingly, both the state and district court's findings on this claim are objectively unreasonable.

### 4. Expert Testimony Regarding Drug Use

The PCR court found that, "[u]nfortunately, Dr. French did not ask the Defendant about the specific amounts of cocaine that the Defendant had used at the time of the crime. Much of Dr. French's opinions were based upon speculation about the quantity of cocaine that was used by the Defendant." (ER 90-91.) This was an unreasonable determination of the facts. Dr. French explicitly stated that his opinion was not based on the amount of drugs that Sansing had consumed on the day of the crime, but rather on Sansing's response to the drugs. He testified, "Again, getting back to the issue of whether a large amount is needed to produce a psychotic-like behavior, it's not necessarily a large amount that's needed. So it could have been a smaller amount." (ER 649.) Later counsel asked, "So would it be proper to really focus, then, on the specific amount that he used?" Dr. French

55

responded, "To me, it's not. Because it gets back to the individual's response to any particular drug." (ER 651.) Dr. French's opinion that Sansing's drug use diminished his ability to control his behavior was based upon Sansing's history of drug use, Sansing's response to the drugs he ingested, and Dr. French's research regarding behavioral and subjective effects of cocaine in humans, not on the amount of drugs Sansing had actually used. Therefore, the PCR court's rejection of Dr. French's expert opinion, based on the very fact that the expert explained was not important to the calculus, was an unreasonable determination of the facts. The district court failed to address this section of the claim in its decision denying Sansing's claim.

### 5. Antisocial Personality Disorder Evidence

The PCR court also found that, "[i]n the evidentiary hearing, trial counsel testified that to offer the antisocial personality disorder diagnosis as a mitigating factor could have opened the door for the prosecution to rebut it with evidence of the Defendant's prior specific antisocial acts, which could have been very damaging to the Defendant." (ER 93.) The PCR court described this as a "dilemma" for trial counsel and said, "[i]t clearly appears to this court that Ronan made a strategic decision to avoid this trap." (ER 93.) There is no basis in the record for the court's conclusion. Ronan never testified that he faced a dilemma as to whether to present evidence that Sansing had been diagnosed with antisocial

personality disorder, and never even hinted that he crafted a strategy to keep that diagnosis out of evidence. Instead, Ronan testified that "[b]ased on the report as I have now seen it, I would not see any reason to call [Dr. Menendez, who had diagnosed Sansing with antisocial personality disorder]." (ER 601.)

Trial counsel did not assert that he decided not to call Dr. Menendez to testify because he was concerned about opening the door to evidence of prior bad acts. He merely agreed that if a client has antisocial personality disorder and a defense attorney decides to present that in trial, the attorney is opening the door for the state to present prior bad acts. He agreed that prior bad acts would be part of the calculus a defense attorney would make when deciding whether to present evidence of antisocial personality disorder. (ER 623.) He did not say he made this calculus in Sansing's case and the scales tipped on the side of not presenting Dr. Menendez's report. Trial counsel's testimony at the PCR hearing reveals no strategy regarding the use of Dr. Menendez in this case, no weighing of harms, and no "dilemma" regarding avoiding a "trap." The PCR court's decision that this in fact was trial counsel's strategy was speculative and an unreasonable determination of the facts in light of the record presented. The district court's decision simply repeated Ronan's testimony as support for the state court's findings, despite the fact that Ronan did not make any statements supporting those conclusions.

In addition, the district court's conclusions regarding this claim were also incorrect in that the court concluded that trial counsel's purported strategy here was reasonable, because precedent demonstrates that "evidence of an antisocial personality disorder may be potentially more harmful than helpful." (ER 50.) However, other cases from this Court make clear that "so-called 'damaging rebuttal evidence' could, in the hands of a competent attorney, have been used to support" the defendant's mitigation evidence. *Correll*, 539 F.3d at 955. As the Court noted in *Correll*, all of the facts in that case alleged to be damaging "could be either dehumanizing or mitigating, depending on the context and history for each cited fact." *Id.* And, the district court opined that putting on evidence of "antisocial personality disorder would have opened the door to [Sansing's] history of antisocial behavior, including violence against his wife, involvement of his children in other illegal activities, and other past crimes." (ER 51.) However, all of these issues came up during the trial and sentencing proceedings—they were not new information. And, it is hard to understand how the facts against Sansing could have been worse; this evidence could only have given support to the mitigation Sansing presented if the proper context and expert testimony were used to explain its meaning.

### 6.    Trial Counsel's Strategy

Finally, the PCR court concluded that trial counsel did not render deficient performance because trial counsel had strategic reasons for not calling expert witnesses. (ER 94.) Ronan never said that he had a strategic or tactical reason for not calling expert witnesses. In fact, when specifically asked whether there was a strategic reason he did not call experts, he said: "Not that I recall, you know, at this point in time." (ER 588.) At least three experts were consulted about this case at the trial level. None of the experts were provided with necessary information, and none provided testimony at sentencing. Ronan never suggested that he had a tactical reason to withhold the presentation of expert testimony. The closest he came to suggesting that he had a strategy was "speculating" that at the time he felt the sentencing judge would understand the connection between Sansing's abusive childhood, drug abuse, and the murder. (ER 593-94.) The decision to not present expert witnesses because it is not necessary and is too "time-consuming" is not a strategic decision. (ER 94.)

As a factual matter, trial counsel never asserted that he had a strategy or tactic to not present experts, to avoid, for example, "unnecessary and time-consuming expert testimony." *Id.* As a legal matter, if he had asserted that it was his strategy or tactic to not present experts, it would be an objectively unreasonable strategy. Even if the sentencing judge was an expert in psychology, it would not be

59

competent for capital defense counsel to rely on the knowledge of the judge regarding a client's background. (*See* ER 688-89.) Trial counsel's duty is to make a record for the higher courts to review, and if there is no record, those courts have nothing upon which to do an independent review of a death sentence. (*See* ER 689.) The importance of this duty is highlighted here, where the Arizona Supreme Court itself noted the lack of expert testimony. (ER 118.) *Sansing II*, 77 P.3d at 37; s*ee also* Claim 1, *supra*.

A reviewing court cannot supply its own post hoc reasoning to justify defense counsel's performance at trial. *See Wiggins*, 539 U.S. at 526-27; s*ee also Duncan v. Ornoski*, 528 F.3d 1222, 1237 n.7 (9th Cir. 2008). While Ronan's inability to recall his actions or reasoning in many circumstances is not enough to assume that his performance was deficient, the record is bare of any evidence to the contrary. The PCR court's unsupported and speculative conclusion that trial counsel did not call expert witnesses for strategic or tactical reasons was an unreasonable determination of the facts in light of the evidence presented. The district court repeated these identical errors in denying this claim.

## B.   Unreasonable applications of *Strickland*

In addition, the PCR court's adjudication of the questions of deficient performance and prejudice involved an unreasonable application of *Strickland*. The PCR court found that "counsel appears to have acted reasonably, even though no

expert witnesses were called during the mitigation phase to attempt to create a causal nexus between Sansing's drug usage, tough childhood and antisocial personality disorder and the crime." (ER 94.) This was an objectively unreasonable application of clearly established federal law.

The PCR court cited *Strickland* as the basis for its ruling, but unreasonably applied the test for deficient performance. As discussed above, ineffective assistance under *Strickland* is deficient performance by counsel resulting in prejudice. 466 U.S. at 687. Performance is measured against an "objective standard of reasonableness," *id.* at 688, "under prevailing professional norms," *id. See also Wiggins*, 539 U.S. at 521. The performance of trial counsel is judged by "norms of adequate investigation in preparing for the sentencing phase of a capital trial, when defense counsel's job is to counter the State's evidence of aggravated culpability with evidence in mitigation." *Rompilla v. Beard*, 545 U.S. 374, 380-81 (2005).

In addition to the hearing testimony regarding the standard of practice, Arizona Rule of Criminal Procedure 6.8 required capital counsel to be familiar with the ABA Guidelines and to obtain capital-specific Continuing Legal Education ("CLE"). Ronan testified that the mandatory capital CLE that was provided to capital defense attorneys in Maricopa County required counsel to develop and present mitigation in a meaningful manner, including presenting experts. (ER 562-68.) However, Ronan failed to present evidence of Sansing's

abusive, dysfunctional family history in an effective manner, failed to select appropriate experts who could competently evaluate and opine regarding the issues presented in this case (including substance abuse and brain damage), failed to provide the experts with necessary information, and failed to present any experts to the court. This conduct fell below the standard of care required of competent capital counsel.

The lack of expert testimony drew express commentary from the Arizona Supreme Court. (ER 118.) *Sansing II*, 77 P.3d at 37. The PCR court's determination that counsel acted reasonably in their presentation of mitigation evidence "even though no expert witnesses were called during the mitigation phase to attempt to create a causal nexus between Sansing's drug usage, tough childhood and antisocial personality disorder and the crime" was an objectively unreasonable application of *Strickland*, and therefore this claim must be reviewed *de novo*. (ER 94.) The district court's decision relied on the sentencing judge's findings that Sansing had a "difficult childhood" and "was somewhat impaired by crack cocaine at the time of the offense," making the evidence presented in the PCR hearing "duplicative and cumulative." (ER 55.) This conclusion is incorrect in light of the evidence presented at the PCR hearing.

In addition, the PCR court found that no reasonable jury could find that the mitigation evidence was sufficient to call for leniency, so there was no prejudice.

62

The PCR court held, "It is difficult, if not impossible, to imagine that any reasonable jury would find that the proposed mitigating circumstances . . . were sufficiently substantial to call for leniency in this brutal, cruel crime." (ER 98-99.) The court's conclusion is objectively unreasonable because there is a reasonable probability that but for trial counsel's failures to investigate and present mitigation, the result of the proceeding would have been different. The district court did not address this aspect of Sansing's claim.

## III.    Trial counsel's performance was deficient to Sansing's prejudice.

Once this Court determines that the PCR court's adjudication of the question of deficient performance is not entitled to deference under AEDPA, it must review this claim *de novo*. Such a review demonstrates that Sansing's trial counsel failed to conduct a constitutionally adequate investigation, failed to present Sansing's personal history to a competent mental health and substance abuse expert, and failed to present Sansing's mitigation to the court, which, in turn, resulted in Sansing being deprived of a fair and reliable sentencing hearing.

### A.    Deficient Performance

"[C]ounsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Strickland*, 466 U.S. at 690. A court should "focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's]

background was itself reasonable." *Wiggins*, 539 U.S. at 523 (emphasis omitted). Indeed, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. Trial counsel has an "obligation to conduct a thorough investigation of the defendant's background." *Terry Williams v. Taylor*, 529 U.S. 362, 396 (2000); *see also Wiggins*, 539 U.S. at 521; *Stankewitz*, 365 F.3d at 716, 720; *Wallace v. Stewart*, 184 F.3d 1112, 1117 (9th Cir. 1999). Although we must defer to a lawyer's strategic choices, those choices must have been made after counsel has conducted "reasonable investigations or [made] a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. During penalty phase proceedings, counsel has a duty to make a "diligent investigation into his client's troubling background and unique personal circumstances." *Williams v. Taylor*, 529 U.S. 362, 415 (2000) (O'Connor, J., concurring).

The standard of practice in Arizona at the time of Sansing's trial was that the sentencing phase investigation should begin immediately upon appointment, that counsel should consider witnesses familiar with the client's life and development, and that counsel should consult experts to provide explanations for the offense. (ER 294-95.) The prevailing standards of practice also directed counsel to present all reasonably available evidence in mitigation unless there were strong strategic

reasons against it and to present evidence in the most effective way. (ER 296-97, 294.) Those standards dictated that live testimony from the defendant's family members was a minimally compelling way to present mitigation, and that experts with records and background documents were needed. (ER 692; ER 701-03.) Ronan agreed that the standard was to seek expert assistance. (ER 557.)

Ronan performed below the standard of care. The mitigation specialist conducted background interviews with Sansing's family, but no family members were ever called to present testimony about the abuse and neglect Sansing suffered. The sentencer was left to discern Sansing's horrific childhood from a sterile document rather than hearing Sansing's siblings describe the abuse and neglect he suffered as a child. It is deficient performance when a defense lawyer merely submits a report that includes mitigating factors rather that identifying them for the court and explaining "why those factors should affect the judge's decision." *Lambright v. Schriro*, 490 F.3d 1103, 1125 (9th Cir. 2007). Under these circumstances, the minimal and unsupported statements that Ronan did present are not enough to stave off an ineffectiveness claim. *Douglas v. Woodford*, 316 F.3d 1079, 1090 (9th Cir. 2003). Although Ronan did present a mitigation report, the discrepancy between what he should have presented and what he did present is enormous, highlighting his deficient performance. *See Stankewitz*, 365 F.3d at 716.

At the evidentiary hearing, Sansing's siblings described their mother's alcoholism and the abuse and neglect they suffered as children. This should have happened at sentencing because "you have to bring out the actual people who know the client, who can express emotion, who can explain what it was like to be in the house" to humanize the client. (ER 692.) Trial counsel utterly failed to humanize Sansing.

In addition, trial counsel made some contact with experts. However, he does not appear to have provided any of them with any relevant documentation such as school records, medical records, or a social history that would enable them to conduct a competent and complete evaluation of Sansing. (ER 1059-60.) The failure to obtain and adequately prepare a mental health expert when the need for one is indicated by the investigation can constitute deficient performance. *See, e.g.*, *Caro*, 165 F.3d at 1226; *Bloom v. Calderon*, 132 F.3d 1267, 1277 (9th Cir. 1997). Furthermore, trial counsel's selection of which experts to retain was haphazard, at best.

Ronan retained Dr. Sara Hill to examine Sansing for competency. A competency evaluation is prepared for a different purpose from mitigation and should not be relied upon for mitigation. *Summerlin*, 427 F.3d at 642. Dr. Hill noted that Sansing "attended no special education classes," which is accurate, but did not note that he failed or received Ds in most of his classes and his scores on

standardized tests qualified him for special education classes—he simply never received the help he needed. (ER 286; ER 304-05.) She also stated that Sansing "denies having gotten treatment for mental health problems in the past, and relates he does not have family members who have been treated to [sic] mental illness." (ER 287.) This does not mean that Sansing did not have a psychiatric disorder or that members of his family also did not have psychiatric conditions. No reasonable attorney would have relied on this obviously flawed expert report, and no reasonable attorney would have relied on this report when preparing a mitigation case.

Ronan retained Dr. Kathryn Menendez to assess whether Sansing had a learning disability, but he apparently did not give her any school records or other background documents. Dr. Menendez stated that Sansing was "an average student" (ER 299), which is contradicted by his school and testing records with evidence of regular D and F grades and declining grades with each passing year (ER 304-05). Dr. Menendez wrote that Sansing was treated well by his mother and stepfathers, which is contradicted by the physical abuse and neglect in his childhood. (ER 298; ER 611-12.)

Ronan testified that his practice was to provide information to experts, but he acknowledged that the discrepancies between the report and available data supported an assessment that Dr. Menendez did not have Sansing's records. (ER

67

612.) Under the prevailing standards, it was incomprehensible that school records were not provided to an expert evaluating Sansing for a learning disability. (ER 724.) Dr. Menendez also diagnosed Sansing with antisocial personality disorder, (ER 303), despite lacking evidence necessary to the professional diagnostic criteria. Even if Dr. Menendez had been provided with the tools to make a proper diagnosis, a learning disability would be only one part of the picture the sentencing judge would need to understand to evaluate Sansing's culpability. None of the experts counsel consulted had expertise in cocaine abuse or how drugs would have affected Sansing's capacity.

In addition to presenting live testimony from witnesses who were familiar with Sansing's personal history, reasonably competent trial counsel would have selected experts who could explain to the sentencer how Sansing's background, mental disorders, and substance abuse played a role in the commission of the offense to prove the (G)(1) aggravator. (ER 445.) In addition, the offense was committed while Sansing was under the influence of crack cocaine, he used crack extensively in the days leading up to the offense, and he abused an assortment of substances from a shockingly young age (he started using marijuana when he was eleven years old) and for most of his life. Yet, counsel left undeveloped the depth of Sansing's cocaine abuse and never hired an expert who specialized in the effects of cocaine or drug abuse. (*See* ER 585-86.)

68

Ronan was an experienced defense attorney and knew that he was supposed to investigate and present mitigation, even in a high-profile case with an unsympathetic client. He testified that the standard of care in Maricopa County at the time of Sansing's trial was to provide the court with expert testimony regarding the impact of adverse events in childhood. (ER 561.) Ronan was lead counsel in another high-profile case one year before Sansing's with similar mitigation. *State v. Martinez*, 999 P.2d 795, 806 (Ariz. 2000). In that case, Ronan presented experts to the court in support of his case for Martinez's life. In sum, Ronan failed to present Sansing's abusive dysfunctional family history, failed to select appropriate, qualified experts, failed to provide the experts with the information necessary for their work, and failed to present the experts' testimony or reports to the court. This deficient conduct fell below the standard of care required of competent capital counsel.

### B. Prejudice

Sansing must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability "is a probability sufficient to undermine confidence in the outcome." *Id.*; *see also Rompilla*, 545 U.S. at 393 (stating that "although we suppose that [the sentencer] could have heard it all and still have decided on the death penalty, that is not the test");

*Wiggins*, 539 U.S. at 537. It is not necessary for Sansing to demonstrate that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances if the newly presented mitigation might well have influenced the sentencer's appraisal of Sansing's moral culpability. *See Williams*, 529 U.S. at 398.

If trial counsel had presented expert evidence in support of the (G)(1) mitigating factor, there is a reasonable probability Sansing would have received a *Ring* remand. The Arizona Supreme Court did not find *Ring* error in Sansing's case because it was able to conclude based on the record before it that no reasonable jury would have found the existence of (G)(1) statutory mitigation, or would have found the non-statutory mitigating circumstances sufficiently substantial to call for leniency. (ER 116-22.) *Sansing II*, 77 P.3d at 37-39. The court specifically pointed to the lack of expert testimony in support of the (G)(1) statutory mitigating circumstance. (ER 118-21.) *Sansing II*, 77 P.3d at 37-38. Thus, in Sansing's case, the prejudice analysis must be viewed in the context of *Ring* error. Here, trial counsel's deficient performance denied Sansing his right to have his mitigation evidence assessed by a jury. It was unreasonable for the PCR court to conclude that no reasonable jury hearing the testimony of Drs. Miller, French and Lanyon would find the mitigating circumstances "sufficiently substantial to call for leniency." (ER 98-99.)

Dr. Miller is a developmental psychologist. (ER 744.) He testified that low education level and temperament are factors that can affect a parent's ability to nurture. (ER 753-55.) Dr. Miller noted that Glenda was not empathetic, emotionally supportive, or capable of understanding the needs and perspectives of her children. (ER 756.) Glenda's self-centered parenting led to children who become egocentric to survive; they learn to think only about their own needs because no one else is thinking about their needs. (ER 794.) Dr. Miller further testified about how multiple changes in residences, domestic violence, Glenda's alcohol use, Glenda's repeated divorces, and negative stepfather figures are all sources of risk for Sansing. (ER 783-84.) He testified about how these threats and stressors can mold a child's personality. (ER 784.) Dr. Miller's report and testimony explained why the stories told by Sansing's siblings about the abuse and neglect Sansing suffered affected him.

Dr. French submitted a report stating that chronic use and abuse of cocaine can lead to mania or paranoid psychosis as well as increased heart rate, rate of breathing, and shortness of breath. (ER 426.) Dr. French reported that Sansing told him that he felt he was dying during his attack on the victim, and told Dr. Lanyon that his heart was racing so fast that he thought he was going to die. (ER 426.) This description, Dr. French reported, was in line with the effects of cocaine on the cardiovascular system and would support a conclusion that Sansing was under the

71

influence of cocaine at the time of the attack. (ER 426.) Dr. French stated that chronic abusers may undergo a schizophrenia-like psychosis, and may become aggressive and experience attacks of paranoia or panic. (ER 426-27.) Dr. French concluded that "[Sansing's] chronic use of methamphetamine and crack cocaine negatively impacted the underlying cognitive and emotional dysfunctions . . . and thereby diminished his ability to control his conduct toward the victim and his behavior several hours thereafter." (ER 427.)

Dr. Lanyon opined that Sansing's chronic and extreme dysfunction throughout his childhood and adolescence, which included poverty and punitive and neglectful parenting practices with domestic violence and alcoholism, caused severe emotional pain for which Sansing's use of street drugs before age eleven provided relief. (ER 441.) Dr. Lanyon noted that on the afternoon of the offense, Sansing had been using cocaine very heavily for the previous few days. But, he had no money to pay the drug dealer so he thought of trading food for cocaine or obtaining money for drugs from the woman's purse. However, as Dr. Lanyon described, Sansing became convinced that the woman who had brought the food was going to call the police. (ER 442.) This was a serious and pivotal cognitive distortion that could have been a product of a paranoid personality disorder, or independently, a product of a delusional psychotic mental state brought about by Sansing's cocaine intoxication. For both reasons, Dr. Lanyon concluded that it was

72

highly probable that Sansing's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly diminished. (ER 442.) Dr. Lanyon continued that Sansing's delusion triggered a series of behaviors that are best explained by a psychotic mental state. (ER 442.) Significantly, corroborating that he was affected by the cocaine, Sansing experienced extreme physiological reactions, including a heartbeat so rapid that he was convinced he was going to die. This reaction is consistent with chronic and heavy cocaine use and can cause a psychotic state that can last several hours. Dr. Lanyon opined that Sansing was in a psychotic state at the time of his offense. Dr. Lanyon noted that Sansing's cocaine use was a product of the extreme dysfunction of his childhood. Thus, Dr. Lanyon offered, "the effects of [Sansing's] childhood environment can also be considered to be a causal factor in significantly diminishing his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law." (ER 443.)

In addition, Sansing's family members presented compelling live testimony about the abuse and neglect Sansing suffered as a child—testimony that was noticeably absent from his sentencing hearing. If all this mitigation evidence had been presented at Sansing's sentencing, there is a reasonable probability that the sentencer would not have imposed death. Although the PCR court cites the facts of the crime in support of its conclusion that the mitigation would not have made a

difference (ER 96-99), the Ninth Circuit has made clear that, especially in cases like this one where the state proved the existence of only a sole aggravating factor, "[e]vidence of mental disabilities or a tragic childhood can affect a sentencing determination even in the most savage case." *Lambright v. Stewart*, 241 F.3d 1201, 1208 (9th Cir. 2001); *see also Ainsworth v. Woodford*, 268 F.3d 868, 874-78 (9th Cir. 2001). That is especially true when this evidence is weighed against the only remaining aggravating circumstance.

The powerful mitigation evidence not presented to the sentencing judge in Sansing's case may very well have been enough to overcome the sole aggravating factor. Here, as in *Rompilla*, 545 U.S. at 393, the "evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the [sentencer], and although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test." *Id.* Trial counsel's failure to investigate, to present Sansing's personal history to a competent mental health and substance abuse expert, and to present Sansing's mitigation to the court resulted in prejudice for which the only remedy is a new sentencing.

**Claim Seven**

**The trial court and the Arizona Supreme Court violated Sansing's Eighth and Fourteenth Amendment Rights to the consideration of all relevant mitigating evidence when, contrary to clearly established federal law, they refused to consider mitigating factors that did not have a "causal nexus" to the crime.**

This issue was adjudicated on the merits by the Arizona Supreme Court on direct appeal. *Sansing I*, 26 P.3d at 1129; *Sansing II*, 77 P.3d at 37, 39. By requiring a "causal nexus" between the mitigating evidence presented at sentencing and the crime itself, the state courts acted contrary to clearly established federal law. The district court denied this claim on the merits. (ER 63-69.)

## I.    Arizona's causal nexus test violated Sansing's constitutional rights under the Eighth and Fourteenth Amendments.

In its decision on this claim, the district court concluded that both the trial court and the Arizona Supreme Court considered all of Sansing's mitigation, but that they had appropriately decided to give minimal weight to those factors without a causal nexus to the crime. (ER 68-69.) These conclusions were legally incorrect and any factual findings they were based on were clearly erroneous.

The Eighth and Fourteenth Amendments require that a capital sentencer, along with a reviewing court, consider and give effect to any and all relevant mitigating evidence. *Eddings*, 455 U.S. at 114. This requirement furthers the fundamental underpinnings of constitutional capital sentencing: avoiding arbitrary death sentences and judging the character and record of the individual defendant.

75

*See, e.g.*, *Kennedy v. Louisiana*, 554 U.S. 407, 436, *as modified* (Oct. 1, 2008), *modified on denial of reh'g*, 554 U.S. 945 (2008). Thus, the United States Supreme Court repeatedly reiterated, for decades before Sansing's sentencing, that a state may not preclude the sentencer "from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence." *Eddings*, 455 U.S. at 113-14; *Penry v. Lynaugh*, 492 U.S. 302, 317 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002); *Lockett v. Ohio*, 438 U.S. 586 (1978).

Despite this clearly established federal law, various state legislatures and courts began imposing a barrier to considering and giving effect to mitigation by requiring that defendants satisfy the "causal nexus test." This test would either prevent sentencers from considering mitigation that had no "causal nexus" to the crimes charged, or would prevent sentencers from giving proper effect to mitigation on the same basis. The result in Arizona was that both sentencing and reviewing courts failed to provide the individualized consideration that the Eighth and Fourteenth Amendments demand.

In 2004, when reviewing a similar causal nexus requirement in Texas, the Supreme Court clarified that these restrictions were unconstitutional. Imposing any causal nexus requirement on proffered mitigating evidence—indeed, imposing any threshold standard other than the "most expansive" interpretation of the general

76

relevance standard—has "no foundation" in the Supreme Court's jurisprudence and violates the Eighth and Fourteenth Amendments. *Tennard v. Dretke*, 542 U.S. 274, 284-85 (2004). The Court went on to stress that it has "never countenanced and now ha[s] unequivocally rejected" imposing any causal nexus requirements as a barrier to considering or giving effect to mitigating evidence. *Smith v. Texas*, 543 U.S. 37, 45 (2004).

Contravening this precedent, from the late 1980s until 2006, the Arizona Supreme Court applied a causal nexus test to non-statutory mitigation evidence. "For a period of a little over 15 years in capital cases, in clear violation of *Eddings*, the Supreme Court of Arizona articulated and applied a 'causal nexus' test for nonstatutory mitigation that forbade as a matter of law giving weight to mitigating evidence, . . . unless the background or mental condition was causally connected to the crime." *McKinney v. Ryan*, 813 F.3d 798, 802 (9th Cir. 2015) (en banc). Its treatment of statutory mitigation echoed that unconstitutional requirement. *Id.* at 809-10.

Even when the Arizona Supreme Court asserted that it was "considering" mitigation evidence presented in light of *Eddings*, "[i]n the usage of the Arizona Court, . . . 'considering' such evidence did not mean weighing it to determine how much mitigating effect to give it." *Id.* at 814. "Rather, it meant 'considering' such evidence to determine whether it satisfied the causal nexus test for nonstatutory

mitigation." *Id.* Only if the evidence overcame that causal nexus barrier was the sentencing court required to determine "how much weight, if any, to give it. If [it] did not satisfy the test, the sentencer was required, as a matter of law, to treat it as irrelevant and to give it no weight." *Id.* As this Court previously found, "[i]n no case during this period did the [Arizona Supreme] Court give any indication that the causal nexus test was not the law in Arizona, or any indication that it had the slightest doubt about the constitutionality of the test." *Id.* at 824.

In *McKinney*, the en banc Court recognized that the Arizona Supreme Court's application of this test, even given the appropriate deference under 28 U.S.C. § 2254, violated clearly established federal law. *Id.* at 811-12; *see also Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) ("When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in §2254(d)(1) is satisfied."). As this Court has stated, "The reason for rejecting a nexus requirement is clear: the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender . . . as a constitutionally indispensable part of the process of inflicting the penalty of death." *Lambright v. Schriro*, 490 F.3d 1103, 1115 (9th Cir. 2007) (quoting *Eddings*, 455 U.S. at 112 (internal quotation marks removed; alterations in original)). As described below, both the sentencing judge and the reviewing Arizona Supreme Court committed

78

the same violations of clearly established federal law in Sansing's case and he should receive relief.

## II. The state courts violated Sansing's rights when they applied an unconstitutional causal nexus test to his mitigation.

At the time Sansing was sentenced, both the sentencing judge and the Arizona Supreme Court operated under the unconstitutional assumption that Sansing had to show a causal nexus between his proffered mitigating evidence and the crime. *See, e.g.*, *McKinney*, 813 F.3d at 802; *see also State v. Lee*, 944 P.2d 1204, 1221 (Ariz. 1997) (rejecting proffered mitigation evidence when defendant "failed to establish a nexus between his deprived childhood and his crimes"); *State v. Ross*, 886 P.2d 1354, 1363 (Ariz. 1994) (requiring defendant to show a nexus between offered mitigating evidence of difficult family background and the crime). The language in the state supreme court opinion affirming Sansing's sentence expressly confirms this assertion.

### A. Trial court

In the superior court, the trial judge found that Sansing failed to prove any of the statutory mitigating factors, and then, using a test very similar to that employed by the Fifth Circuit in *Tennard*, refused to give weight to several of Sansing's proffered non-statutory mitigating factors. (ER 269-70.) Specifically, the sentencing judge had evidence of non-statutory mitigating factors, including Sansing's difficult childhood and dysfunctional family as well as his family love

79

and support. (ER 267-68.) Yet because it required proof of a causal nexus between the mitigating evidence and the crime, the judge screened out almost all of this relevant evidence. (ER 267-68.)

Sansing pled guilty to four counts, including first-degree murder, on September 18, 1998. (ER 1383-1400.) The State filed a notice alleging three aggravating factors that it intended to prove. (ER 1379-80.) An aggravation/mitigation hearing was held over three days in August 1999. (ER 1282-1375; ER 1219-81; ER 1179-1218.) As discussed in detail, *supra*, Sansing's mitigation evidence at sentencing showed that he had an abusive and tumultuous childhood. He was abandoned by his father after his birth and was raised by an alcoholic mother, whose lack of education prevented her from being able to support her four children. (ER 345-49.) His mother remarried numerous times to abusive, alcoholic men. (ER 349-50.) Sansing witnessed repeated bouts of domestic violence which resulted in "hundreds of calls to the police" and numerous trips to the hospital. (ER 349.)

After the hearing, the State filed a sentencing memorandum (PSER 67), the defense responded (ER 1149), and the State filed a reply (PSER 51). In its reply, the State repeatedly argued that the mitigation presented by Sansing was either not mitigation or did not provide the necessary causal nexus to constitute mitigating evidence. (PSER 62 ("A difficult or dysfunctional family background is not

80

necessarily a mitigating circumstance. Unless the defendant shows that something in his background affected his behavior, in a manner beyond his control, the defendant has failed to prove mitigation."); PSER 61 ("The fact that defendant was a cocaine user doesn't explain or excuse his actions, not one iota."); PSER 61 ("The defendant argues that his age of 31 years is mitigating. The State alleges it is not."); PSER 63 ("There is nothing about the defendant's education, or lack thereof, which bears upon his actions in this case."); PSER 63 (regarding future dangerousness, rehabilitation, and changed life mitigation, "[t]here can be no mitigation here"); PSER 63 ("there is nothing about the defendant's upbringing that could explain his vicious, premeditated and unprovoked attack"); PSER 64 (regarding victim's daughter request for leniency, stating "There is no relevance to this allegation, and there is no mitigation"); PSER 65 (regarding remorse, stating "[t]he State submits there is no mitigation here"); PSER 65("The mitigation, if present at all, is woefully inadequate to overcome the aggravation.").

Following the hearing, the trial judge issued a special verdict sentencing Sansing to death. (ER 255-71.) While the judge found that the State had not proven the existence of the "previously convicted of a serious offense" aggravating factor, Ariz. Rev. Stat. § 13-703(F)(2) (ER 256-58), the judge did find that the State had proven both the pecuniary gain and the cruel, heinous, or depraved aggravating factors, *id.* §§ 13-703(F)(5), (F)(6) (ER 258-63). In considering Sansing's

81

mitigation, the judge found that Sansing's age was not a mitigating circumstance. (ER 265-66; ER 267.) The judge also found that Sansing had been impaired by crack cocaine at the time of the crime, but that was tempered by the judge's additional notation that the crack cocaine bought with the victim's jewelry was ingested after the crime. (ER 266-67.)

The court went on to consider Sansing's "difficult childhood and dysfunctional family." (ER 267.) Despite the fact that Sansing was able to show by a preponderance of the evidence that he had a "difficult childhood and family background," the trial court found that "there is nothing in the defendant's childhood or family background that provides a causal link to the horrific crime committed by the defendant. Consequently, the court does not give significant mitigating weight to the defendant's difficult childhood . . . ." (ER 267.) The trial judge additionally discounted Sansing's mitigation evidence of family love and support after finding that "it did not prevent the defendant from committing this horrible crime." (ER 268.)

Constitutionally, Sansing was not required to show that his family support or dysfunctional childhood was in any way linked to the crime. This mitigation was relevant to show a sentencer that Sansing should get "a sentence less than death." *Tennard*, 542 U.S. at 285. The trial judge's failure to properly consider this evidence was unconstitutional. *Id*.

## B.    Direct Appeal

This constitutional error was repeated in Sansing's appeal. Because Sansing pleaded guilty to the crimes in the indictment, the court considered only sentencing-related claims. In the appellate briefing, Sansing argued that the trial judge violated his Eighth and Fourteenth Amendment rights in requiring a causal nexus between the crime and the proffered mitigation evidence. (ER 2181-87.) However, the Arizona Supreme Court rejected Sansing's claim on direct appeal, holding that the trial judge did consider the mitigation evidence but simply accorded it minimal weight. (ER 241-42.) *Sansing I*, 26 P.3d at 1129.[6] However, the court's own decision demonstrated that Arizona law required a causal nexus for mitigation evidence to even be considered because that court also required a causal nexus in considering the mitigation: "Arizona law states that a difficult family background is not relevant unless the defendant can establish that his family experience is linked to his criminal behavior." (ER 242.) *Id*. at 358-59 (quoting *State v. Djerf*, 959 P.2d 1274, 1289 (Ariz. 1998)). As the court's own opinion in this case makes clear, Arizona law at the time of Sansing's sentencing required a defendant to prove a causal nexus between mitigation and the crime before the mitigation could be determined to be relevant and, thereby, considered by the

---

[6] In this same opinion during the court's independent review, the court reversed the trial judge's finding of the pecuniary gain aggravating factor because there was not sufficient evidence to support it. (ER 227-34.) *Sansing I*, 26 P.3d at 1124-27. Accordingly, only one aggravating factor remains in this case.

sentencer. *See e.g.*, *State v. Hoskins*, 14 P.3d 997, 1021 (Ariz. 2000); *State v. Wallace*, 773 P.2d 983, 986 (Ariz. 1989).

While the trial judge claimed to have given "minimal weight" to this mitigation, judges are presumed to follow the law as interpreted by the state's highest court. *See Woodford v. Visciotti*, 537 U.S. 19, 24 (2002); *see also Walton v. Arizona*, 497 U.S. 639, 653 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002). At the time of Sansing's sentencing, Arizona law mandated that such evidence could not be considered relevant, and thus could not be considered at all if it was not causally linked to the crime. *See McKinney*, 813 F.3d at 814. Consequently, the trial judge, even after finding that Sansing had proven the existence of this mitigation evidence by a preponderance of the evidence, could not meaningfully consider that mitigation as required by the Eighth Amendment.

And, even if the trial judge did give some minimal weight to the mitigation, Arizona's causal-nexus requirement prevented it from "reasonably find[ing] that [the mitigation] warrant[ed] a sentence less than death." *Tennard*, 542 U.S. at 285 (quoting *McKoy v. N. Carolina*, 494 U.S. 433, 441). The Arizona Supreme Court found that, because Sansing had failed to prove a causal nexus, the trial court "gave the evidence appropriate weight," which was minimal. (ER 243.) *Sansing I*, 26 P.3d at 1130. Thus, under the causal-nexus test, the trial court could not find that the mitigation was sufficiently substantial to call for leniency. If the sentencer

84

is required to only give minimal weight to mitigation that is not causally linked to the crime, it is prevented from giving meaningful effect to that relevant mitigation. *See Penry v. Lynaugh*, 492 U.S. 302, 321 (1989); *see also Porter v. McCollum*, 558 U.S. 30, 43-44 (2009) (finding it unreasonable when a state court "discounts to irrelevance" the mitigation evidence presented by a defendant, especially when that mitigation might be salient for a jury to understand the crime). The Arizona Supreme Court's holding is contrary to clearly established federal law as interpreted by the Supreme Court. *See Tennard*, 542 U.S. at 284.

### C. *Ring* harmless error review

Compounding the error, the Arizona Supreme Court again employed the same unconstitutional test when it reviewed the harmlessness of the *Ring* error in Sansing's case. (ER 116-24.) *Sansing II*, 77 P.3d at 37-39. As described more fully in Claim 1, *supra*, the Arizona Supreme Court's *Ring* harmlessness inquiry focused on whether a reasonable jury would conclude that there are no mitigating circumstances sufficiently substantial to call for leniency. *See Ring*, 65 P.3d at 944. In reevaluating Sansing's mitigation, the Arizona Supreme Court found that Sansing had "failed entirely to show any causal nexus between his alleged drug use and impairment," (ER 118) 77 P.3d at 37, and he failed to "demonstrate any causal link between his crimes and his childhood and lack of education," (ER 122-23) *id.* at 39. Because this mitigation was not considered relevant without a causal link,

the majority determined that a jury would not have given effect to such mitigation and, thus, no reasonable jury would have found the mitigation "sufficiently substantial to call for leniency." (ER 122.) *Id.* at 39.

These findings were unconstitutional. The Arizona Supreme Court unconstitutionally disregarded the majority of Sansing's mitigation evidence in his direct appeal both in denying his claim about the trial judge's errors and in its own independent review, and went on to unconstitutionally deny him a jury sentencing hearing because of this error. *Cf. Eddings*, 455 U.S. at 113-14 ("Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence."). Because the requirement of a causal nexus between mitigation and the crime is inconsistent with *Lockett*, *Eddings*, and *Tennard*, the Arizona Supreme Court deployed its *Ring* harmlessness analysis in a manner "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." *McKinney*, 813 F.3d at 821 (quoting 28 U.S.C. § 2254(d)(1)).

## III.    This error had a substantial and injurious effect on Sansing's sentence.

Sansing can show that this error was not harmless. *See McKinney*, 813 F.3d at 822-23. There is only one aggravating factor remaining in this case, and Sansing has compelling mitigation evidence. Especially when considered along with the

other claims raised in this briefing regarding the errors in Sansing's plea that undermines the evidence of that sole aggravating factor, the additional mitigation evidence that should have been presented, and the victim's daughter's request for leniency, Sansing has shown that there can be no confidence in his death sentence. The fundamental "respect for humanity underlying the Eighth Amendment" requires consideration of Sansing's character and record as an individual. *Id.* With his life at stake, a "properly informed, individualized sentencing determination" was essential. *Id.* Because the sentencing judge and reviewing court did not give meaningful effect or a reasoned moral response to his mitigating evidence, his sentence was "fatally flawed." *Id.* (quoting *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 264 (2007)). Undermining Sansing's mitigation evidence by repeatedly imposing a causal nexus barrier to considering it and giving it effect "undermined the very core" of his plea for life. *See id.* (quoting *Coleman v. Calderon*, 210 F.3d 1047, 1051 (9th Cir. 2000)). Accordingly, the Arizona courts' *Eddings* errors had a substantial and injurious effect on Sansing's sentence. *See id.* at 822-23.

Finally, resentencing is the only proper remedy for the causal nexus error in this case. A remand to the Arizona Supreme Court, instead of a remand for resentencing, is not a constitutional remedy in light of *Ring v. Arizona*, 536 U.S. 584 (2002), and *Hurst v. Florida*, 136 S. Ct. 616 (2016). As those cases make clear, the Supreme Court's opinion in *Clemons v. Mississippi*, 494 U.S. 738

(1990), and its remedy of appellate reweighing, was based upon precedent which now has been expressly overruled by the Supreme Court.

*Clemons* upheld the use of appellate reweighing after one aggravating factors was struck on appeal. 494 U.S. at 741. It did so by relying upon *Hildwin v. Florida*, 490 U.S. 638 (1989) and *Spaziano v. Florida*, 468 U.S. 447 (1984). *Clemons*, 494 U.S. at 746. In *Hildwin*, the Supreme Court had held that the Sixth Amendment does not require a jury finding on aggravating circumstances. 490 U.S. at 639-40. In *Spaziano*, the Court held that neither the Sixth nor the Eighth Amendment provide a constitutional right to have a jury determine whether a capital sentence is appropriate. 468 U.S. at 459. Relying on these two cases read together, *Clemons* held that because a jury was unnecessary for the findings supporting the death sentence, there was no constitutional reason an appellate court could not reweigh the facts supporting a death sentence after that death sentence was found to be infirm. 494 U.S. at 746.

The invalidity of *Clemons* is clear in light of *Ring* and *Hurst*. In *Hurst*, the Supreme Court expressly overruled both *Spaziano* and *Hildwin* because "[t]ime and subsequent cases have washed away the logic" of those holdings." 136 S. Ct. at 624-25. Again, echoing the pronouncement of *Ring*, *Hurst* reiterated that it is juries, not judges, who must make all the findings supporting a death sentence. *Id.*

88

at 624. The only way to cure Sansing's unconstitutional death sentence is through the impaneling of a jury, not appellate reweighing on a cold record.

Prior to *Hurst*, this Court has been inconsistent in regard to the proper remedy for causal nexus error. It has remanded some causal nexus error cases for resentencing, *Williams v. Ryan*, 623 F.3d 1258, 1271-72 (9th Cir. 2010) (remanding for resentencing and granting the writ for causal nexus error), and remanded others for further appellate review by the Arizona Supreme Court, *Styers v. Ryan* ("*Styers III*"), 811 F.3d 292 (9th Cir. 2015) (upholding remedy of remand to the Arizona Supreme Court for further appellate review). However, *Styers III* predated *Hurst*, which expressly overruled the cases *Clemons* relied upon to justify appellate reweighing. In addition, other courts, when faced with causal nexus error, have determined that resentencing, not appellate reweighing, is the appropriate remedy. *See, e.g.*, *Cole v. Dretke*, 265 F. Appx. 380 (5th Cir. 2008) (remanding for granting of writ and resentencing, not additional appellate review, after the Supreme Court reversed their appellate findings on causal nexus error in *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007)); *Ex parte Smith*, No. AP-74228, 2007 WL 1839892 (Tex. Crim. App. 2007) (remanding for a new sentencing trial after Supreme Court found error in their appellate review of the causal nexus issue in *Smith v. Texas*, 543 U.S. 297 (2007)).

And, even if *Styers III* remains good law, Sansing's case is distinguishable. Unlike *Styers III*, where the causal nexus error occurred solely at the Arizona Supreme Court, Sansing's causal nexus error occurred at the trial court level as well. *See Styers v. Schriro* ("*Styers I*"), 547 F.3d 1026, 1028 (9th Cir. 2008) (noting that Styers' claim was that the Arizona Supreme Court erred in its appellate reweighing). It was the analysis of the trial judge using the nexus test that led to the unconstitutional death sentence here. Because the genesis of the error was at the trial level, the only constitutional remedy in the wake of *Ring* is jury resentencing. *See Ring*, 536 U.S. 584 (2002) (holding unconstitutional Arizona's judge sentencing scheme in capital cases). This is also consistent with the holding in *Williams*, where the *Lockett/Eddings* error occurred both at the trial level and in the Arizona Supreme Court and "further sentencing" was held to be the appropriate remedy. *See Williams*, 623 F.3d at 1270-71 (citation omitted).

And in any event, the review provided by the Arizona Supreme Court after the remand in *Styers I* was purely superficial. *See State v. Styers* (*Styers II*), 254 P.3d 1132 (Ariz. 2011). The Arizona Supreme Court disagreed with this Court's finding that it violated *Lockett/Eddings* at all, *id.* at 1135 ("we disagree with [the Ninth Circuit's] reading of our opinion [on direct appeal]"), and again denied relief to Styers based on the lack of connection between the mitigation and the crime, *id.* ("Like the defendants in *Tucker*, *Smith*, and *Ellison*, Styers failed to present any

90

evidence that his PTSD affected his conduct at the time of the crime."). As Justice Hurwitz explained in his dissent in *Styers II*, the Arizona Supreme Court's "'do-over'" of the independent review was "not constitutionally permitted." *Styers II*, 254 P.3d at 1136-37 (Hurwitz, J., dissenting). Independent review can only occur on direct appeal. *Id.* at 1137. However, after *Ring*, Sansing would first be entitled to a jury trial "unless the original jury made the requisite findings or no reasonable jury could have failed to find them." *Id.* In this scenario, Sansing is entitled to a new sentencing proceeding before a jury. *Id. Hurst* has proven that Justice Hurwitz's analysis was correct and Sansing must receive a new sentencing proceeding by a jury.

## Claim Eight

**Sansing's guilty plea was not knowing, intelligent, or voluntary because the written factual basis established an aggravating factor without Sansing's waiver of privilege against self-incrimination, in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.**

Sansing challenged the validity of his guilty plea in his PCR proceedings, but both state courts summarily denied Sansing's claim. (ER 101; ER 84.) The state courts' rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. Alternatively, it was an unreasonable determination of the facts in light of the evidence presented to the state courts.

91

The waiver of a constitutional right must be knowing, intelligent and voluntary. *Johnson v. Zerbst*, 304 U.S. 458 (1938). Several federal constitutional rights are implicated by the waiver that occurs during a guilty plea, including the right to a jury trial, the right to confront one's accusers, and the Fifth Amendment right against compulsory self-incrimination. *Boykin v. Alabama*, 395 U.S. 238, 243 (1969). For waiver of each of those rights to be valid, "it must be an intentional relinquishment or abandonment of a known right or privilege." *Id.* at 243 n.5 (quoting *Johnson*, 304 U.S. at 464). Significantly, there is no difference between the guilt and penalty phases of a defendant's capital murder trial for purposes of the Fifth Amendment protection against self-incrimination. *Estelle v. Smith*, 451 U.S. 454, 462-63 (1981).

"Courts [must] indulge every reasonable presumption against waiver of fundamental constitutional rights and . . . not presume acquiescence in the loss of fundamental rights." *Johnson*, 304 U.S. at 464 (citations omitted). "Presuming waiver from a silent record is impermissible." *Boykin*, 395 U.S. at 242 (citation omitted). Furthermore, a guilty plea "cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts." *McCarthy v. United States*, 394 U.S. 459, 466 (1969).

The reliability required for waiving constitutional rights is heightened in a capital case. When a defendant's life is at stake, a court must be "particularly

sensitive to insure that every safeguard is observed." *Gregg v. Georgia*, 428 U.S. 153, 187 (1976). The Supreme Court has noted that "[w]hat is at stake for an accused facing death or imprisonment demands the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and *of its consequence*." *Boykin*, 395 U.S. at 243-44 (emphasis added); *see also Brady v. United States*, 397 U.S. 742, 748 (1970). In this case, Sansing never knowingly or voluntarily relinquished his right against self-incrimination at the penalty phase.

With practically no investigation conducted by his attorneys, Sansing agreed to plead guilty to all charges with nothing in exchange. Because Sansing did not get a deal from the prosecution, he was not required to sign a detailed factual basis for the plea. He was only required to plead guilty to the formal elements of the offenses charged against him. *See McCarthy*, 394 U.S. at 466. Instead, on the ineffective advice of counsel, Sansing signed a detailed factual basis, prepared by the prosecution, in which he unknowingly admitted a fact necessary to establish the sole aggravating factor upon which his death sentence is predicated. (ER 1401; ER 1105-11.)

Sansing's factual basis stated that the victim was conscious when he returned from moving her vehicle. (ER 1401.) The victim's consciousness was used to establish the cruelty aggravating factor, which required a showing beyond a

93

reasonable doubt that "the victim was conscious during the attack." (ER 235-36.) *Sansing I*, 26 P.3d at 1127. Notably, the victim's consciousness was not an element of any of the charged offenses that Sansing was required to admit for the purposes of his guilty plea. (*See* ER 1402.)

Aside from Sansing's unknowing admission, there was strong evidence showing that the victim was in fact unconscious after being struck in the back of the head. The medical examiner doubted that the victim could have ever regained consciousness after the blunt force head trauma. (ER 1253.) Also, Kara testified that the victim was unconscious after Sansing hit her in the head during the initial struggle, verifying the medical examiner's testimony. (ER 1354.) However, Sansing's factual basis was used to conclusively establish that the victim was conscious during the entire attack, supporting a finding of cruelty. (*See* ER 107-12.) *See Sansing II*, 77 P.3d at 33-35.

Sansing did not knowingly, intelligently, and voluntarily waive his privilege against self-incrimination at the sentencing phase when he admitted to a fact that conclusively established an aggravating factor. Sansing's trial counsel failed to explain to him that the state is required to prove aggravating circumstances to obtain a death sentence. (ER 452.) In fact, Sansing had no understanding of the sentencing phase process. (ER 452.) Likewise, Sansing had no knowledge that the state would have to prove that the victim was conscious during the attack to

94

establish the "cruelty" aggravating factor. (ER 452.) Even more alarming, trial counsel did not review the written factual basis with Sansing before his change of plea hearing. (ER 451.) The first time Sansing saw this document was at the courthouse before he pleaded guilty. (ER 451.) Sansing was completely unaware that he was not required to sign such a detailed document to plead guilty. (ER 451.) Had trial counsel properly explained the consequences of his plea, and taken the time to thoroughly go over the admissions, Sansing would not have signed the document. (ER 453-54.)

The trial court also failed to explain to Sansing the consequences his admissions and stipulations would have on the sentencing phase of his capital trial. During the plea colloquy, the judge only asked Sansing whether he understood the rights that he was giving up with respect to the guilt phase. (ER 1389-90.) And, with respect to his Fifth Amendment right against compulsory self-incrimination, the trial court only asked whether Sansing knew that he was giving up his right to refuse to testify at a guilt-phase trial. (ER 1389-90.) At no point within the plea colloquy did the trial court ask if Sansing understood that his factual admissions, which were part of his guilty plea, could be used as conclusive fact against him at his sentencing phase. The plea colloquy failed to put Sansing on notice that his rights under the Fifth Amendment to the United States Constitution applied to his sentencing phase. *See Boykin*, 395 U.S. at 243-44. Had Sansing known that the

written factual basis would not solely be used to guarantee his conviction, but rather to guarantee his death sentence, he would have never stipulated to such facts. (ER 454.)

The district court denied this claim, concluding that the trial court's finding of the victim's consciousness was not a direct consequence of the plea, but rather a collateral consequence, and therefore the trial court was not required to advise Sansing of the self-incrimination implications during the plea colloquy. (ER 32.) The district court reasoned that, based on this Circuit's decision in *Torrey v. Estelle*, 842 F.2d 234, 235 (9th Cir. 1988), because the finding of the (F)(6) aggravator was a "result of a separate, discretionary proceeding during which Petitioner retained all his constitutional rights," it was not a direct consequence of his plea deal. (ER 32.)

The district court's decision is erroneous for several reasons. First, the sentencing phase of a capital proceeding in Arizona is not a "discretionary proceeding" but rather a mandatory hearing. *See* Ariz. Rev. Stat. § 13-752. Second, and more importantly, because this claim is governed by AEDPA, this Circuit's holdings cannot be the basis for denying relief. *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012). Thus, the only relevant question is whether clearly established Supreme Court precedent required that Sansing be informed of the consequences of his plea on his sentence. Given that his factual basis was used as self-

96

incrimination in violation of the Fifth Amendment during his sentencing hearing, the Supreme Court has unequivocally held that such a right must be intentionally relinquished. *Boykin*, 395 U.S. at 243.

Since Sansing did not understand the law in relation to the facts, nor did he understand the consequences of his plea, his plea was not knowing or voluntary. *Johnson*, 304 U.S. at 464; *Boykin*, 395 U.S. at 243-44. The state courts' dismissal of Sansing's claim was, therefore, an unreasonable application of, or contrary to, Supreme Court precedent, which requires an intentional relinquishment or abandonment of a *known* right. *Boykin*, 395 U.S. at 243 n.5; *Johnson*, 304 U.S. at 464. Consequently, this Court should find that Sansing's guilty plea was not knowingly or voluntarily given and grant him relief.

## Claim Twelve

**The trial court violated Sansing's rights under the Eighth and Fourteenth Amendments to the United States Constitution when it failed to find and/or consider the victim's daughter's wishes as a mitigating factor.**

Sansing raised this claim on direct appeal, and the Arizona Supreme Court denied relief. (ER 240-41.) *Sansing I*, 26 P.3d at 1129. The Arizona Supreme Court's decision was both contrary to and an unreasonable application of clearly established federal law, and was based on an unreasonable determination of the facts presented in state court. The district court also denied this claim on the merits. (ER 74-77.)

Given "'that the imposition of death by public authority is . . . profoundly different from all other penalties,' . . . the sentencer must be free to give 'independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation.'" *Eddings*, 455 U.S. at 110 (quoting *Lockett*, 438 U.S. at 605). The only constitutional limit to evidence offered in mitigation of a crime is relevance. *See, e.g.*, *Lockett*, 438 U.S. 586; *Eddings*, 455 U.S. 104. Thus, the only question here is whether the letter from the victim's daughter asking that Sansing not be given a death sentence was relevant evidence in mitigation of Sansing's crime. *See Skipper*, 476 U.S. at 4. It is undoubtedly relevant and the state court's adjudication to the contrary violated clearly established federal law.

The victim's daughter wrote a letter to the trial court stating that "it says in the bible that you should forgive and forget. . . . Instead of dying, [the Sansings] should live to do something for their kids that my mom can't do now. They should go to jail instead of dying." (ER 1114.) In other materials, she again asked that Sansing not be given a death sentence because it would give him a better chance to be saved and a death sentence would not bring her mother back. (ER 1115.)

The trial court acknowledged the letter but refused to consider it as mitigating evidence because it did not relate to Sansing or the circumstance of the offense. (ER 269.) The Arizona Supreme Court upheld the trial court's decision,

finding that it was "irrelevant to either the defendant's character or the circumstances of the crime and is therefore not proper mitigation." (ER 240-41.) *Sansing I*, 26 P.3d at 1129 (quoting *State v. Trostle*, 951 P.2d 869, 887 (Ariz. 1997)). The state supreme court's decision is contrary to Supreme Court precedent.

The Supreme Court has held that "the sentencer may not refuse to consider . . . any relevant mitigation evidence." *Skipper*, 476 U.S. at 4 (internal quotation and citation omitted). Relevancy is not limited only to evidence that relates to the defendant or the circumstances of the crime. *See id*. The wishes of the victim's ten-year-old daughter could reasonably have been found to warrant a sentence less than death, especially when coupled with Sansing's cooperation with the police, acceptance of responsibility and remorse, his use of crack cocaine during the crime, and his difficult childhood. The state court's refusal to consider such evidence was contrary to Supreme Court precedent and, therefore, does not require deference. In fact, this Court has held under analogous circumstances that while a request for leniency from the victim's father was not enough, standing alone, to establish prejudice, it must be considered with the other mitigation counsel did not present. *Scott v. Schriro*, 567 F.3d 573, 585-86 (9th Cir. 2009).

The district court denied this claim because the "Supreme Court has not addressed the issue or ever held that a victim's recommendation of leniency constitutes relevant mitigation." (ER 76.) However, courts need not "wait for some

nearly identical factual pattern before a legal rule must be applied." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (quoting *Carey v. Musladin*, 549 U.S. 70, 81 (2006) (Kennedy, J., concurring)). A federal habeas court may find "an application of a [legal] principle unreasonable when it involves a set of facts different from those of the case in which the principle was announced." *Id.* (internal quotation and citation omitted). The phrase "clearly established Federal law" in 28 U.S.C. § 2254(d)(1) refers simply to a governing legal *principle* set forth in Supreme Court precedent. *See Williams v. Taylor*, 529 U.S. 362, 405-06, 407 (2000).

The Supreme Court has clearly established that all relevant mitigating evidence must be considered in a capital sentencing hearing. *See Lockett*, 438 U.S. 586; *Eddings*, 455 U.S. 104; *Skipper*, 476 U.S. at 4; *Boyde*, 494 U.S. at 377-78. Thus, regardless of whether the Supreme Court has addressed a case in which this precise type of mitigation evidence was presented, it has firmly established the governing legal principle. The Arizona Supreme Court's dismissal of this highly probative mitigating evidence was therefore an unreasonable application of and contrary to the Supreme Court's firmly established precedent on mitigation. The district court's finding to the contrary was also erroneous.

Alternatively, the district court held that the Arizona Supreme Court's decision was in line with the Supreme Court's decisions in *Booth v. Maryland*, 482

100

U.S. 496 (1987), and *Payne v. Tennessee*, 501 U.S. 808 (1991), which prohibited opinions from victim's family members about the appropriate sentence in a capital case. (ER 76.) However, the focus in *Booth* and *Payne* was whether the *state* could present evidence of the *harm* that the victim's family suffered. *Payne*, 501 U.S. at 825; *Booth*, 482 U.S. at 506-07. Thus, the Supreme Court was addressing the more typical situation in which the state wishes to put forth highly-emotional evidence of the loss suffered by the victim's family to help secure a death sentence. *Payne*, 501 U.S at 825-26. This was not the situation here and, therefore, *Booth* and *Payne* do not prohibit the victim's daughter's wishes from being considered. Indeed, it is a rare case when a murder victim recommends any degree of leniency for a defendant. Rather than fall under the victim impact-type of evidence offered by the state, the letters here are mitigating evidence that call for a sentence less than death and are entitled to tremendous weight.

On *de novo* review, this Court must conduct its own harmless error analysis of the trial court's denial to determine whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (internal quotation and citation omitted); *see Fry*, 551 U.S. at 116. A plea for leniency from the victim's daughter, who is directly impacted by the crime, is powerful mitigating evidence. Given that there was only one aggravating factor in this case, the trial court's failure to consider and give effect to such a unique

request had a substantial and injurious effect on Sansing's sentence. Further, consideration of such mitigating evidence could have changed the calculus in the Arizona Supreme Court's *Ring* error analysis. The Arizona Supreme Court would have been required to remand Sansing's case for resentencing because a reasonable jury could have viewed the victim's daughter's plea as sufficiently substantial to call for leniency. Including such mitigation evidence in the weighing of aggravation and mitigation in this case would have substantively changed the sentencer's consideration, and, therefore, it cannot be harmless. Sansing was prejudiced by the fact that this mitigating evidence was not considered, and he is entitled to relief.

*Uncertified Issue*[7]

### Claim Four

**Sansing was denied effective assistance of counsel in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution because trial counsel failed to properly advise Sansing about the consequences of his plea, stipulated factual basis, and sentencing stipulation.**

Sansing presented this claim in his PCR proceedings, but the state courts

---

[7] Sansing raises this issue pursuant to Ninth Circuit Rule 22-1(e), allowing a petitioner to brief uncertified issues "if a petitioner concludes during the course of preparing the opening brief, that an uncertified issue should be discussed in the brief." In such cases, uncertified issues "will be construed as a motion to expand the COA and will be addressed by the merits panel to such extent as it deems appropriate." *Id.* Sansing respectfully requests that the Court issue a certificate of appealability as to this claim and decide it on the merits.

summarily denied the claim. (ER 101; ER 84.) The district court denied this claim on the merits. (ER 61-63.)

## I.    Facts of claim

Sansing entered a plea agreement admitting to first-degree murder, kidnapping, armed robbery, and sexual assault. The parties offered a written factual basis, prepared by the prosecution, to support the plea. (ER 1401.) There were no sentencing agreements. The court read the written factual basis to Sansing and obtained his agreement to the facts. (ER 1391-94.) The victim's "consciousness" was discussed in the factual basis, but was not an element of any of the offenses to which Sansing pled. (ER 1401.) Ronan did not explain to Sansing the consequence of admitting to an aggravating factor (ER 454), and did not realize that the admission was actually false (ER 1354; ER 1253; ER 451; ER 1104). Sansing's erroneous admission that the victim was conscious would later become a key piece of evidence in the finding of the cruelty aggravating factor. (ER 259-61; ER 107-08.)

Later, during the sentencing phase, counsel admitted a sentencing stipulation through which the state gained the admission of the hearsay statements of the Sansings' children and a news reporter. (ER 1107-09.) Defense counsel never interviewed these witnesses. (ER 455-57.) The sentencing judge relied on the

children's statements and Sansing's statements to the news reporter in his finding of the (F)(6) cruelty factor. (ER 259-61.)

## II.    Legal argument

The PCR court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). It was also an unreasonable determination of the facts in light of the evidence presented. *Id.* § 2254(d)(2). Sansing incorporates by reference the authority addressing ineffective assistance of counsel claims cited in Claim Two, *supra*.

Trial counsel was ineffective for failing to properly advise Sansing about the consequences of his plea, the stipulated factual basis, and the sentencing stipulation. Because Sansing was pleading to the indictment, the prosecutor's approval of the factual basis was not necessary. (ER 447-49.) Sansing did not have a plea deal from the prosecutor; therefore, only those facts necessary to establish the elements of first-degree murder should have been included in the factual basis. The victim's consciousness was not an element of any of the offenses to which Sansing was pleading. The victim's consciousness was, however, a fact that the state needed to prove to establish cruelty in the alleged (F)(6) aggravator. *See State v. Bolton*, 896 P.2d 830 (Ariz. 1995). Given that the state had already noticed its intent to prove the existence of cruelty, no reasonable trial counsel would advise a

client to sign a factual basis that unnecessarily (and falsely) established the aggravating factor.

Furthermore, even if counsel was going to advise his client to sign this factual basis, he had an obligation to fully explain the consequences. *See, e.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 366-69 (2010). Counsel also has a duty to "explain to the client the full content of the agreement along with the advantages, disadvantages and potential consequences of the agreement." (ER 291.) Most importantly, the decision whether to plead guilty "should be based solely on the client's best interest." (ER 292.) Before a client enters a plea, it is incumbent upon counsel to "make certain that the client understands the rights he or she will waive by entering the plea and that the client's decision to waive those rights is knowing, voluntary and intelligent" and "make certain that the client fully and completely understands the . . . consequences [he] will be exposed to by entering a plea." (ER 292.)

Given the duties of counsel to meet with a client and keep the client apprised of all aspects of the case, and given the special duty of counsel to meet extensively with a client who is choosing to plead guilty to serious criminal charges, it is nothing short of shocking that trial counsel failed to meet with Sansing at the jail to properly advise Sansing that the factual basis could be used against him during

sentencing and about his Fifth Amendment right against self-incrimination. (*See* ER 453.)

In rejecting this claim, the district court found that it was not unreasonable for the state court to discount Sansing's assertions that counsel never discussed or explained the factual basis and sentencing stipulation with him because Sansing admitted in his declaration that "he is not a truthful person." (ER 62.) This is an inaccurate portrayal of Sansing's statements. (ER 454.) Regardless, the record is clear that trial counsel did not understand the consequences of the factual basis to explain them to Sansing, as evidenced by the fact that counsel argued that the victim was unconscious in the sentencing memorandum despite the admissions in the factual basis. (ER 1152.) The defense memorandum, in blindness to its own admissions and stipulations, claimed that "[t]he only evidence that [the victim] was conscious after that point [after being hit on the head] comes from Kara Sansing's testimony that the victim said something to the defendant while he was sexually assaulting her." (ER 1152.) The defense argument against a finding of cruelty was moot because the defense had already conceded the victim's consciousness. Because sentencing counsel could not have advised Sansing on consequences he apparently had not understood, the state court's determination that counsel was not ineffective was objectively unreasonable.

In addition, counsel was ineffective for advising Sansing to sign the stipulation without, at the very least, interviewing the witnesses discussed within. If he had conducted a proper investigation, trial counsel would have discovered that the statements were not accurate. As discussed above, the victim did not regain consciousness prior to her death. (ER 1354; ER 1253; ER 451; ER 1104.) However, the trial court relied on these hearsay statements in his finding of the (F)(6) cruelty factor. (ER 259-61.) When defense counsel does not submit the prosecution's case to the crucible of adversarial testing, he is not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Strickland*, 466 U.S. at 687. Defense counsel had a duty to, at a minimum, conduct an investigation into these statements before advising his client to stipulate to them. *See Wiggins*, 539 U.S. at 527.

The district court rejected this argument, claiming that Sansing agreed to the sentencing stipulation because he did not want his children to be called as witnesses. (ER 62.) While Sansing did not want his children involved, he also did not want to receive the death penalty. (ER 1168.) Sansing believed that signing the sentencing stipulation was simply a technicality to prevent his children from being involved. However, had he been properly advised that entering in their hearsay statements would negate his entire defense theory of drug impairment, he may well have decided differently. Furthermore, regardless of Sansing's decision, counsel

107

had an independent duty to interview all of the witnesses whose statements were being entered in the stipulation. *See Wiggins*, 539 U.S. at 527; *Stankewitz*, 365 F.3d at 721-22. His failure to conduct any investigation precluded him from being able to provide advice to Sansing regarding his plea and prevented him from understanding that the plea involved false information.

Sansing would not have signed the factual basis if he had understood the consequences. (ER 454.) The prejudice to Sansing from trial counsel's failure to properly advise him about the consequences of his plea, stipulated factual basis, and sentencing stipulation is obvious. If Sansing had not signed the factual basis and stipulation, the court would not have entered the guilty plea that ensured the finding of the cruelty factor. At the very least, the absence of the factual basis and stipulation would change the balance of aggravating and mitigating circumstances and would undermine confidence in the outcome. Given that the (F)(6) aggravator is the sole aggravating factor in his case, without the plea and Sansing's incorrect admissions, there is a reasonable probability that a rational sentencer would not have found that aggravator beyond a reasonable doubt and, thus, would not have sentenced Sansing to death.

The district court found no prejudice after concluding that, even without the factual basis or sentencing stipulation, there was no reasonable probability of a different outcome based on Kara's testimony and the state's ability to call the

108

reporter as a witness. (ER 62.) First, the reporter's testimony would have been inadmissible hearsay. *See* Ariz. R. Evid. 802. Second, Kara's lack of credibility and the discrepancy between her testimony and that of the medical examiner undermines a finding of consciousness beyond a reasonable doubt. Rather, the courts' findings of cruelty were overwhelmingly based on Sansing's own admissions in the factual basis and sentencing stipulation. (ER 259-61; ER 107-12.) *Sansing II*, 77 P.3d at 35. Counsel's ineffective assistance undermines confidence in the outcome of Sansing's death sentence, and Sansing is entitled to relief.

## Conclusion

For the preceding reasons, Sansing respectfully requests that this Court reverse the district court's order denying his federal habeas corpus petition and remand the case to the district court with orders to grant the writ of habeas corpus and return his case to the state court for further proceedings. If this Court concludes that factual issues relevant to the issues herein remain unresolved, Sansing requests that the case be remanded to the district court for discovery and an evidentiary hearing.

Respectfully submitted:               April 13, 2017.

                                      Jon M. Sands
                                      Federal Public Defender

                                      Jennifer Y. Garcia
                                      s/ Jennifer Y. Garcia
                                      Attorney for Petitioner Sansing

**Statement of Related Cases**

I certify that there are no cases pending before this Court that are related to this case within the meaning of 9th Cir. R. 28-2.6.

<u>s/ Jennifer Y. Garcia</u>
Attorney for Petitioner Sansing

**Certificate of Compliance**

This brief exceeds the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), but complies with the Court's order regarding the replacement brief. (Ninth Cir. ECF No. 44.) Accordingly, it contains 26,404 words, excluding the parts exempt under Fed. R. App. P. 32(a)(7)(B)(iii). It was prepared in a proportionately spaced typeface (Times New Roman, a Windows system font) of size 14 points, double spaced, using Word 2013.

s/Jennifer Y. Garcia
Attorney for Petitioner Name

**Certificate of Service**

I certify that on April 13, 2017, I transmitted the foregoing Replacement

Opening Brief using the Appellate CM/ECF system for filing and transmittal of a

Notice of Docket Activity to the following ECF registrants:

Clerk of Court
James R. Browning U.S. Courthouse
95 7th Street
San Francisco, California 94103

Lacey Gard
Assistant Attorney General
1275 West Washington Street
Phoenix, AZ 85007


s/ Robin Stoltze
Assistant Paralegal
Capital Habeas Unit

113