No. 13-99001

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHN EDWARD SANSING,

Petitioner-Appellant,

vs.

CHARLES L. RYAN, Director,
Arizona Department of Corrections, et al.,

Respondents-Appellees.

On Appeal from the United States District Court
for the District of State
Case No. 2:11-cv-01035-SRB

## PETITIONER'S SUPPLEMENTAL EXCERPTS OF RECORD

## VOLUME 1: PSER 1 through PSER 98

JON M. SANDS
Federal Public Defender

Jennifer Y. Garcia (Arizona Bar No. 021782)
Assistant Federal Public Defender
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816  telephone
(602) 889-3960  facsimile

Petitioner-Appellant John Edward Sansing
Supplemental Excerpts of Record

---

Volume 1 (PSER 1 – PSER 98 ):

PSER 1    Declaration of Joshua Edward Sansing, filed as Exhibit C to Motion for Evidentiary Development, filed February 24, 2012 (Dist. Ct. ECF No. 53-2)

PSER 3    Marriage Certificates, Divorce Decrees, and Separation Agreement regarding John Sansing's mother, Glenda, filed as Exhibit E to Motion for Evidentiary Development, filed February 24, 2012 (Dist. Ct. ECF No. 53-3)

PSER 24   Crime Report of Child Neglect from Sparks Police Department, filed as Exhibit F to Motion for Evidentiary Development, filed February 24, 2012 (Dist. Ct. ECF No. 53-4)

PSER 33   Declaration of Dr. Shalene M. Kirkley, filed as Exhibit M to Motion for Evidentiary Development, filed February 24, 2012 (Dist. Ct. ECF No. 53-5)

PSER 34   Report by Dr. Robert Heilbronner, filed as Exhibit N to Motion for Evidentiary Development, filed February 24, 2012 (Dist. Ct. ECF No. 53-5)

PSER 47   Phoenix Police Department Report No. 80384200, filed as Exhibit O to Motion for Evidentiary Development, filed February 24, 2012 (Dist. Ct. ECF No. 53-5)

PSER 51   State's Reply to Defendant's Sentencing Memorandum, filed September 23, 1999 (Trial Docket 98)

PSER 67   State's Sentencing Memorandum Re: Death Penalty, filed September 3, 1999 (Trial Docket 96)

### DECLARATION OF JOSHUA EDWARD SANSING

**I declare under penalty of perjury the following to be true and accurate to the best of my information and belief:**

1. I am the oldest son of John and Kara Sansing. I was present on February 24, 1998, when Trudy Calabrese was killed. I was 12 years old.

2. The months before the crime, my parents began using drugs more and more. They were selling off everything we owned in order to get more drugs.

3. My father generally stole things in order to buy drugs. He used to steal purses. But I had never seen my father assault a stranger in order to rob them before this crime occurred on February 24, 1998.

4. Before Mrs. Calabrese arrived at our house, I never heard any mention of a plan to harm Mrs. Calabrese.

5. On the day of the crime, before Mrs. Calabrese arrived, my dad had been smoking crack.

6. When Mrs. Calabrese arrived, my siblings and I went outside to see if her purse was in her truck. Once we realized her truck was locked, we came back in the house and told my father. Shortly thereafter, my father attacked Mrs. Calabrese. What actually happened to Mrs. Calabrese was never discussed before she arrived, and when it began it was shocking.

7. I tried to protect my three younger siblings by taking them into the living room. Unlike the rest of my siblings, I watched the entire attack on Mrs. Calabrese up until the point that she was taken into my parents' bedroom, and parts of it after that.

8. My dad tackled Mrs. Calabrese and threw her on the floor. She was then tied up. She asked us to call 9-1-1. Within moments, she was struck on the head and knocked unconscious. A sock was put in her mouth while she was on our dining room floor. I did not see her conscious again or hear her speak again.

9. My father then went to move Mrs. Calabrese's truck. After he returned, Mrs. Calabrese was moved into my parents' bedroom. She was still unconscious.

10. There was a closet that had a vent into my parents' bedroom. I went into that closet and looked through the vent into the bedroom. I could see that Mrs. Calabrese's chest was moving up and down, so I assumed she was still breathing, but I did not hear her speak.

11. After Mrs. Calabrese was moved to the bedroom, my parents called their drug dealer to buy more crack cocaine. The drug dealer came to our house and my parents obtained more crack cocaine, then sent us kids into our bedrooms while they smoked the drug.

JeS

12. Some time after my parents had bought and smoked the crack cocaine, while I was in my bedroom, I heard my mother screaming at my father because he was in the bedroom having sex with Mrs. Calabrese. I do not recall the exact time but I remember that it was night time. It was dark outside when my mother began screaming.

13. Well more than an hour elapsed between the time that Mrs. Calabrese was hit in the head in the dining room and the time I heard my mother shouting at my father over the sexual assault.

14. Nobody from my father's defense team has ever interviewed me about what happened that night.

**I declare the foregoing to be true and accurate to the best of my information and belief. Signed this 19 day of October, 2011, at Phoenix Arizona.**

Joshua Edward Sansing

Jes

THE FRONT OF THIS DOCUMENT IS PINK - THE BACK OF THIS DOCUMENT IS BLUE AND HAS AN ARTIFICIAL WATERMARK - HOLD AT AN ANGLE TO VIEW

# ALABAMA
## Center for Health Statistics

### Marriage License

6797

STATE OF ALABAMA __Cullman__ 22 COUNTY.

To any person lawfully authorized to solemnize marriage within said State, greetings:
You are hereby authorized to celebrate the rite of matrimony for the persons named below, after which you are required to return this license, duly certified under your hand, to the Probate Judge of the aforesaid county.

Done this the __19th__ day of __April__ 19 60.

_Graf Hart_
Judge of Probate

**GROOM**

1. Full Name __Allen Willis Sansing__ 525
2. Residence, City __Box 174, Blountsville__
   (If outside city limits, write RURAL)
   County __Blount__ 05010 State __Ala.__
3. Birth Date ____  4. Age __17__  5. Race or Color __W.__
6. Birth Place __Tennessee__
7. Single, Widowed Divorced __Single__  8. No. of Previous Marriages __None__
9. Occupation __None__
10. Full Name of Father __John Sansing__
11. Full Maiden Name of Mother __Annie Meadows__

**BRIDE**

12. Full Name __Glenda Sue Anderson__ 536
13. Residence, City __Box 81, Hanceville__
    (If outside city limits, write RURAL)
    County __Cullman__ State __Ala.__
14. Date ____  15. Age __18__  16. Race or Color __W.__
17. Birth Place __Cullman County, Alabama__
18. Single, Widowed Divorced __Single__  19. No. of Previous Marriages __None__
20. Occupation __Newman's Laundry__
21. Full Name of Father __George Edward Anderson__
22. Full Maiden Name of Mother __Glinnie Milligan__

**24. CERTIFICATE OF PERSON PERFORMING CEREMONY**

I hereby certify that __Allen Willis Sansing__ (Groom) and
__Glenda Sue Anderson__ (Bride) were joined in marriage by me in
accordance with the Laws of the State of Alabama in __Jefferson__ 37XXX County, Alabama,
this __24th__ day of __April 04__ 19 60.

Signed __Rev. George E. Shipp__ Official Position __Minister__
Address __P.O. Box 22, Warrior, Ala__

Returned this __29th__ day of __April__ A. D. 19 60 and
recorded in Marriage License Record Book No. __46__ Page __486__

_Graf Hart_
Judge of Probate

FS-30-5000-4-52

THIS IS A PERMANENT RECORD. DO NOT REMOVE ATTACHED PHYSICIAN'S CERTIFICATE OF BLOOD TEST. USE A TYPEWRITER OR WRITE PLAINLY WITH UNFADING DARK INK

ANY ALTERATIONS VOID THIS DOCUMENT

This is an official certified copy of the original record filed in the Center of Health Statistics, Alabama Department of Public Health, Montgomery, Alabama. 2011-357-697-1

_Catherine Molchan Donald_
Catherine Molchan Donald
State Registrar of Vital Statistics

August 30, 2011

PSER 3

THE FRONT OF THIS DOCUMENT IS PINK - THE BACK OF THIS DOCUMENT IS BLUE AND HAS AN ARTIFICIAL WATERMARK - HOLD AT AN ANGLE TO VIEW

# ALABAMA
## Center for Health Statistics

THIS LICENSE IS VOID AFTER 30 DAYS FROM DATE, UNLESS SOLEMNIZED WITHIN SAID TIME.

### Marriage License

STATE OF ALABAMA, CULLMAN COUNTY.

3485

To any person lawfully authorized to solemnize marriages within said State, greetings:
You are hereby authorized to celebrate the rite of matrimony for the persons named below, after which you are required to return this license, duly certified under your hand, to the Probate Judge of the aforesaid county.

Done this the 23 day of February 19 73

Judge of Probate

| GROOM | BRIDE |
|---|---|
| 1. Full Name Silus Skinner 2-20-14 | 12. Full Name Glenda Sue Sansing 2-20-14 |
| 2. Residence: City 1106 Lee Ave SW Cullman | 13. Residence: City 417 Hickory Ave SW Cullman |
| (If outside city limits, write RURAL) Cullman Ala. | (If outside city limits, write RURAL) Cullman Ala. |
| County State | County State |
| 3. Date 12-5-30 4. Age 42 5. Color W | 14. Date 15. Age 29 16. Color W |
| 6. Birth Place Cleburn County, Ala. | 17. Birth Place Cullman County |
| 7. Single, Widowed, Divorced Widowed 8. No. of Previous Marriages | 18. Single, Widowed, Divorced Divorced 19. No. of Previous Marriages 1 |
| 9. Blood relationship to bride: None | 20. Blood relationship to groom: None |
| 10. Full Name of Father Jesse Franklin Skinner | 21. Full Name of Father George Edward Anderson |
| 11. Full Maiden Name of Mother Lillie Mae Rodgers | 22. Full Maiden Name of Mother Glennie Irene Milligan |

### 24. CERTIFICATE OF PERSON PERFORMING CEREMONY

I hereby certify that Silus Skinner (Groom) and

Glenda Sue Sansing (Bride) were joined in marriage by me in

accordance with the Laws of the State of Alabama in Blount 05 x x 8 County, Alabama

this 23 day of February 19 73

Signed Official Position Minister

Address

Returned this 27 day of Feb. A. D. 19 73 and

recorded in Marriage License Record Book No. 59 Page 266

Judge of Probate

This is an official certified copy of the original record filed in the Center of Health Statistics, Alabama Department of Public Health, Montgomery, Alabama. 2011-357-493-8

August 30, 2011

Catherine Molchan Donald
State Registrar of Vital Statistics

PSER 4

THE FRONT OF THIS DOCUMENT IS PINK - THE BACK OF THIS DOCUMENT IS BLUE AND HAS AN ARTIFICIAL WATERMARK - HOLD AT AN ANGLE TO VIEW

# ALABAMA
## Center for Health Statistics

**THIS LICENSE IS VOID AFTER 30 DAYS FROM DATE, UNLESS SOLEMNIZED WITHIN SAID TIME**

### Marriage License

**STATE OF ALABAMA** Cullman **22 COUNTY**

To any person lawfully authorized to solemnize marriage within said State, greetings:

You are hereby authorized to celebrate the rite of matrimony for the persons named below, after which you are required to return this license, duly certified under your hand, to the Probate Judge of the aforesaid county.

Done this the 8 day of August, 19 77

25727

Tom Burleson
*Judge of Probate*

| GROOM | | BRIDE | |
|---|---|---|---|
| 1. Full Name Roy Charles Dooley | | 12. Full Name Glenda Sue Skinner | |
| 2. Residence: City Rt. 5 Box 53 Pines Tr. | | 13. Residence: City Rt. 5 Box 53 Pines Tr. Park | |
| County Cullman State AL | | County Cullman State AL | |
| 3. Birth Date Age 27 | 4. Race or Color W | 14. Birth Date 15. Age 34 | 16. Color W |
| 5. Birth Place Cullman AL | | 17. Birth Place Cullman AL | |
| 7. Single, Widowed Divorced D-3 | 8. No. of Previous Marriages 2 | 19. Single, Widowed Divorced D-3 | 18. No. of Previous Marriages 2 |
| 9. Blood relationship to bride None | | 20. Blood relationship to groom None | |
| 10. Full Name of Father Johnnie Shelton Dooley | | 21. Full Name of Father George Edward Anderson | |
| 11. Full Maiden Name of Mother Mary Geneva Walker | | 22. Full Maiden Name of Mother Glennie Irene Milligan | |

**24. CERTIFICATE OF PERSON PERFORMING CEREMONY**

I hereby certify that Roy Charles Dooley (Groom) and Glenda Sue Skinner (Bride) were joined in marriage by me in accordance with the Laws of the State of Alabama in Cullman County, Alabama this 27 day of August 08 19 77

Signed Rev G W Butler Official Position minister
Address 3722 Katherine St. N.W. Cullman Al

Returned this 18 day of August; A. D. 19 77 and recorded in Marriage License Record Book No. 64 Page 326

Tom Burleson
*Judge of Probate*

This is an official certified copy of the original record filed in the Center of Health Statistics, Alabama Department of Public Health, Montgomery, Alabama. 2011-357-489-0

August 30, 2011

Catherine McLchan Donald
State Registrar of Vital Statistics

PSER 5

THE FRONT OF THIS DOCUMENT IS PINK - THE BACK OF THIS DOCUMENT IS BLUE AND HAS AN ARTIFICIAL WATERMARK - HOLD AT AN ANGLE TO VIEW

# ALABAMA
## Center for Health Statistics

THIS LICENSE IS VOID AFTER 30 DAYS FROM DATE, UNLESS SOLEMNIZED WITHIN SAID TIME

## Marriage License

2616

STATE OF ALABAMA __Cullman__ COUNTY.

To any person lawfully authorized to solemnize marriages within said State, greetings:
You are hereby authorized to celebrate the rite of matrimony between the persons named below, after which you are required to return this license, duly certified under your hand, to the Probate Judge of the aforesaid county.

Done this the __17__ day of __Feb__, 19 82

Tom Burleson
_____
Judge of Probate

| GROOM 022 814 | | BRIDE 022 XX8 | |
|---|---|---|---|
| 1. Full Name | Floyd Franklin Smith | 12. Full Name | Glenda Sue Dooley |
| 2. Residence: City | 1648 Brindley Ave Cullman | 13. Residence: City | Same |
| | (If outside city limits, write RURAL) | | (If outside city limits, write RURAL) |
| County Cullman | State Al. | County Cullman | State Al |
| 3. Date | 4. Age 57 | 5. Color W | 14. Date 15. Age 39 | 16. Color W |
| 6. Place Cullman Co. | | 17. Place Cullman Co. | |
| 7. Single, Widowed, Divorced D 3 | No. of Previous Marriages 2 | 18. Single, Widowed, Divorced D 3 | No. of Previous Marriages 3 |
| 9. Blood relationship to bride None | | 20. Blood relationship to groom None | |
| 10. Full Name of Father | James Smith | 21. Full Name of Father | George Edward Anderson |
| 11. Full Maiden Name of Mother | Betty L. Gilley | 22. Full Maiden Name of Mother | Glenda Irene Milligan |

### 16. CERTIFICATE OF PERSON PERFORMING CEREMONY

I hereby certify that __Floyd Franklin Smith__ (Groom) and
__Glenda Sue Dooley__ (Bride) were joined in marriage by me in
accordance with the Laws of the State of Alabama in __Cullman 022 XX8__ County, Alabama
this __19th__ day of __February 02__, 19 __55__,
Signed __A. W. Butler__   Official Position __minister__
Address __1897 Katherine St N.W. Cullman Ala.__

Returned this __25__ day of __Feb__, A. D. 19 82 and
recorded in Marriage License Record Book No. __70__   Page __91__

Tom Burleson
_____
Judge of Probate

This is an official certified copy of the original record filed in the Center of Health Statistics, Alabama Department of Public Health, Montgomery, Alabama. 2011-357-484-9

August 30, 2011

Catherine Molchan Donald
Catherine Molchan Donald
State Registrar of Vital Statistics

PSER 6

THE FRONT OF THIS DOCUMENT IS PINK - THE BACK OF THIS DOCUMENT IS BLUE AND HAS AN ARTIFICIAL WATERMARK - HOLD AT AN ANGLE TO VIEW

# ALABAMA
## Center for Health Statistics

**VOID**

THIS LICENSE IS VOID AFTER 30 DAYS FROM DATE, UNLESS SOLEMNIZED WITHIN SAID TIME.

## Marriage License

−85  17039

STATE OF ALABAMA ....Cullman.... COUNTY.

To any person lawfully authorized to solemnize marriages within said State, greeting:

You are hereby authorized to celebrate the rite of matrimony for the persons named below, after which you are required to return this license, duly certified under your hand, to the Probate Judge of the aforesaid county.

Done this the ...4... day of ...June... 11 ..85...

*Tom Burleson*
Judge of Probate

| GROOM | | BRIDE |
|---|---|---|
| 1. Full Name ..Tommy Dunn.. 005XX8 | 12. Full Name ..Glenda C. Smith.. 022014 | |
| 2. Residence: City ..Route 3, Blountsville.. (If outside city limits, write RURAL) | 13. Residence: City ..Box 262 Cullman.. (If outside city limits, write RURAL) | |
| County ..Blount.. State .. Al. | County ..Cullman.. State .. Al. | |
| 3. Birth Date ........ 4. Age ..29.. 5. Color ..W.. | 14. Birth Date ........ 15. Age ..42.. 16. Color ..W.. | |
| 4. Birth Place ..Blount Co... | 17. Birth Place ..Cullman Co... | |
| 6. Single, Widowed 7. Divorced .. D .. No. of Previous 8. Marriages .. 3 .. | 18. Single, Widowed Divorced .. D .. No. of Previous 19. Marriages .. 4 .. | |
| 9. Blood relationship to bride ..none.. | 20. Blood relationship to groom ..none.. | |
| 10. Full Name of Father ..Cecil Dunn.. | 21. Full Name of Father ..George E. Anderson.. | |
| 11. Full Maiden Name of Mother ..Mabel Freeman.. | 22. Full Maiden Name of Mother ..Glennie Milligan.. | |

### 24. CERTIFICATE OF PERSON PERFORMING CEREMONY

I hereby certify that ..Tommy Dunn.. (Groom) and ..Glenda C. Smith.. (Bride) were joined in marriage by me in accordance with the Laws of the State of Alabama in ..Cullman.. 022XX8 County, Alabama this ..5th.. day of ..June.. 19..85.. 

Signed ..Tom Burleson.. Official Position ..Probate Judge..

Address ..Cullman, Al..

Returned this ..5th.. day of ..June.. A. D. 19..85.. and recorded in Marriage License Record Book No. ..24.. Page ..386..

*Tom Burleson*
Judge of Probate

**VOID**

This is an official certified copy of the original record filed in the Center of Health Statistics, Alabama Department of Public Health, Montgomery, Alabama. 2011-424-867-8

*Catherine Molchan Donald*
Catherine Molchan Donald
State Registrar of Vital Statistics

November 8, 2011

PSER 7

MAILING ADDRESS 233 EAST 4TH ST., RENO, NV. 89501

### State of Nevada
# Marriage Certificate

**No. D 027176**

89305135

State of Nevada.
County of Washoe. } ss.

**This is to Certify** that the undersigned, <u>COMMISSIONER OF CIVIL MARRIAGES</u> *(Title)*

did on the __10TH__ day of __MARCH__ A. D. 19 89,

at __195 SOUTH SIERRA STREET__ __RENO__ **Nevada**,
*(Address or County)* *(City)*

join in lawful **Wedlock** __HARVEY LEE__ __CAVASOS__

of RENO _____ **State of** __NV.__

and __GLENDA S.__ __BAKER__

of RENO _____ **State of** __NV__

with their mutual consent, in the presence of __JOANNE WALTER__

and _____, **witnesses.**

BK 0867 PG 0575

'89 MAR 13 A9 :18

JOE MELCHER, RECORDER
WASHOE COUNTY **JHF**

MINISTER OR JUDGE: COPY MUST BE PRESENTED TO THE RECORDER WITHIN (10) DAYS

JUDI BAILEY, COMMISSIONER

BY: __Leo T. Hettich__
*Signature of person performing marriage*

LEO T. HETTICH, DEPUTY
*Print name under signature* *(Requestor)*

By the raised Washoe County Recorder seal on this page, I certify that this document is a correct copy of the original recorded in my office.

*Kathryn L. Burke*   By __Charles A. Lynh__ 10/31/11
DEPUTY RECORDER / DATE

Kathryn L. Burke, County Recorder, Washoe County, Nevada

MAILING ADDRESS: P.O. BOX 4394 SPARKS, NV. 89431

State of Nevada

# Marriage Certificate

No. D 064817

90311229

State of Nevada,
County of Washoe. } ss.

This is to Certify that the undersigned, COMMISSIONER OF CIVIL MARRIAGES *Title*.

Did on the 17TH day of ____ MAY ____ A.D. 19 90, Nevada,

at ____ 195 SOUTH SIERRA STREET RENO ____ *(City)*
*(Address of Church)*

join in lawful Wedlock ____ RODOLFO CASTELLANOS PUIG ____

of SPARKS ____ State of ____ NV. ____

and ____ GLENDA G. ____ BAKER ____

of SPARKS ____ State of ____ NV. ____

with their mutual consent, in the presence of ____ ELLEN CURTIS ____

and ____, witnesses.

JUDI BAILEY, COMMISSIONER

RECORDED #783

'90 MAY 18 P2:31

JHF

BY: _Frank R. Weert_
*Signature of person performing marriage*

FRANK R. KOONTZ, DEPUTY
*Print name under signature* *(Denomination)*

MINISTER OR JUDGE, COPY MUST BE PRESENTED TO THE RECORDER WITHIN (10) DAYS

By the raised Washoe County Recorder seal on this page, I certify that this document is a correct copy of the original recorded in my office.

_Kathryn L. Burke_ By _Charles A Vap_ 10/31/11
DEPUTY RECORDER / DATE

Kathryn L. Burke, County Recorder, Washoe County, Nevada

PSER 9

### State of Nevada
# Marriage Certificate

NO. MA92-6714

92306915

State of Nevada,  
County of Washoe,  } SS.

**This is to Certify** that the undersigned, __COMMISSIONER OF CIVIL MARRIAGES__

did on the ___2ND___ day of ___APRIL___ A.D. 19 92

at ___195 SOUTH SIERRA STREET    RENO___ Nevada,

join in lawful Wedlock ___RICARDO RAMOS___

of ___SPARKS___ State/Country of ___NEVADA___

and ___GLENDA S BAKER___

of ___SPARKS___ State/Country of ___NEVADA___

Mailing Address ___1215 SULLIVAN LN, SPARKS, NV 89431___

with their mutual consent, in the presence of ___ELLEN CURTIS___

and _____, witnesses.

JODI BAILEY, COMMISSIONER

BK 0 9 1 4 PG 0 8 0 0

'92 APR -3 A11:20

JOE MELCHI R. RECORDER  
WASHOE COUNTY, BY RP

BY: _Leo T. Hettich_  
Signature of person performing marriage

LEO T. HETTICH, DEPUTY  
Print name under signature

MINISTER OR JUDGE COPY MUST BE PRESENTED TO THE RECORDER WITHIN (10) DAYS

By the raised Washoe County Recorder seal on this page, I certify that this document is a correct copy of the original recorded in my office.

_Kathryn L. Burke_   By _____ : OCT 24 2011  
DEPUTY RECORDER DATE

Kathryn L. Burke, County Recorder, Washoe County, Nevada

PSER 10

State of Nevada

# Marriage Certificate

NO. MA94-8571

94309582

State of Nevada,
County of Washoe, } ss.

MINISTER

This is to Certify that the undersigned,

did on the ___26___ day of ___April___ A.D. 19 ___94___

at ___HEART OF RENO CHAPEL, RENO___ Nevada,

(Address/Church)

join in lawful Wedlock ___RICARDO BALLES RAMOS___

of ___RENO___ State/Country of ___NEVADA___

and ___GLENDA SUE RAMOS___

of ___SPARKS___ State/Country of ___NEVADA___

Mailing Address ___2389 ROUND HOUSE RD SPARKS NV 89431___

with their mutual consent, in the presence of _____ and _____ witnesses.

BK0945PG0013
'94 MAY-2 P1:32

JOE MELCHER, RECORDER
WASHOE COUNTY, BY **GMK**

_____
Signature of person performing marriage

W. ECKROAT        MINISTER

_____
Print name under signature

MINISTER OR JUDGE: COPY MUST BE PRESENTED TO THE RECORDER WITHIN (10) DAYS

By the raised Washoe County Recorder seal on this page, I certify that this document is a correct copy of the original recorded in my office.

*Kathryn L. Burke*        By _____ DEPUTY RECORDER / DATE        OCT 24 2011

Kathryn L. Burke, County Recorder, Washoe County, Nevada

State of Nevada

# Marriage Certificate

NO. MA96-2431

96303051

State of Nevada,  
County of Washoe, } ss.

**This is to Certify** that the undersigned, **MINISTER**

did on the 15 day of February A.D. 19 96

at HEART OF RENO CHAPEL, RENO _____ Nevada,

join in lawful Wedlock _____ LAL SINGH _____

of SPARKS State/Country of NEVADA

and GLENDA SUE RAMOS

of SPARKS State/Country of NEVADA ,

Mailing Address 800 E NICHOLS BLVD SPARKS NV 89434

with their mutual consent, in the presence of _____ witnesses.

and _____ witnesses.

BK 0969 PG 1976

96 FEB 20 AM 9: 47  
JOE MELCHER, RECORDER  
WASHOE COUNTY, BY JHF

_Delano V. Hollenbeak_  
Signature of person performing marriage  
**DELANO V. HOLLENBEAK**  
**MINISTER**  
Print name underneath  
(Capacity)

MINISTER OR JUDGE: COPY MUST BE PRESENTED TO THE RECORDER WITHIN (10) DAYS

By the raised Washoe County Recorder seal on this page, I certify that this document is a correct copy of the original recorded in my office.

_Kathryn L. Burke_  By _____ OCT 24 2011  
DEPUTY RECORDER / DATE

Kathryn L. Burke, County Recorder, Washoe County, Nevada

PSER 12

State of Nevada

# Marriage Certificate

NO. MA99-3978

State of Nevada, } ss.
County of Washoe, }

99004624

**This is to Certify** that the undersigned, COMMISSIONER OF CIVIL MARRIAGES *(Title)*

did on the ___12TH___ day of ___MARCH___ A.D., 19 99 ,

at ___195 SOUTH SIERRA STREET___ ___RENO___ Nevada,
*(Address or Church)* *(City)*

join in lawful Wedlock ___LAL SINGH___

of ___RENO___ State/Country of ___NEVADA___

and ___GLENDA S SINGH___

of ___RENO___ State/Country of ___NEVADA___

Mailing Address ___404 LINDEN ST #52 RENO NV 89502___

with their mutual consent, in the presence of ___DOUG JONES___

and _____, witnesses.

AMY HARVEY, COMMISSIONER

BK I 0 I 0 PG 0 I 0 6

99 MAR 16 PM 3: 36

KATHRYN L. BURKE
WASHOE COUNTY RECORDER

BY _____ II

BY: *(Signature of person performing marriage)*

BETTE M. NAHAS, DEPUTY
*Print name under signature* *(Requestor)*

MINISTER OR JUDGE COPY MUST BE PRESENTED TO THE WASHOE COUNTY RECORDER
P.O. BOX 11130, RENO, NV 89520-0027 WITHIN (10) DAYS.

By the raised Washoe County Recorder seal on this page, I certify that this document is a correct copy of the original recorded in my office.

*Kathryn L. Burke* By _____ OCT 2 4 2011
DEPUTY RECORDER DATE

Kathryn L. Burke, County Recorder, Washoe County, Nevada

### State of Nevada

# Marriage Certificate

NO. MA99-20076

99021580

State of Nevada,
County of Washoe, } ss.

**This is to Certify** that the undersigned, COMMISSIONER OF CIVIL MARRIAGES _____ [Title]

did on the ___11TH___ day of ___NOVEMBER___ A.D., 19 99 ,

at ___195 SOUTH SIERRA STREET___ [Address or Church] ___RENO___ [City] Nevada,

join in lawful Wedlock ___LAL SINGH___

of ___RENO___ State/Country of ___NEVADA___

and ___GLENDA S SINGH___

of ___RENO___ State/Country of ___NEVADA___

Mailing Address ___1659 WEDEKIND RD APT 15B RENO NV 89512___

with their mutual consent, in the presence of ___ELLEN ROBISON___

and _____, witnesses.

AMY HARVEY, COMMISSIONER

BY: _____
Signature of person performing marriage

I. C. MC NEILL, JR., DEPUTY
Print name under signature _____ (Requestor)

MINISTER OR JUDGE: COPY MUST BE PRESENTED TO THE WASHOE COUNTY RECORDER
P.O. BOX 11130, RENO, NV 89520-0027 WITHIN (10) DAYS.

BK 1,018 PG 1,100

99 NOV 17 AM 8: 38

KATHRYN L. BURKE
WASHOE COUNTY, RECORDER

BY ___KW___

By the raised Washoe County Recorder seal on this page, I certify that this document is a correct copy of the original recorded in my office.

*Kathryn L. Burke* By _____ DEPUTY RECORDER / DATE OCT 24 2011

Kathryn L. Burke, County Recorder, Washoe County, Nevada

PSER 14

THE FRONT OF THIS DOCUMENT IS PINK - THE BACK OF THIS DOCUMENT IS BLUE AND HAS AN ARTIFICIAL WATERMARK - HOLD AT AN ANGLE TO VIEW

# ALABAMA
## Center for Health Statistics

VOID VOID VOID

## ALABAMA DEPARTMENT OF HEALTH
### DIVISION OF VITAL STATISTICS

3402

Report of __Divorce__
Divorce, Annulment or Separation    22

In __Circuit__ Court of __Cullman__ County, Alabama

Trial Docket No. 14656

Date of Final Decree 3/28/77

| HUSBAND | WIFE |
|---|---|
| Full Name Silus Skinner | Full Name Glenda S. Skinner |
| Usual Residence City Cullman | Usual Residence City Cullman |
| County Cullman State AL 01 | County Cullman State AL 01 |
| Date of Birth Sept. 5 1930 Month Day Year | Date of Birth Apr. 24, 1943 Month Day Year |
| Place of Birth Cleburn AL County State | Place of Birth Cullman AL County State |
| Race or Color W Number of this Marriage 2 | Race or Color W Number of this Marriage 2 |
| Usual Occupation Kind of Business | Usual Occupation waitress Kind of Business |
| Date of this Marriage Feb. 24 1973 4 Month Day Year | Place of this Marriage Walker AL 01 County State |
| Plaintiff Glenda S. Skinner 2 (Wife or Husband) | Number of Children Under 18 Yrs. |

Legal Grounds for Decree __incompatibility__    22    Decree Granted to __Wife__ 3
(Wife or Husband)

Signature of Clerk or Register __Ruth Lasser__
By: Polly Tankersley, Deputy Clerk

VS-16
1-74

VOID VOID VOID

This is an official certified copy of the original record filed in the Center of Health Statistics, Alabama Department of Public Health, Montgomery, Alabama. 2011-357-475-0

October 21, 2011



Catherine Molchan Donald
State Registrar of Vital Statistics

THE FRONT OF THIS DOCUMENT IS PINK - THE BACK OF THIS DOCUMENT IS BLUE AND HAS AN ARTIFICIAL WATERMARK - HOLD AT AN ANGLE TO VIEW

# ALABAMA
### Center for Health Statistics

c/

### STATE OF ALABAMA
### REPORT OF DIVORCE, ANNULMENT
### OR LEGAL SEPARATION

6708

State File Number

MAIL REPORT BY THE FIFTH (5) OF EACH MONTH TO BUREAU OF VITAL STATISTICS DEPARTMENT OF PUBLIC HEALTH MONTGOMERY, AL 36130

ANY ALTERATIONS VOID THIS DOCUMENT

ANY ALTERATIONS VOID THIS DOCUMENT

| HUSBAND | | | | |
|---|---|---|---|---|
| HUSBAND – NAME 1. First ROY | Middle CHARLES | Last DOOLEY | | RACE OR COLOR 2. WHITE |
| USUAL RESIDENCE – STATE 3a. ALABAMA | COUNTY 3b. CULLMAN | CITY OR TOWN 3c. CULLMAN 022xx8 | | |
| STREET ADDRESS (If rural, give location) 3d. ROUTE 5, BOX 53, CULLMAN, AL 35055 | BIRTHPLACE (State or Country) 4. ? | DATE OF BIRTH (Mo., Day, Yr.) 5. 1-18-50 | | |

ALL ITEMS MUST BE COMPLETE AND ACCURATE

| WIFE | | | | |
|---|---|---|---|---|
| WIFE – NAME 8a. First GLENDA | Middle SUE | Last DOOLEY | MAIDEN NAME 8a. Anderson | RACE OR COLOR 7. WHITE |
| USUAL RESIDENCE – STATE 8b. ALABAMA | COUNTY 8b. CULLMAN | CITY OR TOWN 8c. CULLMAN 022xx8 | | |
| STREET ADDRESS (If rural, give location) 8d. ROUTE 5, BOX 192, CULLMAN, AL 35055 | BIRTHPLACE (State or Country) 9. ? | DATE OF BIRTH (Mo., Day, Yr.) 9. 4-24-43 | | |

SEE OTHER SIDE

MARRIAGE

| PLACE OF THIS MARRIAGE – CITY 11a. CULLMAN | COUNTY 11b. CULLMAN | STATE (If not in U.S.A. name Country) 11c. ALABAMA | DATE OF THIS MARRIAGE (Month, Day, Year) 12. 8-8-77 | DATE COUPLE SEPARATED (Month, Day, Year) 13. ? |
|---|---|---|---|---|
| NUMBER OF CHILDREN EVER BORN ALIVE TO THIS MARRIAGE – Specify 14. ONE | CHILDREN UNDER 18 IN THIS FAMILY – NUMBER (Specify) 15. ONE | | | PETITIONER – Husband, Wife, Both, Other (Specify) 16. WIFE 2 |
| ATTORNEY FOR PETITIONER 17a. B. DON HALE | | ADDRESS OF ATTORNEY 17b. 316-2nd Ave., S.W., Cullman, AL. | | |

TYPE OR PRINT IN PERMANENT BLUE OR BLACK INK

DECREE

| TYPE OF DECREE – Divorce, Annulment or Separation (Specify) 18. DIVORCE | DATE OF FINAL DECREE (Mo., Day, Yr.) 19. 4-17-79 | | DECREE GRANTED TO – Husband, Wife, Both (Specify) 20. BOTH 3 |
|---|---|---|---|
| COUNTY OF DECREE 21. CULLMAN 27 | TITLE OF COURT 22. CIRCUIT | LEGAL GROUNDS FOR DECREE 23. INCOMPATIBILITY 22 | |
| SIGNATURE OF CERTIFYING OFFICIAL 24a. Pelly Sankersley | TITLE OF OFFICIAL 24b. DEPUTY CLERK | | TRIAL DOCKET NO. 25. DR-78-373 |

This is an official certified copy of the original record filed in the Center of Health Statistics, Alabama Department of Public Health, Montgomery, Alabama. 2011-357-676-8

August 31, 2011

Catherine Molchan Donald
Catherine Molchan Donald
State Registrar of Vital Statistics

PSER 16

STATE OF ALABAMA      X

CULLMAN COUNTY      X     SEPARATION AGREEMENT

THIS AGREEMENT, made and entered into this the 10th day of April, 1979, by and between GLENDA SUE SKINNER DOOLEY AND ROY CHARLES DOOLEY,

## W I T N E S S E T H

WHEREAS, the parties are now husband and wife, differences have arisen between the said husband and wife and they have heretofore ceased to live together, and irreconciliable differences have arisen which make it impossible for them hereafter to live together as husband and wife, and

WHEREAS, the parties have agreed between themselves on a final settlement in references to property rights, rights of the minor child, and of the other differences existing between them; and for the purpose of settling all their differences and in consideration of the mutual agreements hereinafter made they agree as follows:

1. That during the marriage, there was one child born, namely: LORETTA LYNN DOOLEY, born August 20, 1978, and that the plaintiff, GLENDA SUE SKINNER DOOLEY, is the proper person to have the care, custody and control of said minor child.

LE & WILLIAMS
BONDS AT LAW
DAD AVE . O D
LINDA, AL DEDEE



2. ¦ That ROY CHARLES DOOLEY agrees to support the child
for a period of two years, said support being twenty ($20.00)
Dollars per week for the first forty-eight (48) weeks, and the
sum of Ten ($10.00) Dollars per week for the next fifty-eight
(58) weeks, and it is agreed that there will be no further
support after this period of time. Said payments shall be made
through  a Clerk of the Circuit Court.

It is further agreed that the payment of said support
by Defendant is not an admission by Defendant that he is the
father of the child.

IT IS AGREED between the parties that no further support for
the minor child is necessary after the above enumerated period due
to the fact that the Plaintiff has cared for and maintained the
minor child since her birth and that she feels and knows that she
is capable of caring for and supporting the child without support
from Roy Charles Dooley.  Roy Charles Dooley wishes to contribute
the amount of support as stated herein, however, due to his
financial condition, he is unable to contribute any support other
than as herein agreed.  Both parties feel that the support as
agreed upon will be adequate and that Roy Charles Dooley is
willing and able to contribute the above stated amount as suonort
for said child.  CLENDA SUE SKINNER DOOLEY feels that after this
period of time of additional support from Roy Charles Dooley,
she will be capable of supporting said child.

It IS AGREED between the parties that ROY CHARLES DOOLEY will
have no visitation rights with said minor child; that he does
not feel any love  nor affection for said child and does not wish
to have visitation rights with said child.

3. The parties hereby agree that each party shall have their own personal belongins, including, but not limited to, clothing, personal papers and documents, ancestral pictures and belongings respectively.

IN THE EVENT A divorce is granted to one of the parties hereto this agreement is intended as a full and complete settlement of all property rights between the husband and wife, and from this time forward neither party shall have any interest of any kind or nature in or to any real, personal or mixed property of the other party to this agreement not snecIfically set out herein. In the event a divorce is hereafter granted the parties hereto request the court to ratify and confirm this agreement and make the same a part of any final judgment entered by the court.

THIS AGREEMENT entered into between GLENDA SUE SKINNER DOOLEY AND ROY CHARLES DOOLEY, on this the 10th day of April, 1979.

GLENDA SUE SKINNER DOOLEY

ROY CHARLES DOOLEY

a a WILLIAMS
DOOLEY AT LAW
GAS ONE . G D

Recorded in Minutes & Final Record
Vol. 129 Page 136:158

Ruth Gasser
Clerk

FILED IN OFFICE
APR 10 1979
RUTH GASSER
CIRCUIT CLERK

GLENDA SUE SKINNER DOOLEY,    )

                PLAINTIFF,    )

                              )    IN THE CIRCUIT COURT OF

VS.                      )

                              )    CULLMAN COUNTY, ALABAMA

                              )    CIVIL ACTION NO. DR-78-373

ROY CHARLES DOOLEY,      )

              DEFENDANT,    )

## AMENDED ANSWER AND COUNTER CLAIM

Comes now the Defendant, Roy Charles Dooley and with leave of the Court first had, files this his amended answer and Counter-Claim:

As to paragraph 2, of Plaintiff's Complaint, Defendant alleges that he is not physically capable of fathering either Plaintiff's child or any child, and that this condition of sterility has existed for a period of time commencing at least in September 1977; and that this condition is the result of a long standing testicular atrophy,

That Defendant during the time the parties had been married, has provided Plaintiff with sufficient funds to pay household and other necessary expenses of the marriage and that there are no debts for which Defendant should be responsible.

Further, the Defendant, by way of Cross-Claim, avers and alleges that Plaintiff has been guilty of adultery with a person or persons whose names to the Defendant are unknown.

Wherefore, the premises considered, the Defendant prays that this Honorable Court will, upon a final hearing and proof order and adjudge the following:

(a) That the Defendant be granted a Divorce from the Plaintiff.

(b) That the Defendant is not the father of Plaintiff's child born on or about August 1978, and that Defendant has no financial responsibility or obligation to said child.

(c) That the Defendant is not responsible for any debts incurred by Plaintiff.

Signed at Cullman, Alabama this ____ day of April, 1979.

JAMES E. THOMPSON, ATTORNEY FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that I have this day placed a copy of the foregoing Answer in this case in the United States Mail, Postage prepaid, addressed to the Attorney for Plaintiff, Hon. Roy Williams, at his regular mailing address.

Signed at Cullman, Alabama, this ____ day of April 1979.

James E. Thompson, Attorney for Defendant

FILED IN OFFICE

APR 6 1979

RUTH GASSER
CIRCUIT CLERK

THE FRONT OF THIS DOCUMENT IS PINK - THE BACK OF THIS DOCUMENT IS BLUE AND HAS AN ARTIFICIAL WATERMARK - HOLD AT AN ANGLE TO VIEW

# ALABAMA
## Center for Health Statistics

**STATE OF ALABAMA**
**REPORT OF DIVORCE, ANNULMENT**
**OR LEGAL SEPARATION**

22906

State File Number

MAIL REPORT BY THE FIFTH OF EACH MONTH TO BUREAU OF VITAL STATISTICS, DEPARTMENT OF PUBLIC HEALTH, MONTGOMERY, AL 36130

ANY ALTERATIONS VOID THIS DOCUMENT

| | HUSBAND — NAME | First | Middle | Last | RACE OR COLOR |
|---|---|---|---|---|---|
| HUSBAND | 1. | Floyd | Franklin | Smith | 2. White |

| | USUAL RESIDENCE - STATE | COUNTY | CITY OR TOWN | |
|---|---|---|---|---|
| | 3a. Alabama | 3b. Cullman | 3c. Eva | 0 2 2 X X 8 |

| STREET ADDRESS (If rural, give location) | OCCUPATION | BIRTHPLACE (State or Country) | DATE OF BIRTH (Mo., Day, Yr.) |
|---|---|---|---|
| 3d. Rt. 1, Eva | 4. Nursery | 5. Tennessee | 6. |

| | WIFE — NAME | First | Middle | Last | MAIDEN NAME | RACE OR COLOR |
|---|---|---|---|---|---|---|
| WIFE | 7. | Glenda | Sue | Smith | 7a. Anderson | White |

| | USUAL RESIDENCE - STATE | COUNTY | CITY OR TOWN | |
|---|---|---|---|---|
| | 8a. Alabama | 8b. Cullman | 8c. Eva | 0 2 2 X X 8 |

| STREET ADDRESS (If rural, give location) | OCCUPATION | BIRTHPLACE (State or Country) | DATE OF BIRTH (Mo., Day, Yr.) |
|---|---|---|---|
| 9. Rt. 1, Eva | 10. None | 11. Alabama | 12. |

| PLACE OF THIS MARRIAGE - CITY | COUNTY | STATE (If not in U.S.A. name country) | DATE OF THIS MARRIAGE (Month, Day, Year) | DATE COUPLE SEPARATED (Month, Day, Year) |
|---|---|---|---|---|
| 13a. Cullman | 13b. Cullman | 13c. Alabama | 14. 2-22-82 | 15. 11-26-82 |

| NUMBER OF CHILDREN EVER BORN ALIVE TO THIS MARRIAGE — Specify | CHILDREN UNDER 18 IN THIS FAMILY — NUMBER (Specify) | PETITIONER — Husband, Wife, Both; Other (Specify) |
|---|---|---|
| 16. None | 17. None | 18. Husband |

| | PETITIONER OR REPRESENTATIVE | ADDRESS |
|---|---|---|
| MARRIAGE | 19a. Roy W. Williams, Jr. | 19b. 110 Downtown Plaza, Cullman, AL 35055 |

| | TYPE OF DECREE — Divorce, Annulment or Separation (Specify) | DATE OF FINAL DECREE (Mo., Day, Yr.) | DECREE GRANTED TO — Husband, Wife, Both (Specify) |
|---|---|---|---|
| DECREE | 20. Divorce | 21. 12-10-82 | 22. Husband |

| COUNTY OF DECREE | TITLE OF COURT | LEGAL GROUNDS FOR DECREE |
|---|---|---|
| 23. Cullman | 24. Circuit | 25. Incompatibility |

| SIGNATURE OF OFFICIAL | TITLE OF OFFICIAL | TRIAL DOCKET NO. |
|---|---|---|
| 26a. [signature] | 26b. Deputy Clerk | 27. DR-82-539 |

TYPE OR PRINT IN PERMANENT BLUE OR BLACK INK.

ALL ITEMS MUST BE COMPLETE AND ACCURATE

SEE OTHER SIDE

ANY ALTERATIONS VOID THIS DOCUMENT

This is an official certified copy of the original record filed in the Center of Health Statistics, Alabama Department of Public Health, Montgomery, Alabama. 2011-357-479-2

August 29, 2011

Catherine Molchan Donald
State Registrar of Vital Statistics

THE FRONT OF THIS DOCUMENT IS PINK - THE BACK OF THIS DOCUMENT IS BLUE AND HAS AN ARTIFICIAL WATERMARK - HOLD AT AN ANGLE TO VIEW

# ALABAMA
## Center for Health Statistics

VOID

-88 3586

State Number **101**

## STATE OF ALABAMA
### CERTIFICATE OF DIVORCE, ANNULMENT, DISSOLUTION OR LEGAL SEPARATION

ALL ITEMS MUST BE COMPLETE AND ACCURATE. TYPE OR PRINT IN PERMANENT BLACK INK. DO NOT USE GREEN, RED, OR BLUE INK.

**HUSBAND**

| 1. HUSBAND—NAME First Middle Last (Print last name all capitals) | 2. SOCIAL SECURITY NUMBER | 3. COUNTY OF DECREE |
|---|---|---|
| Tommy DUNN | UNKNOWN | Cullman 22 |

| 4a. DATE OF BIRTH (Month, Day, Year) | 4b. AGE | 5. BIRTHPLACE (State or Foreign Country) | 6. OCCUPATION |
|---|---|---|---|
| | 32 | Alabama 01 | Unknown 999 |

| 7a. USUAL RESIDENCE—STATE | 7b. COUNTY | 7c. CITY—TOWN OR LOCATION |
|---|---|---|
| Alabama | Blount | Blountsville 005XX8 |

| 7d. INSIDE CITY LIMITS | 7e. ADDRESS—Street and Number or RFD Number | Zip Code |
|---|---|---|
| ☐ Yes ☑ No | Route 3 Box 6 | 35031 |

**WIFE**

| 8. WIFE—NAME First Middle Last (Last name all capital letters) | 9. SOCIAL SECURITY NUMBER | 10. WIFE'S MAIDEN SURNAME |
|---|---|---|
| Glenda Sue DUNN | Unknown | Anderson |

| 11a. DATE OF BIRTH (Month, Day, Year) | 11b. AGE | 12. BIRTHPLACE (State or Foreign Country) | 13. OCCUPATION |
|---|---|---|---|
| | 44 | Alabama 01 | Unemployed 917 |

| 14a. USUAL RESIDENCE—STATE | 14b. COUNTY | 14c. CITY—TOWN OR LOCATION |
|---|---|---|
| Alabama | Cullman | Cullman 022014 |

| 14d. INSIDE CITY LIMITS | 14e. ADDRESS—Street and Number or RFD Number | Zip Code |
|---|---|---|
| ☐ Yes ☑ No | Route 15 Box 1330 Lot 16 | 35055 |

**MARRIAGE**

| 15. Number of children under 18 whose physical custody was awarded to: | | 16. NUMBER OF CHILDREN UNDER 18 IN THIS HOUSEHOLD AS OF THE DATE IN ITEM 17. | 17. DATE COUPLE SEPARATED (Month, Day, Year) |
|---|---|---|---|
| ☐ Husband ☐ Wife ☐ Join-Husband/Wife ☐ Other | Total Children 0 | 0 | 117 |

| 18. PLACE OF THIS MARRIAGE—(City, County, State) | 19. DATE OF THIS MARRIAGE (Month, Day, Year) | 20a. PETITIONER— ☐ Husband ☑ Wife ☐ Both |
|---|---|---|
| Cullman, Cullman, Alabama 01 | 6/5/84 | Specify 2 |

**DECREE**

| 20b. PETITIONER'S ATTORNEY OR REPRESENTATIVE—Type or Print | 20c. ADDRESS—Street and Number or RFD Number—City—State—Zip |
|---|---|
| Lee Ann F. Asher | 102 Clinton Ave Suite 50R Huntsville Al 35801 |

| 21a. TYPE OF DECREE | 21b. DATE OF FINAL DECREE (Month, Day, Year) | 21c. DECREE AWARDED TO | 22. TITLE OF COURT | 23. LEGAL GROUNDS FOR DECREE |
|---|---|---|---|---|
| ☑ Divorce ☐ Legal Separation ☐ Annulment ☐ Dissolution | 3-23-88 | ☐ Husband ☐ Wife ☑ Both 3 | CIRCUIT | Incompatibility of Temperament 22 |

| 24a. SIGNATURE OF OFFICIAL | 24b. TITLE OF OFFICIAL | 23. TRIAL DOCKET NUMBER |
|---|---|---|
| Robert Bates | Circuit Clerk | DR-88-126 |

VOID

This is an official certified copy of the original record filed in the Center of Health Statistics, Alabama Department of Public Health, Montgomery, Alabama. 2011-414-595-0

October 28, 2011

_Catherine M. Donald_
Catherine Molchan Donald
State Registrar of Vital Statistics

# CRIME REPORT — SPARKS POLICE DEPARTMENT

| CRIME/INCIDENT TYPE | Classification | □ Felony City | □ Misdemeanor | □ SPARKS PD NO. |
|---|---|---|---|---|
| CHILD NEGLECT | | | | 89-11100 |

| PRIMARY STATUTE | PRIMARY CODE | 2ND CODE | 3RD CODE | CASE CROSS REF. |
|---|---|---|---|---|
| 200.508 | 200.405 | | | |

**ADDRESS** 135 E. PRATER WAY #H  **APT/UNIT** **BUSINESS NAME** **LOCATION IF NONADDRESS**

**Occurred From (or at)** 5 9 89 0558 SAT  **Wk. Day**

**PERSON REPORTING (signature)** MRS. 287.260 MAKES IT UNLAWFUL TO FILE A FALSE POLICE REPORT

**When Reported** 5 9 89 1108 SAT

**Reporting Officer** JOHNSON L  **Serial #** 0826

**Approving Officer** SGT MORON  **Serial #** 3901

NOW (ORIGINALLY) RECEIVED:
- D = DESK OFFICER
- I = IN PERSON
- O = ON OTHER
- P = PHONE ☒
- R = REFERRAL
- S = SELF-INITIATED
- U = UNKNOWN

**STATUS**
- A = ACTIVE ☒
- C = CASE CLOSED/NO FURTHER
- X = CLEARED ARREST, CITE, ETC.
- O = OTHER
- S = SUSPENDED
- U = UNFOUNDED
- Z = COURTESY

- A — UNFOUNDED
- B — EXCEPT/ADULT
- C — EXCERT/JUV
- D — NO FOLLOWUP
- E — SINGLE ADULT ARREST
- F — SINGLE JUV ARREST
- G — MULT ADULT ARREST
- H — MULT JUVENILE ARREST
- I — JUV REPRIMAND
- J — JUV PETITION
- K — REF TO OTHER AGENCY
- L — FILED ☒
- M — ADM CLOSURE
- N — RELEASED
- O — OTHER
- P — DA FILING

- Q — DA REJECT
- R — REFER OTHER
- S — CITED-ADULT TRAFFIC
- T — CITED-JUV TRAFFIC
- U — IMMUNITY GRANTED

CODE TABLES: INVOLVE
- RP = REP. PARTY
- WI = WITNESS
- VM = VICTIM
- PG = PARENT/GUARDIAN
- DC = DISCOVERED BY

RACE:
- A = ASIAN
- B = BLACK
- H = INDIAN
- M = MEX-LATIN
- O = OTHER
- W = WHITE
- X = UNKNOWN

**Photos Taken** ☒ No ☐ Yes  **AMT.**  **Door to Door Conducted** ☐ Yes ☐ No if yes, exp. in supple.

| Involve | Name (Last, First, Middle) Firm Name | Sex | Race | D.O.B | Age | Ht. | Wt. | Bld | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|---|---|
| VM | CITY OF SPARKS | | | | | | | | | |

**Residence Address** 1125 C ST  **City** SPARKS, NV  **Zip** 89431  **Residence Phone** 358-2284

| Involve | Name (Last, First, Middle) Firm Name | Sex | Race | D.O.B | Age | Ht. | Wt. | Bld | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|---|---|
| VM | DOOLEY, LORETTA LYNN | F | W | 3-20-78 | 11 | 4'2 | 100 | BIG | BLN | BLU |

**Residence Address** 135 E. PRATER WAY #H  **City** SPARKS NV

**Business Name or School** LINCOLN PARK SCHOOL  **Address** 4TH GRADE

**Occupation** STUDENT  **Activity at Time of Offense** AT HOME  **Physical Condition** NONE

I hereby certify that the attached documents are correct copies of official records of the Sparks Police Department.

Deedha Ramrut
Custodian of Records

DATE 10 10 11

NOT RESTRICTED DO NOT BE RELEASED DISSEMINATION OF THIS INFORMATION IS PROHIBITED UNLAWFUL RESTRICTED VIOLATION WILL FOR THE LIABILITY TO CRIMINAL AND PEL TO AT Head Pub Defender DATE SPARKS POLICE DEPARTMENT 10 10 11

**SOLVE FACTORS** 01
1. WITNESS TO CRIME
2. SUSPECT WAS ARRESTED
3. SUSPECT WAS NAMED
4. SUSP CAN BE LOCATED
5. SUSP CAN BE DESCRIBD
6. SUSP CAN BE ID'D
7. SUSP VEH CAN BE ID'D
8. IDENTIF'BL STOL' PROP
9. SIGNIFICANT M O
10. SIGNIF PHY EVIDENCE
11. MAJOR INJURY
12. MAJOR INJ/SEX CRIME
14. GOOD POSS SOLUTION

14. FURTHER INVEST NEED.
15. VEH CAN BE DESCRIBED
99. OTHER

**EVIDENCE** 02
1. FINGERPRINTS
2. TOOLS
3. TOOL MARKINGS
4. GLASS
5. PAINT
6. BULLET CASING
7. BULLET PROJECTILE

8. RAPE KIT
9. SEMEN
10. BLOOD
11. URINE
12. HAIR
13. FIREARMS
14. WEAPONS-OTHER
15. PHOTOS
16. FOOTPRINT
17. TIREPRINT
18. DOCUMENT/NOTE/WRITE
19. EXEMPLAR
20. FINGERNAIL SCRAPE
21. CONTROLD SUBSTANCES
22. VEHICLE

20. IDENTIKIT/COMPOSITE
99. OTHER

**PREMISES** 03
1. BANK/SAV LOAN/FINANC
2. BAR
3. CLEANERS/LAUNDRY
4. CONSTRUCTION SITE
5. THEATER
6. FAST FOODS
7. GAS STATION
8. HOTEL/MOTEL

9. DEPT/DISCOUNT STORE
10. DRUG STORE
11. GUN/SPORT GOODS
12. JEWELRY STORE
13. LIQUOR STORE
14. PHOTO STAND
15. CONVENIENCE STORE
16. RESTAURANT
17. SUPERMARKET
18. TV/RADIO
19. AUTO PARTS
20. CASINO
21. CAR/TRYCYCLE SALES

(OVER)

PD FORM #1700

| PREMISES (CONT) 03 | METHOD OF ENTRY (CONT) 05 | SEX CRIMES ONLY (CONT) 09 | SUSP PRETENDS TO BE (cont) 11 | REL'SHIP VIC TO SUSP (cont) 14 |
|---|---|---|---|---|
| 21 ☐ CLOTHING STORE | 11 ☐ HUSH PRY DEVICE | 15 ☐ MANCUN JURY | 16 ☐ EMPLOYEE/MESSENGER | 16 ☐ STRANGER |
| 23 ☐ HARDWARE | 12 ☐ COAT HANGER WIRE | 16 ☐ MINOR INJURY | 7 ☐ FRIEND/RELATIVE | |
| 24 ☐ MEDICAL | 13 ☐ DEV SLIP/SHIM | 17 ☐ THREAT OF INJURY | 6 ☐ CLR INJURED | MARITAL STATUS-VICT 15 |
| 25 ☐ OFFICE BUILDING | 14 ☐ CON LEVER/REMOVE | 99 ☐ OTHER | 9 ☐ RES PHONE/VCTM/BATH | |
| 26 ☐ FLORIST | 15 ☐ WINDOW SMASH | | 10 ☐ POLICE/LAW | 1 ☐ ANNULLED |
| 27 ☐ HOTEL | 16 ☐ DRILL/FORCE | BURGLARY ONLY 09 | 11 ☐ RENTER | 2 ☐ COMMON LAW |
| 28 ☐ OTHR COMRCL | 17 ☐ BOLT PULLING | | 12 ☐ REPAIRMAN | 3 ☐ SINGLE |
| 29 ☒ APARTMENT | 18 ☐ TUNNELED | 1 ☐ NGHWATCH-YES | 13 ☐ SALE OF ILL'C GOODS | 4 ☐ MARRIED |
| 30 ☐ CONDOMINIUM | 19 ☐ UNKNOWN | 2 ☐ NGHWATCH-NO | 14 ☐ SALES PERSON | 5 ☐ DIVORCED |
| 31 ☐ DUPLEX/TRIPLEX | 99 ☐ OTHER | | 15 ☐ SEEK ASSISTANCE | 6 ☐ WIDOWER |
| 32 ☐ GARAGE | | SUSPECT'S ACTIONS 10 | 16 ☐ SEEK DIRECTIONS | 7 ☐ SEPARATED |
| 33 ☐ FENCED AREA/YARD | VEHICLE ENTRY ONLY 06 | | 17 ☐ SEEKING SOMEONE | 9 ☐ OTHER |
| 34 ☐ HOUSE | | 1 ☐ ALARM DISABLED | 18 ☐ SOLICIT FUNDS | |
| 35 ☐ MOBILE HOME | 1 ☐ DOOR/LOCK FORCED | 2 ☐ ARSON | 19 ☐ UTILITY PERSON | DOMESTIC ONLY (DV) 16 |
| 36 ☐ OTH-RES | 2 ☐ ? FUNCH FORCED | 3 ☐ ATE/DRANK ON PREMISE | 20 ☐ PROSTITUTE | |
| 37 ☐ CHURCH | 3 ☐ WINDOW BROKEN | 4 ☐ BLIND/BOUND/GAGD VC | 99 ☐ OTHER | 1 ☐ PRIOR DV ARRESTS (NV) |
| 38 ☐ HOSPITAL | 4 ☐ WINDOW FORCED | 5 ☐ CLIMB ABOVE GRND LVL | | 2 ☒ PRIOR DOMESTICS (NV) |
| 39 ☐ PARK/PLAYGROUND | 5 ☐ WINDOW OPEN | 6 ☐ DEFECATED/URINATED | PHYSICAL SECURITY 12 | 3 ☐ PRIOR ASSLTIVE BEHAV |
| 40 ☐ PARKING LOT | 6 ☐ UNLOCKED | 7 ☐ DEMANDED MONEY | | 4 ☐ THREATENS FURTHR VIO |
| 42 ☐ PUBLIC BUILDING | 7 ☐ HOOD | 8 ☐ DISROBE/VIC FULLY | 1 ☐ AUDIBLE ALARM | 5 ☐ RESTRAIN ORDER INVOL |
| 43 ☐ SCHOOL | 98 ☐ UNKNOWN | 9 ☐ DISROBE/VIC PARTLY | 2 ☐ SILENT ALARM | 6 ☐ PROTECT ORDER INVOL |
| 44 ☐ SHOPPING CENTER | 99 ☐ OTHER | 10 ☐ FIRED WEAPON | 3 ☐ PRV SECURITY PATROL | 7 ☐ LESS THAN 4 HOURS OLD |
| 45 ☐ CARRIER/BOAT/MCYCLE | | 11 ☐ FORCED VIC TO MOVE | 4 ☐ DOG | 8 ☐ MORE THAN 4 HOURS OLD |
| 46 ☐ MOTOR HOME | PROPERTY TARGET 07 | 12 ☐ FORCED VIC INTO VEH | 5 ☐ STANDARD LOCKS | 9 ☐ MULTIPLE ARRESTS (NV) |
| 47 ☐ PASSENGER CAR | | 13 ☐ HAD BEEN DRINKING | 6 ☐ AUXILIARY LOCKS | 99 ☐ OTHER |
| 48 ☐ PICKUP TRUCK OR VAN | 1 ☐ CASH/NOTES | 14 ☐ INDICATION MULTI SUS | 7 ☐ WINDOW BARS/GRILLS | |
| 49 ☐ TRAC/TRLR/DLV TRUCK | 2 ☐ CLOTHES/FUR | 15 ☐ INFLICTED INJURIES | 8 ☐ OUTSIDE LIGHTING ON | DISCLOSURE 17 |
| 98 ☐ OTHER VEH | 3 ☐ CONSUMABLE GOODS | 16 ☐ KNEW LOC HIDDEN $$$$ | 9 ☐ INSIDE LIGHTING ON | |
| | 4 ☐ FIREARMS | 17 ☐ MADE THREATS | 10 ☐ GARAGE DOOR LOCKED | 1 ☐ UNK TO DISCLOSE |
| | 5 ☐ HOUSEHOLD GOODS | 18 ☐ PUT PROP/SACK, POCKET | 11 ☐ OBSCURED INT/VIEW | 2 ☐ WON'T DISCLOSE |
| POINT OF ENTRY 04 | 6 ☐ JEWELRY/METALS | 19 ☐ PREPARED EXIT | 12 ☐ SECURITY SIGNING | 3 ☐ NOT DISCLOSED |
| | 7 ☐ LIVESTOCK | 20 ☐ RANSACKED | 99 ☐ OTHER | 4 ☐ PER OFFICER |
| 1 ☒ FRONT | 8 ☐ OFFICE EQUIPMENT | 21 ☐ RIPPED/CUT CLOTHING | | 5 ☐ PER PHYSICAL |
| 2 ☐ REAR | 9 ☐ TV/RADIO/CAMERA | 22 ☐ SELECTIVE IN LOOT | VICTIM'S CONDITION 13 | 6 ☐ PER PRV REVIEW |
| 3 ☐ SIDE | 10 ☐ BICYCLES | 23 ☐ SHUT OFF POWER | | 7 ☐ PER SUPV REVIEW |
| 4 ☐ DOOR | 11 ☐ SPORTING EQUIPMENT | 24 ☐ SMOKED ON PREMISES | 1 ☐ UNDER INF ALCHO/DRUG | |
| 5 ☐ WINDOW | 12 ☐ COLLECT-COIN-STAMP | 25 ☐ SEARCHED VICTIM | 2 ☐ SICK/INJURED | INJURY/DEATH 18 |
| 6 ☐ SLIDING GLASS DOOR | 13 ☐ COLLECT-OTHER | 26 ☐ STRUCK VICTIM | 3 ☐ SENIOR CITIZEN | |
| 7 ☐ BASEMENT | 14 ☐ CONSTR. TOOLS/MAT'S | 27 ☐ SUSPECT ARMED | 4 ☐ BLIND | 1 ☒ HOSPITAL |
| 8 ☐ ROOF | 15 ☐ AUTO PARTS | 28 ☐ THREATENED RETALIATION | 5 ☐ HANDICAPPED | 2 ☐ DRS NAME |
| 9 ☐ FLOOR | 16 ☐ SAFE | 29 ☐ TOOK ONLY CONSUMABLE | 6 ☐ DEAF | 3 ☐ CORONER |
| 10 ☐ WALL | 17 ☐ VALUE UND $50 | 30 ☐ TOOK VIC'S VEHICLE | 7 ☐ MUTE | |
| 11 ☐ DUCT/VENT | 18 ☐ VALUE $50-$200 | 31 ☐ TORTURED | 8 ☐ MENT/EMOT IMPAIRED | TOTALS |
| 12 ☐ GARAGE | 19 ☐ VALUE OVR $200 | 32 ☐ UNDER INFLUENCE DRUG | 99 ☒ OTHER MINOR | |
| 13 ☐ ADJ BUILDING | 99 ☐ OTHER | 33 ☐ USED LOOKOUT | | TOTAL DAMAGE AMOUNT |
| 14 ☐ GROUND LEVEL | | 34 ☐ USED LOOKOUT | REL'SHIP-VIC TO SUSP 14 | |
| 15 ☐ UPPER LEVEL | | 35 ☐ USED DRIVER | | $ |
| 16 ☐ FENCE | SEX CRIMES ONLY 08 | 36 ☐ USED MATCH-CANDLE | 1 ☐ HUSBAND | |
| 98 ☐ UNKNOWN | | 37 ☐ USED VICTIM'S NAME | 2 ☐ WIFE | |
| | 1 ☐ SUSPECT CLIMAXED | 38 ☐ USED SUITCASE/PILLOW | 3 ☒ MOTHER | |
| METHOD OF ENTRY 05 | 2 ☐ UNKNOWN IF CLIMAXED | 39 ☐ USED VICTIM'S TOOLS | 4 ☐ FATHER | |
| | 3 ☐ VICTIM BOUND TIED | 40 ☐ VEH NEEDED TO REMOVE | 5 ☐ DAUGHTER | |
| 1 ☐ NO FORCE USED | 4 ☐ COVERED VICTIM FACE | 41 ☐ CUT/DISCONN PHONE | 6 ☐ SON | |
| 2 ☐ ATTEMPT ONLY | 5 ☐ PHOTOGRAPHED VICTIM | 42 ☐ CASED LOC BEFORE | 7 ☐ BROTHER | TOTAL LOSS FROM |
| 3 ☐ BODILY FORCE | 6 ☐ VIC ORAL COPUL SUSP | 99 ☐ OTHER | 8 ☐ SISTER | THEFT / ROBBERY |
| 4 ☐ BOLT CUTTERS | 7 ☐ SUSP ORAL COPUL VICT | | 9 ☐ OTHER FAMILY | |
| 5 ☐ CRNL LOCK/VICE GRIPS | 8 ☐ RAPE BY INSTRUMENT | | 10 ☐ ACQUAINTANCE | |
| 6 ☐ PIPE/WRENCH | 9 ☐ SODOMY | SUSP PRETENDS TO BE 11 | 11 ☐ FRIEND | |
| 7 ☐ SAW/DRILL/BURN | 10 ☐ SUGG VIC TO LEND ACT | | 12 ☐ BOYFRIEND | $ |
| 8 ☐ PUNCH | 11 ☐ INSERT FINGER-VAGINA | 1 ☐ CONDUCTING SURVEY | 13 ☐ GIRLFRIEND | |
| 9 ☐ SCREWDRIVER | 12 ☐ FORCED VIC-FONDL SU | 2 ☐ CUST/CLIENT | 14 ☐ NEIGHBOR | |
| 10 ☐ TIRE IRON | 13 ☐ SUSP FONDLED VICTIM | 3 ☐ DELIVERY PERSON | 15 ☐ BUSINESS ASSOCIATE | |
| | 14 ☐ MASTURBATED SELF | 4 ☐ DISABLED MOTORIST | | |
| | | 5 ☐ DRUNK | | |

**NARRATIVE TEXT**

_See Details attached_

CONTROLLED DOCUMENT NOT TO BE DUPLICATED

# SPARKS POLICE DEPARTMENT
## SUSPECT/ARREST REPORT

SPARKS CASE NO. **89-11100**  DATE **9-9-89**

| STATEMENT | ☐YES ☐NO | STATEMENT WAS ☐VERBAL ☐WRITTEN | ☐WM/MASTERCASE ☐SUPPLEMENTAL F/U | ☐ARREST (ADULT) (A/R) ☐ARREST JUV (A/R) ☐SUSPECT (S) |

**SUBJECT** #1  NAME (LAST, FIRST, MIDDLE) **Batie Glenn J.s.**  SUFFIX  REF #  DL #  DL'S STATE

| SEX F | RACE W | DOB (IF KNOWN) | AGE/RANGE 46 | HEIGHT/RANGE 54 | WEIGHT/RANGE 120 | BUILD Blk | HAIR Blk | EYES Bro | SS # |

RESIDENT ADDRESS **131 E Prater way  8H  Sparks Nv**

BUSINESS NAME or SCHOOL **Silver Club 1040 B** ADDRESS **Sparks** CITY  STATE **89431**

| OCCUPATION **Change** | DAYS OFF **Mon - Tue** | WORK HRS **8a-430p** | SUSPECT ARRESTED ☐YES ☐NO | SUSPECT CAN BE LOCATED AT **Res** | BUSINESS PHONE/EXT **359-4771** |

| STATUS ☐ADULT ☐JUVENILE | STATE BIRTH **Alabama** | ID # | S.P.D. | IF BOOKED B/A # | LOCAL # |

CLOTHING  ☐CITATION #  WITTENBURG #

CLOTHING **Black shirt/purse  Black pants  Black shoes**

| WAS SUSPECT INJURED ☐YES ☐NO | INJURY LINKED TO: ☐MISD CRIME ☐POLICE ACTION ☐FELONY CRIME | ☐INJ. ACCIDENT ☐ACCIDENTAL ☐OTHER | ☐UNKNOWN | EXTENT OF INJURY |

**VEHICLE**

| LIC. NO. | LIC. STATE | LIC. TYPE | YEAR/RANGE | MAKE | MODEL | BODY | COLOR(S) |

| UNIQUE ID | | VIN | | DISPOSITION | | TOWED-BY |

| RO-NAME ☐PERSON ☐BUSINESS | ADDRESS | APT/SUITE | CITY | STATE | ZIP | PHONE |

**CHECK BOXES — ARREST / SUSPECT**

| HAIR LENGTH 21 | FACIAL HAIR 26 | TATTOOS/SCARS/MARKS 30 | UNIQUE CLOTHING 41 | CALIBER/LENGTH/GRIPS 47 |
|---|---|---|---|---|
| 1 ☐ BALD | 0 ☐ BEARD-SCRAGGLY | 1 ☐ FACE | 1 ☐ BASEBALL CAP | 1 ☐ 22 CALIBER |
| 2 ☐ COLLAR | 1 ☐ BEARD-SHORT | 2 ☐ TEETH | 2 ☐ COWBOY HAT | 2 ☐ 25 |
| 3 ☐ LONG | 2 ☐ BEARD-FULL | 3 ☐ NECK | 3 ☐ LEATHER HAT | 3 ☐ 32 |
| 4 ☐ RECEDING | 3 ☐ CLEAN SHAVEN | 4 ☐ ARM | 4 ☐ OTHER HAT | 4 ☐ 38 |
| 5 ☐ SHAVED | 5 ☐ FUMANCHU | 5 ☐ L ARM | 5 ☐ SKI MASK | 5 ☐ 380 |
| 6 ☐ SHORT | 6 ☐ GOATEE | 6 ☐ R HAND | 6 ☐ NYLON MASK | 6 ☐ 357 |
| 7 ☐ SHOULDER | 7 ☐ MUSTACHE-THIN | 7 ☐ L HAND | 7 ☐ GLOVES | 7 ☐ 41 |
| 99 ☐ OTHER | 8 ☐ MUSTACHE-THICK | 8 ☐ R LEG | 8 ☐ MILITARY JACKET | 8 ☐ 44 |
|  | 9 ☐ SIDEBURNS | 9 ☐ L LEG | 9 ☐ P-COAT | 9 ☐ 9MM |
| HAIR TYPE 22 | 10 ☐ UNSHAVEN | 10 ☐ R SHOULDER | 10 ☐ SKI/DOWN JACKET | 10 ☐ 410 GAUGE |
| 1 ☐ COARSE | 99 ☐ OTHER | 11 ☐ L SHOULDER | 11 ☐ VEST | 11 ☐ 12 GAUGE |
| 2 ☐ FINE | COMPLEXION 27 | 12 ☐ LEVI JACKET | 12 ☐ LEVI JACKET | 12 ☐ 20 GAUGE |
| 3 ☐ THICK |  | 13 ☐ BACK TORSO | 13 ☐ WINDBREAKER | 13 ☐ 223 RIFLE |
| 4 ☐ THINNING | 1 ☐ ACNE/POCKED MARK | 14 ☐ TATTOO FEATURE | 14 ☐ LEATHER JACKET | 14 ☐ 270 RIFLE |
| 5 ☐ WIG | 2 ☐ ALBINO | 15 ☐ SCAR FEATURE | 15 ☐ SPORTS LOGO JACKET | 15 ☐ 300 RIFLE |
| 6 ☐ WIRY | 3 ☐ DARK | 16 ☐ MARK FEATURE | 16 ☐ SPORTS LOGO CLOTHING | 16 ☐ 308 RIFLE |
| 99 ☐ OTHER | 4 ☐ FRECKLED |  | 99 ☐ OTHER | 17 ☐ 30/06 RIFLE |
|  | 5 ☐ LIGHT/FAIR | TEETH 31 |  | 18 ☐ 30/30 RIFLE |
| HAIR CONDITION 23 | 6 ☐ OLIVE | 1 ☐ BRACES | WEAPON TYPE 45 | 19 ☐ OTHER |
| 1 ☐ CLEAN | 7 ☐ PALE/SHALLOW | 2 ☐ BUCKED |  | 20 ☐ 2-INCH BARREL |
| 2 ☐ DIRTY | 8 ☐ RUDDY | 3 ☐ CHIPPED | 1 ☐ BASEBALL BAT | 21 ☐ 4-INCH BARREL |
| 3 ☐ GREASY | 9 ☐ TANNED | 4 ☐ CROOKED | 2 ☐ CLUB/DEVICE | 22 ☐ 6-INCH BARREL |
| 4 ☐ MATTED | 10 ☐ WEATHERED | 5 ☐ GAPS BETWEEN | 3 ☐ HAND GUN | 23 ☐ 8-INCH BARREL |
| 5 ☐ ODOR | 11 ☐ WRINKLED | 6 ☐ GOLD/SILVER CAPPED | 4 ☐ TOY GUN | 24 ☐ OTHER BBL |
| 99 ☐ OTHER | 99 ☐ OTHER | 7 ☐ JEWEL/STUD/DECO | 5 ☐ SIMULATED GUN | 25 ☐ WOOD GRIPS |
|  |  | 8 ☐ MISSING | 6 ☐ UNKNOWN HAND GUN | 26 ☐ WOOD GRIPS |
| HAIR STYLE 24 | GLASSES/LENSES 28 | 9 ☐ RETAINER | 7 ☐ RIFLE | 27 ☐ PLASTIC GRIPS |
| 1 ☐ AFRO/NATURAL | 1 ☐ NONE | 10 ☐ STAINED/DECAYED | 8 ☐ SHOTGUN | 28 ☐ PEARL/IVORY GRIPS |
| 2 ☐ BANGS | 2 ☐ YES BUT UNKNOWN TYPE | 11 ☐ DENTURES | 9 ☐ KNIFE | 29 ☐ METAL/METALLIC GRIPS |
| 3 ☐ BRAIDED | 3 ☐ PRESCRIPTION GLASSES | 99 ☐ OTHER | 10 ☐ OTHER CUT-STAB INSTR | 30 ☐ OTH-GRIPS |
| 4 ☐ BUSHY | 4 ☐ SUN GLASSES | DISTINGUISH FEATURE 32 | 11 ☐ HANDS OR FEET |  |
| 5 ☐ BUTCH | 5 ☐ WIRE FRAME | 1 ☐ AMPUTATION | 12 ☐ STRANGULATION DEVICE | KNIFE FEATURE 48 |
| 6 ☐ COMBED BACK | 6 ☐ PLASTIC FRAME | 2 ☐ ARTIFICIAL LIMB | 13 ☐ ROPE/TWINE/WIRE/CHAIN | 1 ☐ BAYONET |
| 7 ☐ CORN-ROW | 7 ☐ LENS ORNAMENTATION | 3 ☐ CANE/CRUTCH | 14 ☐ TIRE IRON | 2 ☐ BUTCHER |
| 8 ☐ CURLERS | 8 ☐ CONTACT LENSES | 4 ☐ CAST-ARM/LEG/FOOT | 15 ☐ VEHICLE | 3 ☐ DAGGER |
| 9 ☐ CURLY | 10 ☐ FRAME COLOR-GOLD | 5 ☐ CRIPPLED | 16 ☐ NUMB-CHUCK DEVICE | 4 ☐ HUNTING |
| 10 ☐ FLATTOP | 11 ☐ FRAME COLOR-SILVER | 6 ☐ DEFORMED | 17 ☐ SEMI-AUTOMATIC | 5 ☐ KITCHEN |
| 11 ☐ MILITARY | 12 ☐ FRAME COLOR-BLACK | 7 ☐ GROWTH/MOLE | 99 ☐ OTHER | 6 ☐ POCKET-KNIFE |
| 12 ☐ MOHAWK | 13 ☐ FRAME COLOR-OTHER | 8 ☐ HEARING AID |  | 7 ☐ STILETTO |
| 13 ☐ PONYTAIL | 99 ☐ OTHER | 9 ☐ LIMP | FIREARM FEATURE 46 | 8 ☐ SWITCHBLADE |
| 14 ☐ PROCESSED |  | 10 ☐ SKIN DISCOLOR | 1 ☐ AUTOMATIC | 9 ☐ BUCK |
| 15 ☐ PUNK | SPEECH/VOICE 29 | 11 ☐ SPASTIC MOVEMENTS | 2 ☐ BOLT ACTION | 99 ☐ OTHER |
| 16 ☐ STRAIGHT | 1 ☐ EASTERN U.S. ACCENT | 12 ☐ EARRING/STUD-LEFT | 3 ☐ BLUE STEEL |  |
| 17 ☐ STYLED | 2 ☐ SOUTHERN U.S. ACCENT | 13 ☐ EARRING/STUD-RIGHT | 4 ☐ CHROME-NICKEL/STAIN | WEAPON LOC/CARRIED 49 |
| 18 ☐ CENTER-PARTED | 3 ☐ FOREIGN ACCENT | 99 ☐ OTHER | 5 ☐ DERRINGER | 1 ☐ ANKLE/LEG HOLSTER |
| 19 ☐ LEFT-PARTED | 4 ☐ DEEP |  | 6 ☐ DOUBLE BARREL | 2 ☐ BAG |
| 20 ☐ RIGHT-PARTED | 5 ☐ DISGUISED |  | 7 ☐ OVER/UNDER | 3 ☐ BRIEFCASE |
| 21 ☐ UNKEMPT | 6 ☐ HIGH |  | 8 ☐ PUMP | 4 ☐ NEWSPAPER |
| 22 ☐ WAVY | 7 ☐ SLURRED |  | 9 ☐ REVOLVER | 5 ☐ POCKET |
| 23 ☐ WIDOWS PEAK | 8 ☐ SOFT |  | 10 ☐ SINGLE SHOT | 6 ☐ SHOULDER HOLSTER |
| 24 ☐ DYED | 9 ☐ SPEECH IMPEDIMENT |  | 99 ☐ OTHER | 7 ☐ WAISTBAND/BELT |
| 25 ☐ BLEACHED | 99 ☐ OTHER |  |  | 8 ☐ SLEEVE/ARM |
| 99 ☐ OTHER |  |  |  | 9 ☐ UNDER/BESIDE SEAT |
|  |  |  |  | 10 ☐ GLOVEBOX |
| RIGHT/LEFT HANDED 25 |  |  |  | 11 ☐ TRUNK |
| 1 ☐ RIGHT HANDED |  |  |  | 12 ☐ BEDROOM |
| 2 ☐ LEFT HANDED |  |  |  | 99 ☐ OTHER |
|  |  |  |  | GANG AFFILIATION 50 |
|  |  |  |  | 1 ☐ KNOWN GANG MEMBER |
|  |  |  |  | 2 ☐ SUSPECTED GANG AFFIL |
|  |  |  |  | 3 ☐ GANG NAMED |

COPYRIGHTED DOCUMENT NOT TO BE DUPLICATED

| REPORTING OFFICER **Johnson L 0826** | ID # | APPROVING OFFICER | ID # | ENTERED BY |

FORM 1600

hr

**SPARKS POLICE DEPARTMENT**
Supplemental Or Continuation Report

Type of Report: CHILD NEGLECT                     Case #: 89-11100

Date of Report: 9-9-89                            Officer: JOHNSON 0826

Victim: City of Sparks                  Location: 135 E. Prater Way #H

Date/Time of Supplement: 9-9-89 1558 hrs

Approving Supervisor: _Sgt Marlow 391_                Date: 9-10-89

**Victim:**

DOOLEY, Loretta Lynn, WF, 11 yrs, DOB 9-20-78 Address: 135 E. Prater Way #H, no phone, Student at Lincoln Park Elementary School.

**Suspect:**

BAKER, Glenda Sue, WF, DOB 4-24-43, 46 yrs, 504, 170, blk, bro, SS# ███████████, Address: 135 E. Prater Way #H, Employed by Silver Club, 1040 B St., as Change, day shift.

**Suspect(s) Statement:**

BAKER made a verbal statement that she does leave the child home and she felt that the child was old enough to take care of herself and that she cannot afford a baby sitter for the child and she is struggling to maintain a house hold. She made the verbal statement that she was trying to save money to go back to Alabama and leave the child in Alabama with her other two children.

**Officers Involved And Assignment:**

Officer JOHNSON assigned original case. Officer SCHRIBER cover officer.

**Witnesses:**

#1 Anonymous. The original call on this case was not identified and called Sparks dispatch anonymously.

#2 SMITH, Teresa Marie, WF, DOB 12-30-70, Address: 105 E Prater Way #G, 356-2063, SS# ███████████, unemployed. Can testify to seeing DOOLEY walking around the apartment complex alone and unsupervised and can testify to this happening on several occasions. SMITH can testify to offering her assistance as a baby sitter for a fee to BAKER, however BAKER has never taken her up on the offer.

#3 BARAJAS, Tracy Lynn, DOB 4-27-67, Address: 113 E. Prater Way #D, 359-5264, SS# ███████████, Works at UNR Wolf Club and Lawlor Events, 784-4870. Can testify to seeing DOOLEY outside from approximately 10:30 a.m. and walking around where she ascertained if someone was baby sitting her and she told her that her mom was sleeping. She stated that she then fed the child a hamburger and coke because the child appeared to be hungry.

CONTROLLED DOCUMENT NOT TO BE DUPLICATED

Officer: JOHNSON 0826     _Sgt Moran 3901_     Case #: 89-11100
Supervisor Approving:                                 Date: 9-10-89

## Weapons-Force Used And/Or List of Items and Loss:

None.

## Means of Entry And/Or Exit:

N/A

## Extent Of Injuries And Treatment:

No injuries sustained, no treatment given.

## Evidence:

No evidence taken.

CONTROLLED
DOCUMENT
NOT TO BE
DUPLICATED

## Brief synopsis Of Offense:

Juvenile was left at her residence unattended for an 8 hour period, where the child states she had noodles and mash potatoes for lunch and that her sister had cooked them for her. However upon questioning the child, she stated she does not have a sister. After investigation, child was placed into welfare and case forwarded to welfare division.

## Additional Information:

I made contact with Carol DUNN of the Washoe County Social Services Division at 1730 hrs, where she advised the child be placed into social services.

## Details Of Offense:

Upon todays date, I was dispatched along with Officer SCHRIBER to 135 E. Prater Way #H on a complaint of an 8 yr old who had been left alone and abandoned all day. Upon arrival, I went to apartment H, knocked on the door and found no one to be home. A little girl from across the breeze way stated, "My mom is not home". I noticed that the child was sitting with other adults and juveniles in an area where there was a yard sale in the complex and I asked the child to come over to me.

I asked her what her name was and she stated her name was Loretta. After identifying the child as being the one that lives in the particular apartment #H, I asked her where her mom was and she stated her mother was at work, but that she was there with a baby sitter and that the baby sitter had gone to the store for a minute. I asked her what the baby sitter's name was and she stated that she did not know. I asked her how old she was and she stated she was 11 yrs old, however the child appeared to be a lot younger than 11. I asked the child if she had eaten, she stated she had some mash potatoes and noodles and stated that her big sister had made it for her. I asked the child where her sister was, she stated she was not there.

As I was talking with the juvenile, other adults in the complex came over to me and stated that they had been concerned also about the child's welfare and

Officer: JOHNSON 0826
Supervisor Approving: _Sgt Morrow 3101_

Case #: 89-11100
Date: 7-10-89

several of the adults made verbal statements that the child had been
physically been abused, however I did not notice any bruises on the child
they would not elaborate on this and no statements were obtained from the
subjects. However, several subjects did state that the child had been ou
and about on several occasions and alone and that one parent stated that
when she fed her children, the child DOOLEY would come around and eat the
scraps left over by these kids and this had happened on more that one
occasion.

As I was talking to the child, she stated she did not want to go to welfa
because the last time, her principal was real mean to her. I asked her h
was he mean to her, she stated that he thought she had lice and she state
that this happened in Alabama. Officer note the child was clean and did
appeared to be in any physical danger at this time. Upon further
investigation, it was revealed that I had made contact with this juvenile
and her mother in the past and at this time it was an unstable condition,
where the child had placed a prophylactic on her thumb where the rubber h
gotten too tight and stopped the circulation of the blood and that she
thought she was shrinking. At that time, I made contact with her mother
the mother was complaining of not being able to take care of the child an
having a hard time with her, however she was with a friend at that time a
the friend was helping to take care of her.

Upon todays date, there was no adult supervision and the child finally
admitted that she was home alone. She asked if she was going to be taken
away to welfare again and I told I did not know at this time. I made co
with Sgt MORROW and I transported the child to SPD, where I requested the
mother be contacted at work. Upon dispatch made contact with the Silver
Club, I was advised that the mother had left for the day at 1630 hrs and
gone home. After my arrival at the station, Officer SCHRIBER picked up t
mother and transported her to SPD.

I met with the mother BAKER and was advised by her that she does leave th
child at the residence, she felt that the child is 11 yrs and could take
of herself and that she could not afford a baby sitter and she did assure
that there was food in the residence. I asked DOOLEY about her sister an
that she stated that she did not have a sister. I asked her who fed her
mash potatoes and noodles and she stated it was a friend of hers mother a
that friends name was Connie.

After talking to the mother and determining that the mother could not
physically take care of the child, I then made contact with Social Servic
and talked to Carol DUNN at 1730 hrs. After explaining the situation to
DUNN, she suggested that the child be placed into a foster home temporar:
until investigation can be completed by Social Services. I advised BAKE!
this and the child was transported to a foster home. No further.

CONTROLLED
DOCUMENT
NOT TO BE
DUPLICATED

POLICE DEPARTMENT
SPARKS, NEVADA

BY _____ ON _____
IS RESTRICTED AS TO USE AND
DISSEMINATION

CASE NO. 89-14

STATEMENT OF: Burdas (Last Name) Tracy (First Name) Lupo (Middle Name)
(PLEASE PRINT)

43 E. Prater Wy #D (Address) 35?-5246 (Phone No.)

UNR-Wolf Club (Business Name) Lawlor Annex (Bus. Address) 784-4? (Bus. Phone)

I have been outside since 10:30 and
Loretta was already outside she told
me that someone around the corner wa
babysitting her then told me that her
was home sleeping she said her mom
was working. I asked her what she h
eaten noodles and mashed potate
that her sitter cooked. She looked h
so I gave her a hamberger + co

~~CONTROLLED DOCUMENT NOT TO BE DUPLICATED~~

WITNESS: _____ SIGNATURE: _____

DATE _____ TIME _____

**POLICE DEPARTMENT**
SPARKS, NEVADA

THIS INFORMATION PROVIDED
BY _____ ON _____
IS RESTRICTED AS TO USE AND
DISSEMINATION

CASE NO. 89-11100

STATEMENT OF (PLEASE PRINT)
LAST NAME: Smith
FIRST NAME: Teresa
MIDDLE NAME: Marie
DATE OF BIRTH: _____

ADDRESS: 105 E Prater #G
PHONE NO.: 356-2063
SOCIAL SECURITY NO.: _____

BUSINESS NAME: NONE
BUS. ADDRESS: _____
BUS. PHONE: _____

Lorretta has been walking around the apts all day with no one to watch her or to feed her. And I have seen this on several occassions. So I offered to baby sit for 75¢ an hour and her mother said she would think about it

CONTROLLED
DOCUMENT
NOT TO BE
DUPLICATED

WITNESS: _____

SIGNATURE: Teresa Smith

DATE: _____
TIME: _____

FORM 5000
2/77

## SPARKS POLICE DEPARTMENT — NARRATIVE/TEXT REPORT

| SUPPLEMENTAL | SPARKS CASE NO. 84-1100 | OFFICER ID NO. 9052 | LAST NAME-INITIALS Foxx S.3 | DATE RPT. | TIME RPT. |

(NOTE: WHEN NECESSARY, REFER TO OR CREATE ITEM # PRIOR TO TEXT AND PROVIDE DETAIL (+: EVIDENCE PROPERTY))

After Receiving this Mother I have
Been in Contact With Wendy Ferguson
of Washoe County Social Services. It is her
And My opinion this 11 year old Child
Knows to Call the Police or Fire dept in
Emergency By Dialing 911, And Knows her
Mothers Employment and How to Reach her.
And Subsequently Can Be left Alone, for
the Short Periods of Time She Has Been Alone.
Also the Mother was Advised it May
Be An Emotional Strain on the Child Being
Alone from 8am to 4pm daily for a 2 to 3
Month Period And the Mother Has Agreed
to Arrange Child Care on Weekend as School
Being Back in Has Arranged for Week days.
No further
Disposition of Case. Unfounded.

CONTROLLED DOCUMENT NOT TO BE DUPLICATED

Cam to Z

| OFFICER SIGNATURE OXX | REVIEW ID # 0575 | LAST NAME-INITIALS | DATE 9-13-88 | TIME | PAGE |

PSER 32

## DECLARATION OF SHALENE M. KIRKLEY, PH.D.

**I declare under penalty of perjury the following to be true and accurate to the best of my information and belief:**

1. I am a clinical psychologist, licensed to practice in Arizona.

2. In February 2009, I was working for Dr. M Brad Bayless when he interviewed and evaluated John Sansing. I was completing my post-doctorate residency at the time.

3. I was present during Dr. Bayless' clinical interview of John Sansing on Feb. 10, 2009, and during Dr. Bayless' deposition on Sept. 10, 2009.

4. I recall Dr. Bayless testifying at this deposition that Sansing had told us he raped the victim because her skirt flew up, exposing her vaginal area. I do not recall Sansing ever saying that the victim was wearing a skirt or a dress, or that it flew up, exposing her vaginal area.

5. When I heard Dr. Bayless make the statement about the skirt and the defense attorney mention on cross that the victim was wearing pants, I remember being surprised and embarrassed, because that was a big misstatement for my supvervisor to make.

6. No one from Sansing's defense team has interviewed me prior to now. If anyone had contacted me, I would have been willing to sign this declaration.

**I declare the foregoing to be true and accurate to the best of my information and belief. Signed this 17th day of November, 2011, at Phoenix, Arizona.**

Shalene M. Kirkley, PhD



**Chicago Neuropsychology Group**
333 N. Michigan Ave, Suite 1801
Chicago, Illinois 60601
Phone: 312-345-0933
Facsimile: 312-345-0934
www.chicagoneuropsychology.com

**Director**
**Robert L. Heilbronner, Ph.D., ABPP-CN**

October 21, 2011

Ashley McDonald
Office of the Federal Defender Program
    For the District of Arizona
Capital Habeas Unit
850 West Adams Street, Suite 201
Phoenix, AZ 85007

Re:    State of Arizona v. John Edward Sansing

Dear Ms. McDonald,

I have completed a review of records and my evaluation of Mr. Sansing and wanted to provide you with a summary of my opinions to date. The first part of this report is directed toward an analysis of the opinions of the previous examiners who examined Mr. Sansing during the trial and post-conviction relief phases. The second part will be directed largely towards my opinions derived from the results of my examination of him on September 15th, 2011.

*__Annotated History__*: You are quite familiar with the facts of the case so I will not review them in detail. Briefly, Mr. Sansing has been tried and convicted of First Degree Murder, dangerous kidnapping, dangerous armed robbery, and dangerous sexual assault: he was sentenced to death. He is presently incarcerated at The Arizona State Prison in Florence, Arizona. Mr. Sansing's initial appeal was denied and now his case is in the Capital Habeas phase. His background history includes a number of mitigating factors which were determined in the initial trial not to substantially outweigh the relevant aggravating factors. Some of the non-statutory mitigating factors include: some impairment from the use of crack cocaine, acceptance of responsibility and remorse for the crime, a difficult childhood and family background, and love and support of family. Subsequent examinations in the appeal have raised the issue of other relevant mitigating factors including: a history of abuse and neglect as a child, a borderline level of intellectual functioning, possible learning disability, and a probable history of psychiatric illness. In 2008, it was determined by a previous expert (Dr. Lanyon) that Mr. Sansing did not show evidence of brain damage.

*__Documents Reviewed__*: *Utah Department of Corrections evaluation 1985 (Bates 1-7), Valley Mental Health Records 1988 (Bates 8-14), Hill competency assessment 8-6-98 (Bates 15-19), Parrish handwritten notes 8-6-99 (Bates 20-24), Menendez report 5-10-99 (Bates 25-31), French report 2007*

*John Sansing*                                             *October 21, 2011*

*(Bates 32-35), Miller assessment report 9-23-07 (Bates 36-103), Lanyon psychological evaluation 3-3-08 (Bates 104-120), Bayless report 2009 (Bates 121-126), Kirkley notes 2-10-99 (Bates 127-128), Arizona Department of Corrections mental health records (selected) (Bates 129-223), School records (Bates 224-283), Davis 9-1-99 letter to judge (Bates 284-298), Sansing Factual Basis for Change of Plea 9-18-98 (Bates 299), Special Verdict 9-30-99 (Bates 300-316).*

***Analysis of Examinations from the Trial Phase***: Mr. Sansing was examined by Dr. Sara Hill, a defense expert, on 8/6/98 for the purposes of assessing his competency to stand trial. He was examined by Dr. Kathryn Menendez, a defense expert, on 5/10/99 for the purposes of establishing learning capacity and the presence of a learning disorder.

*Dr. Hill's Report*: In the <u>Background</u> section on Page 1 of Dr. Hill's report, she notes that Mr. Sansing "…attended no special education classes" during grammar school and high school. But, there is a question as to whether or not she had access to his school records. Those records clearly indicate that Mr. Sansing's grades in grammar school were predominantly below average (e.g., D's and F's) with evidence of declining grades with each passing year: his standardized test scores were also well below same age peers. (Bates 87-89, 106, 108, 237, 239-242, 246-247, 272, 275-276, 280-283, 291-292, 296). He may not have attended special education classes, but that does not inherently mean that he did not and does not have a learning disability. The school system may not have had adequate resources for identifying and treating learning disorders. Dr. Hill fails to mention the history of neglect and abuse in the home in which Mr. Sansing was raised, noted to be a relevant non-statutory factor by the judge in 1999. (Bates 39, 48, 49-54, 57-66, 70-72, 76-78, 80, 93-95, 106-107, 111, 118, 122, 285, 290, 296-297, 312, 314). Research and clinical evidence suggests that learning problems in a home where abuse and neglect are common is a toxic combination that almost always leaves longstanding cognitive, emotional and behavioral consequences in the affected child. There is also evidence to suggest that abuse and neglect in the home can have deleterious effects on the child's developing brain.

On Page 2, Dr. Hill writes that Mr. Sansing "…denies having gotten treatment for mental health problems in the past, and relates he does not have family members who have been treated for mental illness." Again, the absence of a formal psychiatric or psychological examination or treatment does not inherently mean that Mr. Sansing did not have a psychiatric disorder or that members of his family also did not have psychiatric conditions. In fact, the records clearly document a history of chronic and pervasive Psychostimulant Abuse and Dependence, meeting criteria for a diagnosable mental disorder. (Bates 17-18, 22, 28, 31, 33-35, 82-84, 96, 108, 111-114, 118-120, 123, 126, 131, 291, 293-297). He also has signs and symptoms of Major Depressive Disorder and features on an Intermittent Explosive Disorder. It is also highly likely that his mother has a history of psychiatric disturbance that undoubtedly had a significant and deleterious impact upon his development as a child. (Bates 40, 111, 118, 287-289, 296). Moreover, there is a question as to whether or not she was abusing alcohol during her pregnancy with him, which also could have caused brain damage in-utero. (Bates 46, 50, 57, 60-61, 63, 94-95, 107, 111, 122, 290, 296, 312). On Page 2, Dr. Hill also fails to mention Mr. Sansing's use/abuse of crystal methamphetamine, focusing instead on his use of marijuana and crack cocaine. This omission is particularly important as the crystal methamphetamine is a significant factor in the commission of the crime and highly relevant for its impact on Mr. Sansing's behavior prior to and leading up to the murder.

In the <u>Mental Status</u> section on Page 2, Dr. Hill writes that Mr. Sansing "…appears to have intelligence in the average range with a fund of information commensurate with incomplete high school

2

John Sansing                                                                  October 21, 2011

education." It is unknown how she arrived at this opinion. Again, she apparently did not have available academic records, which include documentation of test results from 1981 when Mr. Sansing was 14 years old that indicate an IQ in the "borderline range", with weaker verbal abilities compared to nonverbal abilities. (Bates 280-283). He was also noted to be "two or more grade levels behind in verbal skills" on a standardized test. (Bates 108, 280-281). Also his "fund of information" is not simply commensurate with someone who has an incomplete high school education. The testing I did reveals a scaled score of 5 on the Information subtest of the Wechsler Adult Intelligence Scale – 4th Edition (WAIS-IV) and suggests that his fund of information is substantially lower than individuals who have failed to complete high school; it is even lower than someone who finished 9th Grade as he did.

In the Summary section of her report, Dr. Hill writes "The defendant has a history of antisocial behaviors, though more background information would be needed to make a diagnosis of Antisocial Personality Disorder." Dr. Hill does not identify which "anti-social behaviors" Mr. Sansing has. Also, she does not write, nor is there evidence in the other records, that he ever had a diagnosis of Conduct Disorder as a child, a prerequisite for a diagnosis of Anti-Social Personality Disorder as an adult. Dr. Hill appropriately expressed reservations about a diagnosis of Anti-Social Personality Disorder because she did not have more thorough background information. This is important because Dr. Menendez subsequently diagnosed Mr. Sansing with Anti-Social Personality Disorder in May 1999. (Bates 31). In my opinion, this inaccurately paints a picture of Mr. Sansing as being someone who has "...a pervasive pattern of disregard for, and violation of, the rights of other that begins in childhood or early adolescence and continues into adulthood." (DSM-IV). More likely, his behavior is a product of drug abuse and drug seeking behavior and is not a product of an Anti-Social Personality Disorder.

Dr. Menendez's Report: On Page 1 in her report, Dr. Menendez writes "...John's biological mother, Glenda Singh, raised John and reportedly treated him well." She also writes that Mr. Skinner (stepfather) also "...treated John adequately." These statements are in stark contrast to the information in multiple records which documents a history of abuse and neglect as a child, particularly at the hands of Mr. Skinner. Perhaps, Mr. Sansing denied a history of abuse and neglect during his interview with Dr. Menendez; if that is so, it reflects either denial, a minimization of the reality of his childhood, or some other factor. Whatever the explanation, it is relevant in that Dr. Menendez operates on the assumption that Mr. Sansing's mother treated him well as a child. On Page 2, Dr. Menendez writes that Mr. Sansing reports "...his early family life was normal with normal sibling relationships...." Again, the records clearly document a history of abuse and neglect when Mr. Sansing was a child and his relationships with his siblings was not at all normal. (Bates 39, 48, 49-54, 50-51, 57-66, 70-72, 76-82, 85, 93-95, 106-108, 111, 118, 122, 285, 290, 296-297, 312, 314). Mr. Sansing apparently reported to Dr. Menendez that "...he was an average student with adequate behavior." (Bates 27). Again, this is not consistent with the records, which document a history of borderline intellectual functioning and grades that were largely D's and F's.

On Page 3, Dr. Menendez writes that Mr. Sansing used crystal methamphetamine on a regular basis when he was 19 to 20, "...stopping when he came to Arizona." This is not consistent with the facts of the case which document that Mr. Sansing had been abusing crystal methamphetamine up until a month before the murder. (Bates 33, 114). In the Previous Testing section of her report, Dr. Menendez writes "No known." She was either unaware of or did not have access to the test results from 1981 when Mr. Sansing was 14 years old and documents a borderline level of intellectual functioning. (Bates 280-283). In the Current Testing section of her report, Dr. Menendez writes that a Full Scale IQ

3

*John Sansing*                                                                                                    *October 21, 2011*

(80) was in the Below Average range. This is true if one interprets the score literally. However, given the standard error of measurement, the score of 80 can range a few points higher or lower. Thus, the score could be low enough to fall in the Borderline range (70-79). The same holds true for the Performance IQ score of 79; it falls in the Borderline to Below Average range. On Page 4 (first full paragraph), Dr. Menendez writes that "John has likely lost skills with his early attrition from high school." I would argue that many of these skills were not lost, they were simply never acquired.

In the <u>Diagnostic Impressions</u> section on Page 4 of her report, Dr. Menendez diagnoses Mr. Sansing with DSM-IV Axis I Disorders Cocaine Abuse (in remission) and R/O Paraphilia, NOS. On Axis II, she diagnoses Anti-Social Personality Disorder. In my opinion, these diagnoses are both incomplete and incorrect. First, Mr. Sansing abused not only cocaine, but crystal methamphetamine (another psychostimulant). Thus, the diagnosis should be Psychostimulant Abuse. Moreover, his pattern of abuse included symptoms of tolerance and withdrawal, thereby meeting criteria for Dependence, not simply Abuse. The course specifier, *in remission*, is also inaccurate because Mr. Sansing was abusing substances up until the time he was arrested (February 1998), which was over 12 months prior to Dr. Menendez's report. Thus, the course specifier, *sustained full remission* should have been given. The diagnosis R/O Paraphilia would also not be appropriate, particularly if Dr. Menendez was basing it solely on the circumstances of the murder. In order to meet criteria for one of the Paraphilias, the behavior must have been present for 6 months or longer and the "...*fantasies, sexual urges, or behaviors cause clinically significant distress or impairment in social, occupational, or other important areas of functioning*" for Mr. Sansing which was not the case. Finally, the Axis II diagnosis of Anti-Social Personality Disorder was not accurate for reasons previously stated above.

In the <u>Summary Discussion and Recommendations</u> section of her report, Dr. Menendez writes that there "...does not appear to be pronounced, significant learning disorder on the basis of this evaluation. John's scores may have been affected by his early attrition from school and the disruption in his early development." However, the tests she used (WAIS-III, WRAT-3, PIAT-R), while adequate for assessing intellectual and academic functions, are not as sensitive as other measures (e.g., Woodcock Johnson Psychoeducational Battery) for the purposes of assessing the presence and type of a learning disability. Dr. Menendez was not specific about the "disruption in his early development." Further elaboration would have been helpful for understanding how Mr. Sansing's early development affected his overall level of intellectual and academic functioning. Beyond that, disruptions in early development can affect much more than intellectual and academic skills: it can affect a child's approach to solving problems, their overall perceptual schema of the world in general, their personality, how they interact with others in their environment, etc. It can also affect brain development and function.

***Analysis of Examinations from the Post-Conviction Phase***: At the request of defense counsel, Mr. Sansing was examined by Dr. Edward French on 1/23/07 and Richard Lanyon on 3/3/08 directed toward his drug use and to provide a comprehensive account of Mr. Sansing's life, respectively. Also at the request of defense counsel, Dr. Paul Miller also prepared a report regarding the risk factors affecting Mr. Sansing's development as a child and young adolescent.

*Dr. French's Report*: On Page 1 in his report, Dr. French includes inhalants, model glue, and gasoline as substances of abuse for Mr. Sansing: these were not identified in the earlier reports of Drs. Hill and Menendez. This is particularly important as all three substances are known to have deleterious effects on an individual's brain and brain function, particularly during its development in infancy, childhood,

4

and adolescence. Dr. French writes that Mr. Sansing's "…drug use resulted in difficulties in the work place and at home, and several arrests." By definition, these satisfy diagnostic criteria for substance abuse. Dr. French writes that Mr. Sansing reported to him that he was using methamphetamine daily a month before the homicide: this contrasts with Dr. Menendez's assertion that Mr. Sansing had stopped using this substance when he came to Arizona.

On Page 2 of his report, Dr. French comprehensively documents the unwanted effects of methamphetamine and the mild-moderate and severe behavioral and subjective effects of cocaine in humans. It was his opinion that "…Mr. Sansing was under the influence of cocaine at the time of the attack." On Page 3, he also opined that Mr. Sansing's "…chronic use of methamphetamine and crack cocaine negatively impacted the underlying cognitive and emotional dysfunctions described by Dr. Lanyon (see his report), and thereby diminished his ability to control his conduct toward the victim and behavior several hours thereafter."

*Dr. Lanyon's Report*: Dr. Lanyon examined Mr. Sansing on 1/9 and 2/6/09 as part of his post-conviction petition. The purpose was to provide a comprehensive account of aspects of his life, including possible childhood dysfunction, psychopathology if any, substance abuse if any, brain damage, if any, and other factors that might be relevant in gaining a full understanding of his behavior in committing the crimes for which he was convicted. In the report, Dr. Lanyon notes that Mr. Sansing "declined to answer questions related to substance abuse" when he was interviewed by Mr. Valentin of the Adult Probation Department. On Page 2, Dr. Lanyon appropriately identifies an intellectual assessment that was done when Mr. Sansing was 14 years old: his I.Q. was noted to be in the borderline range and "…his scores on nationally standardized achievement tests at that time were sufficiently low to qualify him for learning disability services." Dr. Lanyon's report documents a history of abuse and neglect in the home when Mr. Sansing was a child and it is clear from reading the report that his mother was a chronic alcoholic and likely had an undiagnosed psychiatric condition. (Bates 39, 46, 48, 49-54, 57-66, 70-72, 76-78, 80, 93-95, 106-107, 111, 118, 122, 285, 290, 296-297, 312, 314).

On Page 3 in his report, Dr. Lanyon cites Dr. Miller's report which includes reference to research that shows "children react to angry and aggressive parental conflict with physiological arousal." He also notes that "physically abusive and harsh punishment is one of the most consistently predictive risk factors for disrupting children's normal growth and development, and it is associated with children's antisocial, aggressive, and violent behavior in the long run." What is not noted is the notion that exposure to violence and trauma in infancy and during critical periods of development can have deleterious effects on the organization and development of the brain leading to personality traits that include (but are not limited to): hypersensitivity to external stimuli, hypervigilance, and to be in a persistent stress-response state. It also leads to a "primitive and less mature" style of problem solving, with violence often being employed as a means, albeit a very dysfunctional one, of expression and communication.

Something that may be overlooked but is important to note when trying to understand Mr. Sansing's neuropsychological issues is Dr. Lanyon's statement on Page 4 that Mr. Sansing "…was sniffing gas and glue at that time" (when he was 11 years old). He also described himself as being depressed for most of the time during adolescence. It appears that drugs were a method of self-medication for Mr. Sansing as far back as early adolescence. On Page 6, Dr. Lanyon writes that Mr. Sansing told him that drugs calmed him down, "…helped me to relax after a hard day of work; they eased the tension."

5

In the Personal History section of his report, Dr. Lanyon identifies a number of factors (e.g., family background, education, alcohol and drug use, etc) which are undoubtedly relevant for understanding the psychological and emotional make-up of Mr. Sansing. A few things that are notable for the purpose of understanding Mr. Sansing's brain function/dysfunction include his statement (Page 6) that he "...got hit in the head with frying pans, and everything" and (Page 8) that "....he would deliberately bash his head against the wall when having conflicts with his wife." There is also a question (Page 9) of whether or not Mr. Sansing had attention deficit disorder when he was a child and also continuing up to the time he was examined by Dr. Lanyon. He reports problems reading and remembering things.

Dr. Lanyon performed psychological testing with Mr. Sansing. The MMPI-2 profile was interpreted accurately by analyzing the profile and various clinical scales and not item-by-item as Dr. Bayless does (see his report below). Notably, profile analysis suggests the "...likelihood of a significant anxiety disorder, depression, and thought disorder." There was also evidence of paranoid thoughts and feelings, possibly leading to paranoid delusions. Dr. Lanyon also wrote that the "...profile does not indicate antisocial characteristics or the likelihood of impulsive acting-out." (Bates 117). Thus, this is contrary to Dr. Menendez's diagnosis. (Bates 31). Intellectually, Mr. Sansing obtained a Full Scale IQ score of 87 which falls in the Low Average range; Dr. Lanyon regarded this as a reasonably reliable estimate of Mr. Sansing's intellectual functioning "at the present time." (Bates 118). The important point is the statement *at the present time*, for it suggests that Mr. Sansing may have experienced an improvement in intellectual functions since he has been incarcerated and since he stopped abusing substances.

Finally, Dr. Lanyon assessed Neuropsychological functioning. The tests he used (Trailmaking Test, Wechsler Memory Scale, Aphasia Screening Test), are not sufficient for making a determination as to whether or not a patient has neuropsychological impairment. By themselves, they constitute screening tests as Dr. Lanyon indicates. But, the average scores by themselves do not rule out the possibility of brain dysfunction. A much more comprehensive neuropsychological examination (like the one I conducted on September 15th, 2011) comprised of measures assessing various aspects of cognitive function (e.g., learning and memory, attention and concentration, executive functions, etc.) is required before one can opine with any degree of psychological certainty that the patient either does or does not have "impairment in functioning due to brain damage." I would add that because Mr. Sansing had been incarcerated for over 10 years and had not been abusing drugs during that time would make it less likely that he would have shown evidence of significant neuropsychological impairment that might have existed at the time of the murder when he was under the influence of multiple brain-impairing substances and had been abusing them for an extended period of time.

Dr. Bayless' Report: Michael Bayless, Ph.D. was retained by the prosecution to examine Mr. Sansing's intellect, personality, emotional stability, and amenability to treatment. In the Background section, Mr. Sansing reported to Dr. Bayless that his mother "was also an alcoholic and at times was non-affectionate and abusive." He was sent to detention when he was 12 years old and was reportedly picked on and a victim of sexual assault while he was there. The Education section of the report does not make any mention of Mr. Sansing's grammar school performance and the possibility that he had a learning disorder as a child and adolescent.

In the Psychological History section, Dr. Bayless writes that Mr. Sansing "...does not have a history of mood disturbance" and "...he denies any family history of mental illness..." (Bates 122). If this is what Mr. Sansing told Dr. Bayless, it clearly underestimates the magnitude of the psychopathology in

6

his family; it also minimizes his apparent history of mood disturbance. (Bates 11, 82-84, 95, 112, 118). Whereas he may have never had a formal evaluation or treatment for any psychiatric condition, his history and his use/abuse of drugs is a clear manifestation of a diagnosable psychiatric disturbance (e.g., substance abuse/dependence). (Bates 17-18, 22, 28, 31, 33-35, 82-84, 96, 108, 111-114, 118-120, 123, 126, 131, 291, 293-297). Moreover, it omits the fact that Mr. Sansing's use of drugs represents a means for him to self-medicate his symptoms of depression and it also was a cause of a mood disturbance. Mr. Sansing also mentioned to Dr. Bayless that he had seen his deceased grandmother and grandfather (visual hallucinations); this is not something that occurs in individuals without a psychiatric illness or some other disturbance of brain function, unless they are under the influence of some type of illicit substance.

In the Medical History section of his report, Dr. Bayless reports that Mr. Sansing's history is "…free of any neurological trauma and subsequent impairment." This is not true. During my interview with him, Mr. Sansing reported a history of multiple head traumas as a result of being struck on the head with an ashtray and a heavy metal skillet on a number of occasions by his wife. He also reports a history of striking his head against a wall when he would be extremely angry and a time when his brother "slammed me on the ground" where he was dazed for awhile. In fact, neurological trauma and its subsequent effects are a relevant but inadequately explored factor to consider in this case and will be discussed more extensively in the Summary and Opinions section of this report.

In the Alcohol/Drug History section of the report, Dr. Bayless describes Mr. Sansing's use of alcohol and other drugs. He appropriately documents the age of onset (11 for alcohol and 12 for illicit drugs) and identifies the various substances Mr. Sansing has used from adolescence up to adulthood. However, he does not document the pattern and extent of use and the important point that such chronic use with associated symptoms of tolerance and withdrawal satisfies a diagnosis of Polysubstance Dependence.

Dr. Bayless performed a psychological evaluation on Mr. Sansing which included only two standardized tests (The Wechsler Abbreviated Scale of Intelligence: WASI and the Minnesota Multiphasic Personality Inventory-2). Notably, the WASI is an abbreviated test of intelligence. Whereas the obtained IQ scores correlate highly with the full version (WAIS-III), such an abbreviated version is discouraged in forensic cases where issues of reliability and validity of evidence are especially relevant. The obtained Full Scale IQ of 88 (Low Average to Average) is the highest IQ score Mr. Sansing had obtained at any point in his life and, in my opinion, is inflated because of the abbreviated form of the test. Also, test practice effects from having been tested on previous occasions may have also elevated the score, leading to the opinion that Mr. Sansing's intellectual abilities are higher than they truly are. Dr. Bayless also fails to account for the possibility that the higher IQ score may be a product of Mr. Sansing having been incarcerated for approximately 10 years. Being drug-free and living in a structured prison environment may have actually helped to raise the IQ score, causing it to be higher than it was in the years before the murder. Finally, Dr. Bayless' statement that Mr. Sansing "…did not report nor did his test scores indicate the presence of neurological impairment" is erroneous. An intelligence test such as the WAIS-III and certainly an abbreviated version like the WASI cannot be used to rule in or rule our neurological impairment: it is simply not sufficient for making this determination. Nor, does it provide a foundation for making the statements that Mr. Sansing "…was oriented to reality and had the capacity to appreciate the difference between right and wrong. His thinking was free of hallucinations and delusions. His concentration, memory, judgment, and decision-making were intact."

7

*John Sansing*                                                    *October 21, 2011*

Dr. Bayless used a computer program to interpret the MMPI-2 results (print-out unavailable for review). Although this is one acceptable form for interpreting the MMPI-2, the individual statements in the print out cannot be applied to the test taker unless there is an adequate basis for doing so. The content of Dr. Bayless' report includes sentences that are directly taken from the MMPI-2 booklet. That is, he is describing Mr. Sansing's personality based upon an item-by-item response. This type of literal item-by-item interpretation is not acceptable or consistent with the standards set forth by the test developers and others who have researched this instrument for many, many years. In other words, Dr. Bayless writes that Mr. Sansing "…thinks that most people will use unfair means and lie to get ahead" and "…he thinks and dreams of things that are too bad to talk about." Unless Mr. Sansing literally said these kinds of things to Dr. Bayless, it is assumed that they are taken directly from the MMPI-2 test booklet. They should not be used in isolation to characterize Mr. Sansing's personality and emotional functioning. In fact, almost all of Page 5 is replete with direct statements from the MMPI-2 manual and should not be used for interpretive purposes.

In the <u>Summary</u> section of the report, Dr. Bayless emphasizes Mr. Sansing's alleged mental state at the time the murder occurred. Yet, the purpose of the evaluation was "…to examine Mr. Sansing's intellect, personality, emotional stability, and amenability to treatment." Dr. Bayless writes that "Mr. Sansing appears to be suffering from a personality disorder along with drug dependence. His behavior in the instant offense was not caused by a mental illness or defect that interfered with his ability to discriminate between right and wrong." Further, he writes that Mr. Sansing's "…behavior suggest he was fully aware of what he was doing." In my opinion, the combination of the effects of significant drug intoxication in the context of a dysfunctional brain significantly impaired Sansing's capacity to conform his conduct to the requirements of the law.. Dr. Bayless also notes that Mr. Sansing "…did not indicate any guilt or remorse for his behavior." I do not know whether or not he directly asked Mr. Sansing if he felt any guilt or remorse or was simply waiting for him to express such feelings without being prompted. It cannot be reasonably expected that a defendant would spontaneously express guilt or remorse so many years later, particularly to an examiner retained by the prosecution. Dr. Bayless diagnoses Mr. Sansing with Cocaine Dependence and Personality Disorder NOS with antisocial and obsessive compulsive traits. Like Dr. Hill before him, these diagnoses are incomplete and do not capture the nature and extent of Mr. Sansing's psychological and emotional limitations. Also, these diagnoses are inadequate in that they lack attention to the underlying brain dysfunction that was present from childhood all the way up until the time the murder occurred.

## Neuropsychological Examination on September 15th, 2011

***Behavioral Observations***: Mr. Sansing was examined in a private office at the Arizona State Prison in Florence, AZ. He was dressed in prison-issue garb and was restrained by a chain around his leg attached to the floor and an electric shock device which was attached to his left arm: this was controlled and monitored by an officer who maintained visual contact throughout the examination via a window in the door. Mr. Sansing looked older than his chronological age of 44. The day before the examination, he informed his attorney that he did not want to speak about the facts of the case or talk about his background as these things have been discussed multiple times and with others before. He agreed to participate in the testing because it had already been arranged and he wanted to cooperate with counsel. When I arrived, I informed him that I was aware that I was not to inquire about his history, the facts of the case, etc. Mr. Sansing said that he was "kinda on the fence about things" and was wrestling with having to make a decision soon whether to continue with his appeal or not.

8

Nonetheless, the interview focused largely on issues relevant to neuropsychological functioning including academic background, history of alleged head trauma, and use/abuse of various substances.

***Tests Administered:*** *Wechsler Adult Intelligence Scale-4th Edition (WAIS-4), Wechsler Memory Scale-4th Edition (WMS-4: Logical Memory subtest), Wide Range Achievement Test-4th Edition (WRAT-4), California Verbal Learning Test-2 (CVLT-2), Brief Visual Memory Test-Revised (BVMT-R), Repeatable Battery for the Assessment of Neuropsychological Status (RBANS: select subtests), The Clock Drawing Test, Trailmaking, Parts A & B, Delis-Kaplan Executive Function Scales (DK-EFS: select subtests), Wisconsin Card Sorting Test (WCST), The Short Category Test, Boston Naming Test (BNT), tests of verbal fluency, Visual Form Discrimination (VFD), Finger Tapping Test, Grooved Pegboard, Beck Depression (BDI-2) and Anxiety (BAI) Inventories, Beck Hopelessness Scale (BHS), Wender-Utah Rating Scale (WURS), The Fifteen Item Test (recall & recognition), Test of Memory Malingering (TOMM).*

## Test Results

*Validity & Test Interpretation Considerations:* In order to assess effort, motivation, and potential response bias on cognitive testing, performance on measures sensitive to malingering, erratic performance, and invalid response patterns were assessed. Mr. Sansing's scores on the 15 Item Test, TOMM, Reliable Digit Span, and other embedded neuropsychological measures reflected no signs of suboptimal performance. Taken together with his observed test-taking behavior, these test results suggest that he put forth adequate effort and did not attempt to feign or exaggerate impairment. The current cognitive results are considered reliable and valid.

*Cognitive Functions:* Mr. Sansing is presently functioning in the Low Average to Average range of intelligence with a WAIS-4 FSIQ of 90 (25th%ile). The Verbal Comprehension Index (VIQ=80, 9th%ile) is in the Borderline to Low Average range and Perceptual Reasoning skills (PRI=102, 55th %ile) are in the Average range. The 22 point discrepancy between the VCI and PRI is considered statistically significant and reflects a significant weakness in the verbal realm compared to the nonverbal realm. This is consistent with the results of most of the assessments he has previously undergone and his educational performance, reflecting a pattern of verbal learning difficulties over time. Working Memory (WMI=83, 13th%ile) was Low Average and the Processing Speed Index (PSI=105, 63rd%ile) was Average. The verbal subtest scores were all low average, except for Information (5) which was borderline and represents a relative weakness in a general fund of information for Mr. Sansing. Overall, the current IQ and Index scores are less than expected for same age and education peers based upon an estimate derived from demographic factors (WTAR FSIQ=96).

Mr. Sansing was given a number of measures to assess academic skills. A look at the profile reveals scores that are generally below the expected level for someone who has completed 9th Grade. WRAT-4 Spelling (8.9 Grade; 19th%ile) was good, as reflected by his ability to simply spell words. In contrast, relative weaknesses were demonstrated on tasks measuring Reading (6.0 Grade; 8th%ile) Sentence Comprehension (6.8 Grade; 5th%ile), and Written math skills (5.7 Grade; 10th%ile). These scores are lower than 90% of more of people in the general population. Like the IQ assessment, this is a pattern of performance (i.e., weaknesses in reading and sentence comprehension) that has been evident throughout Mr. Sansing's educational history, consistent with a pattern of learning difficulties in the verbal academic realm.

PSER 42

Mr. Sansing scored in the moderately impaired to average range on the memory tasks, including those requiring the learning and recall of auditory (words, stories) and visually (figures) material. His first trial recall of words from the word lists was mildly impaired (impaired working memory). He showed improved learning on the subsequent trials, but not to the expected degree; he recalled 9/15 words after the fifth trial on one of the tasks, but 8/10 on another. His performance was very affected by the effects of proactive interference, to the point that he recalled only one word from a second list. Short-term recall of the words from the first list was good; in contrast, delayed recall was mildly impaired; on the other word list (RBANS), his delayed recall was very impaired in that he did not recall any of the words. Recognition memory (12/16 and 18/20) was mildly impaired. Immediate and delayed auditory memory of the WMS-4 stories were significantly impaired. There was simply too much information for him to learn and remember and he appeared to have problems processing the amount of information to-be-remembered.

Compared to his auditory memory, Mr. Sansing did slightly better on tasks requiring visual memory. He did well learning and recalling geometric figures across trials and the total amount that he recalled was low average. Delayed recall was mildly impaired, but without evidence of false positive errors. Immediate and delayed visual memory on the Visual Reproduction subtest from the WMS-4 was good. His reproduction of the RBANS complex figure was good and he remembered most of it after a delay.

Mr. Sansing's scores on WAIS-4 tests measuring verbal (Similarities) and nonverbal abstract (Matrix Reasoning) reasoning skills were low average and average, respectively. On the WCST, a task that requires cognitive flexibility in response to changing rules, he obtained 4 categories falling in the mildly impaired range. He had problems "learning to learn" the task and showed a failure to maintain set at several points during the task; he also made some perseverative errors and responses. Mr. Sansing's scores on DK-EFS Sorting task were low average, generally in keeping with his overall level of intellectual functioning. He had trouble coming up with solutions and generating different hypotheses to solve the problems: he also made some perseverative errors on both the free sorting and recognition components and had difficulty describing the abstract concepts underlying the task.

Mr. Sansing's attention, concentration, and working memory skills were generally intact, in the context of the present examination environment (e.g., one on one with an examiner and relatively-free of external distractions). Confrontation naming abilities on the BNT were low average, likely a product of his limited educational background. Semantic and phonemic verbal fluency skills were within normal limits. His score on VFD, a visual-form discrimination task, was excellent; he did well on RBANS Line Orientation task, which required him to perceive and accurately judge the angles of lines. Simple motor speed was average for his dominant, right and his non-dominant left hand. He also did well on a task requiring fine motor coordination, dexterity, and speed, with his scores falling in the average range for the right and left hands, respectively.

*Emotional Functions*: Mr. Sansing was administered the BDI-II to assess symptoms of possible depression. He obtained a score of 37 which falls in the severe range. He endorsed a number of items, most of them were emotional (e.g., sadness, pessimism, thoughts of self-harm) in nature, but also some cognitive (reduced concentration) and physical (sleep disturbance) ones. His score (25) on the BAI, which measures symptoms of anxiety, was in the moderate to severe range. The score (18/20) on the BHS reflects signs and symptoms of hopelessness and pessimism about the future, which is understood in the context of his current situation (e.g., being incarcerated and not knowing about his future).

PSER 43

*John Sansing*                                                                    *October 21, 2011*

**_Summary and Conclusions:_** Results of the present evaluation indicate a pattern of performance that reflects longstanding deficits in multiple areas. Mr. Sansing's overall IQ score was in the Low Average to Average range, which is higher than the borderline IQ score he obtained when he was 14 years old. This may reflect a difference in the tests (the WAIS-IV IQ includes measures of working memory and processing speed whereas earlier versions of related tests did not include those concepts). It may also suggest that his general intellectual abilities have improved since childhood, perhaps as a result of being abstinent from brain-impairing drugs and free of the deleterious influence of a home life that was not only non-stimulating but also threatening and impeded cognitive and emotional growth. He continues to show a disparity between verbal and nonverbal abilities, with verbal skills falling two-thirds of a standard deviation (10 points) below the Full Scale IQ score: they fall more than a standard deviation (>15 points) below the population mean (100). In fact, the VCI score (80) is at the 9th%ile, which suggests that 91% of the general population would score higher than he did on this particular index. Mr. Sansing's scores on measures of academic functioning were below his obtained level of education and reflect problems with reading, sentence comprehension, and math, falling at the 6th Grade level. The scores on tests measuring reading, math, and sentence comprehension were lower than 90% of the general population. Beyond these domains, he also had difficulties on tests measuring reasoning, problem solving, and cognitive flexibility, with evidence of perseverative tendencies and a rather concrete style of thinking. These cognitive deficits were not evident on previous testing because neuropsychological measures were not administered as they should have been, because of his history and resulting questions about possible brain damage.

It is widely recognized that parent-child relationships characterized by emotional warmth, positive parental involvement and the fostering of individual strivings for independence (secure attachment) are associated with healthy psychosocial adjustment, good peer relationships, and higher self-esteem. Absence such experience and development (insecure attachment), dysfunctional behavior is inevitable. This is largely dependent on the internal working model of each parent, with parental psychopathology being a key determinant of a child's subsequent development and behavior. A child growing up in a chaotic and persistently threatening environment is more likely to be hypersensitive to external stimuli, to be hypervigilant, and to be in a persistent stress-response state. The resulting difficulties with cognitive organization contribute to a more primitive, less mature style of problem solving, with violence and aggression often employed as a means of coping. This does not represent primary psychopathy where the violence is planned, purposeful, and emotionless; rather, it is a defensive reaction to a perceived threat and is accompanied by heightened emotional arousal. In Mr. Sansing's case, the violence was directed toward the victim. Under the influence of substances and in a time of stress, he perceived a threat from the victim's actions, which led him to act in an irrational and violent manner.

As previously stated, cognitive impairment was demonstrated in select areas (e.g., attention, learning and memory, certain executive functions). There is scientific literature and clinical evidence to suggest that these are the types of cognitive tasks that are often compromised in cases of childhood abuse and neglect and it is hypothesized that this is a result of impairment in a functional brain network involving prefrontal lobe-amygdala systems dysfunction. Single traumatic events (e.g., natural disasters), and certainly the accumulation of chronic stressful events very early in life (such as from repeated emotional and physical abuse) can negatively affect brain systems that are responsible for managing emotions and coping with stress. Early life experience determines core neurobiology and there are very narrow windows or 'critical periods' of development during which specific cognitive-emotional experience (from primary parental relationships) is required for optimal organization and development

11

John Sansing                                                October 21, 2011

of the brain. Indeed, neurobehavioral dysfunction as a result of environmental deprivation(s), neglect, and abuse has disproportionate importance in organizing the brain, leading to the underdevelopment of the brain which can result in the persistence of primitive, immature behavioral reactivity. This appears in ways besides (or in addition to) deficits on traditional neurocognitive measures: it manifests through the development of soft neurological signs, psychiatric symptomatology, and impaired psychosocial relationships. Chronic and pervasive substance abuse and dependence, particularly with psycho-stimulants, on top of an already compromised brain is an unfortunate combination of factors that has significant repercussions for the affected person. In my opinion, such is the case with Mr. Sansing.

Overall, considering the history, interview information, and neuropsychological profile elucidated above, it is my opinion that there is *objective evidence of cognitive dysfunction reflecting brain-based disturbances in functioning*. In other words, the cognitive deficits cannot be explained by other factors such as normal aging, psychological/emotional issues (e.g., depression, anxiety), or any other type of current environmental stressors. The cognitive deficits occur *in the context of significant mental health and substance abuse factors* combined with a *developmental history that includes significant psychological abuse and neglect*. Indeed, Mr. Sansing's history is replete with evidence of serious problems in the neurodevelopmental, familial, and psychosocial realms. Although never formally diagnosed, he has symptoms associated with several psychiatric disorders (identified below) and he never received treatment for these conditions during his childhood, adolescence, or as an adult. He comes from a dysfunctional family that includes a mother who was physically and emotionally abusive and a stepfather(s) who were also physically and emotionally abusive. There is also a family history of alcoholism in his parents and grandparents. In fact, there is a question as to whether or not his mother abused alcohol during her pregnancy with him, raising a concern about symptoms of possible Alcohol Related Neurodevelopmental Disorder (ARND). He was not raised in the type of home that promotes a healthy sense of self-esteem and self-worth and adaptive coping skills for managing stress and conflict. On the contrary, Mr. Sansing never learned how to manage his emotions and they were mostly internalized, manifesting in symptoms of depression and substance abuse. Yet, there were times in which he would act-out in violent ways (often, injuring himself in the process). Mr. Sansing never received adequate intervention for these symptoms and his mental state continued to deteriorate secondary to the chronic effects of substance abuse and dependence.

**Diagnostic Impressions:**

| | |
|---|---|
| Axis I | Major Depressive Disorder, recurrent, severe with paranoid features (by history) |
| | Cognitive Disorder, NOS |
| | Psychostimulant Dependence and Abuse |
| | Intermittent Explosive Disorder |
| R/O | Post Traumatic Stress Disorder, chronic from childhood |
| Axis II: | None |
| Axis III | None |
| Axis IV | Psychosocial Stresses: dysfunctional childhood, physical abuse and emotional abuse as a child; convicted of First Degree Murder; facing death penalty |
| AXIS V | *Highest level past year*: 70; *Current level*: 70. |

12

John Sansing                                                    *October 21, 2011*

The information expressed in this report represents an accurate and true account of my opinions to date. I reserve the right to amend/append these opinions as further information becomes known.

*Robert L. Heilbronner*

_____

Robert L. Heilbronner, Ph.D., ABPP
Director / Clinical Neuropsychologist

13

```
** PUBLIC **      PHOENIX POLICE DEPARTMENT REPORT      ** RECORD **

  ORIGINAL        PAGE NUMBER:  1      DR NUMBER: 0000 80384200


REPORT DATE: 19980307  TIME: 1437

TYPE OF REPORT: BURGLARY                        OFFENSE: 459

PROSECUTION DESIRED: YES

LOCATION: 003846 W ALICE AVENUE              BEAT: 0924  GRID: CG20

DATE/TIME OF OCCURRENCE:   THU   030598  1830  /  SAT  030798  1300

REPORTING OFFICER[S]: THOMAS BARILLA           5412    UNIT: CALL

PREMISES: SINGLE FAMILY HOUSE                OCCUPIED: NO

OFFENSE INVOLVED:  BIAS -

                  **** VICTIM INFORMATION ****

  VICTIM -01:
                 NAME: SANSING, JOHN

     RACE: W  SEX: M  AGE:      DOB: 1969    HT: 000      WT: 000

     CLOTHING DESC & MISC:
     V1 IN CUSTODY FOR 261/451 MADISON JAIL
     CAN ID SUSPECT(S): NO              SUSPECT(S):
     WILL TESTIFY: YES                  MISC.

     VICTIM REQUESTS NOTIFICATION

                **** REPORTING PERSON INFORMATION ****

  REPORTING PERSON -01:
                 NAME: HOOPER, PATSY

     RACE: W  SEX: F  AGE:      DOB: 1963    HT: 000      WT: 000
     HAIR:       EYES:         SSN:
     CAN ID SUSPECT(S): NO              SUSPECT(S):
     WILL TESTIFY: YES                  MISC.



           ****  CRIME SCENE \ CRIME AGAINST PROPERTY  ****

SCENE NUMBER : 01

ENTRY POINT: WINDOW
     LOCATION: FRONT
     METHOD: BROKE
     TOOL/INSTRUMENT USED: UNKNOWN


 0000 80384200                              Continued.
```

PUBLIC RECORDS
Pursuant to
ARS 39-121 et Seq.

```
** PUBLIC **        PHOENIX POLICE DEPARTMENT REPORT        ** RECORD **

   ORIGINAL         PAGE NUMBER:   2     DR NUMBER: 0000 80384200
```

EXIT POINT: UNKNOWN

SUSPECT ACTIONS:
        RANSACKED

VICTIM WAS: IN JAIL

                    ****  NARRATIVE  ****

   SERIAL NUMBER: 5412

REPORT TAKEN BY CALLBACK.

ON 030798 AT APPROX 1417 HRS I CONTACTED R1 PATSY HOOPER WHO IS V1 JOHN
SANSING'S SISTER.R1 STATED THAT THE LISTED HOME WAS BURGLARIZED BETWEEN
THE LISTED DATES AND TIMES BY SUBJECT/S UNKNOWN.R1 STATED THAT WHEN SHE
ARRIVED TO CLEAN THE HOME SHE NOTICED THAT THE FRONT LIVINGROOM WINDOW
WAS SMASHED AND IT APPEARS THAT SUSPECT/S REACHED IN AND UNLOCKED THE
WINDOW THEN MADE ENTRY.R1 STATED THAT THE HOME WAS RANSACKED AND THAT
SOME JEWELRY WAS PILED UP ON THE KITCHEN COUNTER AND SOME CLOTHES HAD
BEEN MOVED.R1 STATED THAT IT DID NOT APPEAR THAT ANYTHING WAS TAKEN.IT
SHOULD BE NOTED THAT V1 IS IN CUSTODY AT MADISON JAIL
          THAT OCCURRED AT THE HOME APPROX 1 WEEK AGO.
V1 ALSO STATED THAT THE REAR FENCE GATE WAS OPEN WHEN SHE ARRIVED.I
I REQUESTED THAT A FIELD UNIT RESPOND TO PROCESS THE SCENE FOR LATENTS
AND ANY OTHER PHYSICAL EVIDENCE,AND TO GIVE R1 A VICTIMS RIGHTS CARD INC
# 980384500.NFI

   VICTIM RECEIVED RIGHTS INFORMATION:  YES        MAIL-IN SUPPLEMENT:

INVOICES:

   DR ENTERED BY : 5412    DR FINALIZED BY : 5412

                    END OF REPORT        DR NO: 0000 80384200

PSER 48

```
** PUBLIC **       PHOENIX POLICE DEPARTMENT REPORT      ** RECORD **
   SUPPLEMENT        PAGE NUMBER:   1    DR NUMBER: 0000 80384200      1
```

REPORT DATE: 19980307   TIME: 1651

TYPE OF REPORT: BURGLARY                          OFFENSE: 459

LOCATION: 003846 W ALICE AVENUE             BEAT: 0924  GRID: CG20

REPORTING OFFICER[S]: DAVID AUSTIN             6203     UNIT: 92G

PREMISES: SINGLE FAMILY HOUSE                        OCCUPIED: YES

OFFENSE INVOLVED:  BIAS -

SCENE PROCESSED FOR LATENTS: YES      BY: 6203

LATENTS SUBMITTED TO CRIME LAB: YES

   SURFACES EXAMINED FOR PRINTS        METHOD USED

     OUTSIDE WINDOW EAST SIDE HOUSE   POWDER

                     ****  NARRATIVE  ****
   SERIAL NUMBER: 6203

ON 030798, AT APPROXIMATELY 1651 HOURS, I RESPONDED TO RADIO TRAFFIC OF A
BURGLARY SUPPLEMENT. THE CALL WAS PLACED BY CALLBACK AND CAME OUT AS A
REQUEST TO RESPOND TO THE SCENE AND DUST FOR LATENT PRINTS.

UPON MY ARRIVAL, I DUSTED THE WINDOW ON THE EAST SIDE OF THE HOUSE, THE
FARTHEST WINDOW TO THE SOUTH.  I OBTAINED NO USABLE PRINTS FROM THE
INSIDE.  I WAS ABLE TO OBTAIN SOME USABLE PRINTS FROM THE OUTSIDE.  THEY
WERE LATER SENT DOWN TO THE LATENT PRINT SECTION FOR ANALYSIS.

PASS / A3722 / 6203 / 030898 / 1608 / LIVE

   VICTIM RECEIVED RIGHTS INFORMATION:  NO        MAIL-IN SUPPLEMENT:

INVOICES:

   DR ENTERED BY : A3722    DR FINALIZED BY : A3722

                     END OF REPORT        DR NO: 0000 80384200   001

```
** PUBLIC **        PHOENIX POLICE DEPARTMENT REPORT        ** RECORD **
   SUPPLEMENT        PAGE NUMBER:   1     DR NUMBER: 0000 80384200      2
```

```
REPORT DATE: 20050112   TIME: 1630

TYPE OF REPORT:  BURGLARY                              OFFENSE: 459

LOCATION: 003846 W ALICE AVENUE                 BEAT: 0924  GRID: CG20

DATE/TIME OF OCCURRENCE:   THU   030598   1830  /   SAT   030798   1300

REPORTING OFFICER[S]: NATALIE SIMONICK                6669    UNIT: L33

OFFENSE INVOLVED:  BIAS - NONE(NO BIAS)

                  ***   PROPERTY/EVIDENCE   ***

RECOVERY LOCATION: 000000
DATE: 000000                  SEARCH WARRANT INVOLVED:

0001  PKG 001 CODE:EI   UK01
          ITEM: YPRINT  BRAND:      MODEL:              COLOR:
     SIZE:         QUANTITY: 0001  SERIAL/ACCT/ID:
     DESCRIPTION: ONE USABLE LATENT PRINT IMPOUNDED PER THE LAB
     ENHANCEMENT TEAM.  NO AFIS QUALITY.

                  ****  NARRATIVE  ****
  SERIAL NUMBER: 6669

THIS SUPPLEMENT IS BEING GENERATED TO IMPOUND LATENT PRINTS TAKEN FROM BOX
#2702586, WHICH WERE REVIEWED AND IMPOUNDED BY THE LAB ENHANCEMENT TEAM.

   VICTIM RECEIVED RIGHTS INFORMATION:  NO          MAIL-IN SUPPLEMENT:

INVOICES:    3296669

   DR ENTERED BY : *6669   DR FINALIZED BY : *6669

                      END OF REPORT         DR NO: 0000 80384200   002
```



RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY

William K. Culbertson
Deputy County Attorney
Bar ID #: 003390

Vince Imbordino
Deputy County Attorney
Bar ID #:  004291
MCAO Firm #:  00032000
Administration Building
301 W Jefferson St Ste 800
Phoenix, AZ 85003-2143
Telephone:  (602) 506-5780
Attorney for Plaintiff

MICHAEL K. JEANES, CLERK

MICHAEL K. JEANES, CLERK
BY _____ DEP
FILED

1999 SEP 23  PM 1:49

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

|  |  |  |
|---|---|---|
| STATE OF ARIZONA, | ) | NO. CR 98-03520(A) |
| Plaintiff, | ) ) | STATE'S REPLY TO DEFENDANT'S |
| vs. | ) ) | SENTENCING MEMORANDUM |
| JOHN EDWARD SANSING, | ) ) | (Assigned to the Honorable |
| Defendant. | ) ) | Ronald Reinstein) |

The State of Arizona, by and through undersigned counsel,
replies to the Defendant's Sentencing Memorandum.

Submitted September 23rd, 1999.

RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY

BY _____
William K. Culbertson
Deputy County Attorney

BY _____
Vince Imbordino
Deputy County Attorney

(98)

MEMORANDUM OF POINTS AND AUTHORITIES

AGGRAVATION

**A. CRUEL, HEINOUS OR DEPRAVED**

**I. CRUELTY**

Cruelty is proved when the victim consciously suffers either physical or mental anguish prior to death. State v. Schackart, 190 Ariz. 238, 947 P.2d 315 (1997); cert. denied 119 S.Ct. 149, 142 L.Ed.2d 122 (1998).

Uncertainty about one's ultimate fate can constitute mental anguish. In State v. Medina, 193 Ariz. 504, 975 P.2d 94 (1999) a case cited by the defense, the victim made several pleas to the defendant. In Medina the victim cried: "Please don't hit me. Don't hit me. Don't. Don't." The Medina Court held these statements constituted both physical and mental pain and suffering. The Court stressed that an analysis of cruelty includes an examination of the totality of the circumstances surrounding the murder and not just the final act that killed the victim.

In the case at bar, Trudy Calabrese was "body slammed", hogtied about the wrists and ankles, and robbed. She was heard to beg for her life by five separate witnesses. One of those witnesses, the defendant's wife Kara Sansing, testified. The defendant's four children spoke to the police and their statements were received in evidence by stipulation of all parties. According to those five witnesses, Trudy Calabrese pleaded and begged for her life in a manner not dissimilar from the victim in Medina. Trudy stated: "God, just help me... Please, Lord, help me... I don't want

2

to die, but if this is the way you want me to come home, I'm
ready." Trudy also pleaded with the Sansing children to get her
help. She begged them to call the police and call 9-1-1, but the
defendant interceded and directed the children to go to the living
room and watch television. Trudy also begged the defendant not to
hit her after she had loosened her bindings. He hit her anyway.
Trudy's pleas for help, her prayers and begging for her life so
upset the children that they cried and sought solace from their
mother. Trudy's pleas, even more than the victim's pleas in
Medina, constitute cruelty.

The evidence is clear beyond any reasonable doubt that Trudy
Calabrese experienced significant physical pain before she was
rendered unconscious by repeated blows to her head with a wooden
club. At autopsy she was found to have defensive wounds on her
hands. She had been tied so tightly with ligatures of electrical
cords that marks were clearly evident on her wrist and ankle. Her
frenulum was detached and her face showed unmistakable proof of a
beating. When coupled with the evidence she was "body slammed" to
the ground, there is proof beyond a reasonable doubt that Trudy
Calabrese suffered physical pain. Defendant's own statement to
Victoria Harker of the Arizona Republic is very important: "She was
suffering. I wanted to end it. I wasn't playing God. I just
couldn't handle seeing the condition she was in." He also told Ms.
Harker: "Once I attacked her, I had to finish it up because I was
going to jail anyway..."

3

The defendant's own statements prove that Trudy Calabrese suffered physical pain which he claims led him to finish her off to alleviate her suffering.

The defense contention that the State has failed to prove cruelty beyond a reasonable doubt because Trudy may have been unconscious at certain points has no basis in fact or law. In State v. Djerf, 191 Ariz. 583, 959 P.2d 1274 (1998), the Arizona Court held:

> "This court has found, however, that evidence that a victim was bound signifies consciousness. There is no reason to bind an unconscious person who offers no resistance."

In the case at bar, Trudy Calabrese was conscious at the time she was bound. She struggled to loosen her bindings which resulted in a beating. This constitutes cruelty.

The clear and uncontroverted evidence proves beyond any reasonable doubt that after being knocked unconscious, Trudy regained consciousness and actually talked with the defendant as he sexually assaulted her. Kara Sansing observed the sexual assault and heard the conversation between her husband and the victim. The victim was conscious at that point. Kara also testified that the victim was conscious when stabbed by the defendant, pleading with him not to do it. Kara Sansing's testimony is credible and proves cruelty beyond a reasonable doubt.

Trudy Calabrese was stabbed three times in the abdomen. Kara Sansing described one of those stab wounds. She said the defendant

4

was "grinding" th●nife into Trudy's abdomen● she lay helpless
on the floor, undressed and hogtied.

The evidence is uncontroverted that the stab wounds inflicted
upon Trudy by the defendant would <u>not</u> have caused quick or sudden
death.  To the contrary, Dr. Fischione testified that death would
take some time, perhaps minutes.  In <u>State v. Bolton</u>, 182 Ariz.
290, 896 P.2d 830 (Ariz. 1995), the Arizona Supreme Court addressed
the issue of cruelty and fatal stab wounds.  Finding that the
defendant should have reasonably foreseen the victim's post-wound
suffering, the Arizona Supreme Court stated:

> "The fatal wound was a stab wound.
> Defendant must have known, or at least
> should have known, that the wound would
> be painful and that the victim would
> not die immediately."

The defense argues that the sexual assault committed upon
Trudy Calabrese by John Sansing was not cruel, heinous or depraved.
Remember, the victim had already been "body slammed" to the floor,
beaten about the face and head, hogtied so tightly that marks were
left on her appendages and then undressed and sexually assaulted in
front of the defendant's wife.  The defendant sexually assaulted
Trudy in the bedroom while his children watched television nearby.

The Arizona Supreme Court addressed issues of sexual assault
in death penalty litigation in <u>State v. Schackart</u>, <u>Id</u>.  Therein the
Arizona Supreme Court stated:

> "Although we are unwilling to say that
> all stranglings are per se cruel, or
> that all killings involving a sexual
> assault automatically qualify under
> (F)(6), we are persuaded that the
> cruelty finding was appropriate under

5

the present facts.  The events of this
tragic  afternoon  were  sufficiently
connected  to  be  considered  one
'transaction'.    The  length  of  time
Charla (the victim) was held in the
motel  room,  the  presence  of  a  gun,  the
sexual  assault,  the  discussion  about
tying  her  up  or  drugging  her,  the  blow
to  her  head,  the  strangling,  and  her
inevitable  uncertainty  about  her
ultimate  fate  all  support  the  court's
finding  that  this  murder  was  especially
cruel."

As  this  Court  can  easily  discern,  many  of  the  facts  and

circumstances  of  Schackart  are  present  in  the  case  at  bar.

The  Arizona  Supreme  Court  considered  sexual  assault  as  an

aggravating  factor  in  State v. Djerf,  191  Ariz.  583,  959  P.2d  1274

(1998).    In  Djerf,  the  Court  found  that  the  sexually  assaulted

victim  suffered  uncertainty  and  anguish  about  her  fate  from  the

time  she  was  forced  into  a  bedroom,  bound  and  gagged.    In  Djerf,  as

in  the  case  at  bar,  the  victim  struggled  against  her  restraints.

The  Court  found  that  the  victim  was  conscious  after  having  been

bound  and  this  proved  uncertainty  as  to  fate,  an  element  of

cruelty.

In  the  case  at  bar,  Trudy  Calabrese  struggled  mightily  against

her  restraints.    She  struggled  so  strongly  that  the  defendant  hit

her  in  the  head  with  a  club.    She  begged  him  not  to  hit  her  again.

As  in  Djerf,  the  State  has  proved  beyond  a  reasonable  doubt  that

the  killing  was  committed  in  an  especially  cruel,  heinous  or

depraved  manner.

The  Arizona  Supreme  Court  has  also  considered  whether  the

sexual  assault  of  a  homicide  victim  constitutes  aggravation  in

6

State v. Sharp, 28 Ariz. Adv. Rep. 36, 973 P.2d 1171 (1999).   In Sharp, the trial court found beyond a reasonable doubt that the victim suffered physical and emotional pain as a result of sexual assault and murder.  The Sharp Court noted:

> "This Court previously has upheld a finding of cruelty when a defendant sodomized a victim and then strangled him to death*** The evidence here established beyond a reasonable doubt that the victim was conscious and suffered physical pain while she was brutally beaten, sodomized and ultimately strangled.   The victim incurred defensive wounds and scratched Appellant in a vain attempt to defend herself showing that she anticipated her horrible fate and suffered mental anguish during the attack."

The facts in Sharp are not dissimilar to the facts in the case at bar.   Trudy Calabrese also suffered when she was sexually assaulted.  The defense contention that the sexual assault does not prove cruelty, heinousness or depravity is simply incorrect.

## II.   HEINOUS AND DEPRAVED

The senselessness of the murder and the helplessness of the victim are not the only factors the State alleges to establish heinousness and depravity.  The Court must consider the totality of the circumstances and must remember that a Good Samaritan was viciously restrained, raped and beaten, then stabbed multiple times while four young children were in the same house, close by.  The defendant's evil character is best exhibited by his senseless and vicious beating of this hogtied Good Samaritan while his children watched.  His actions profoundly impacted his children as evidenced

7

by their crying ● their questions to their mother asking why their father would do such a thing.

The defendant also engaged in gratuitous violence, another <u>Gretzler</u> factor. He clearly used more force than was necessary to kill Trudy and he used multiple weapons to inflict murder. He could have committed the robbery that he so carefully planned without resort to restraints, beating, sexual assault, stabbing or murder. He could have taken Trudy's money without resort to the horrendous acts that followed. His use of multiple weapons, the fury of his beating, the sexual assault, and the repeated stab wounds constitute gratuitous violence.

The defendant also intended to eliminate a witness. This has been proved true beyond a reasonable doubt by Kara Sansing's testimony. While he was sexually assaulting the victim, the defendant told Kara that it must look like a robbery/rape/murder. This statement proves that he knew that Trudy would be able to testify about his actions and that he intended to kill her and make it look like someone else did the crime.

Heinousness and depravity have been proved beyond a reasonable doubt.

**B.    PECUNIARY GAIN**

On page 6, line 3 of the defendant's sentencing memorandum the defense tells this Court: "The defendant's initial intent was to rob the victim." The State concurs that the defendant did intend to rob Trudy Calabrese and did in fact rob her. The defendant planned the robbery with the assistance of his wife in front of their four

8

children. He stole less than two dollars from her. He took Trudy's jewelry which he hawked for drugs. But perhaps the most telling evidence of defendant's intent to rob the victim came from defendant's own mouth after he had committed these unspeakable acts when he was asked by his son Joseph why he had done this to the church lady. The defendant told Joseph: "I just wanted money."

"[W]hen the defendant comes to rob, the defendant expects pecuniary gain and this desire infects all other conduct of the defendant." State v. LaGrand, 153 Ariz. 21, 35, 734 P.2d 563, 577 (1987).

The defense argues that this case is governed by State v. Medina, Id. In point of fact this case is distinguishable from Medina because robbery permeated John Sansing's every action. There was no attenuation between the kidnaping, robbery and murder of Trudy Calabrese as there was in Medina. The defendant's murder of Trudy Calabrese was all part of his scheme to rob her. Once she arrived at his house (at his request) bringing food for his hungry children, he "body slammed her" to the floor and utilized his wife (one son was asked to bring defendant a cord) to assist in hogtying the victim so he could rob her. He moved her truck so as to prevent discovery of her whereabouts. In his own words to his wife Kara, the sexual assault was part of the plan to make this look like a robbery/rape/murder. Trudy Calabrese lay helplessly restrained inside the defendant's home during this entire horrific episode. The murder of Trudy Calabrese directly flowed from the defendant's scheme to rob her. As such, the State has proved

9

beyond a reasonable doubt that pecuniary gain was a motive for the murder.

C.   **PRIOR SERIOUS OFFENSE CONVICTION**

The defense argues that this aggravating circumstance has not been proved true because no Arizona Court has upheld the finding when the offenses are committed upon the same victim during the same course of events.  Regardless of the defendant's contentions, this aggravating circumstance is present as reflected in the language of <u>Gretzler</u> and <u>Lee</u> (both cited in the State's opening memorandum).

The <u>Gretzler</u> Court held that the Arizona death penalty is not a recidivist or enhancement statute.   <u>Gretzler</u> further held that any conviction entered prior to a sentencing may be considered, regardless of the order in which the underlying crime occurred or the order in which the convictions were entered.

The <u>Lee</u> Court expanded <u>Gretzler</u> by holding the <u>Gretzler</u> decision applicable to prior convictions <u>as</u> <u>well</u> <u>as</u> <u>simultaneous</u> <u>convictions</u>.

This aggravating circumstance has been proved true beyond a reasonable doubt.

## MITIGATION

I.   **CAPACITY**

The defendant carefully planned this entire robbery.  He lured Trudy Calabrese to his home using his hungry children as bait to ensnare a helpless Good Samaritan.

10

The defendant knew very well what he was doing.  During his murderous reign of terror, he continuously looked out the windows. He was looking out the windows because he feared he would be found out and caught.

The defendant moved Trudy Calabrese's truck from the front of his home and hid it at a business, so as to misdirect attention from himself.

The defendant planned to rape and kill Trudy so as to misdirect attention from himself.

All of these actions show premeditation, planning, consciousness, and attention to detail that obviate any influence by drugs.  The fact that defendant was a cocaine user doesn't explain or excuse his actions, not one iota.

**II.  AGE**

The defendant argues that his age of 31 years is mitigating. The State alleges it is not. The State is unaware of any Arizona court holding this advanced age to be mitigating.

The United States Court has upheld imposition of the death penalty to those age 16 or greater.  Stanford v. Kentucky, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989).  Arizona Courts, when assessing this mitigating circumstance, look at the defendant's level of maturity, judgement, past experience and involvement in the crime.  State v. Bolton, 182 Ariz. 290, 314, 896 P.2d 830, 854 (1995).

The defendant in Bolton was 19 years of age.  Id.  The Court found his age to be mitigating, but placed little weight upon it in

11

view of the defendant's prior record and the deliberate way he carried out the killings.

Arizona Courts also look to evidence supporting a connection between age and lack of judgement. See State v. Salazar, 173 Ariz. 399, 844 P.2d 566 (1992).

The defendant for years had led an adult lifestyle, replete with drug use and exposure to the criminal justice system (Utah arrest for assault). He married and had four children. There is no evidence here of youthful intemperance. Instead, there is evidence of a very premeditated act. There is no mitigation in his age of 31 years.

### III. DYSFUNCTIONAL FAMILY

A difficult or dysfunctional family background is not necessarily a mitigating circumstance. Unless the defendant shows that something in his background affected his behavior, in a manner beyond his control, the defendant has failed to prove mitigation. State v. Spears, 184 Ariz. 277, 908 P.2d 1062 (Ariz. 1996). In Spears much more evidence of a dysfunctional, abusive childhood was presented than in this case. In Spears a clinical psychologist testified that the defendant suffered physical and emotional abuse as a child. His father drank too much and was a strict disciplinarian. The father beat the defendant frequently. The psychologist diagnosed the defendant with post-traumatic stress disorder that was subject to being retriggered. When retriggered, it caused the defendant to act impulsively and irrationally.

12

The Supreme Court dismissed <u>Spears</u>' contention of mitigation and found that the defendant's actions were planned and deliberate, not impulsive. The <u>Spears</u> Court upheld that the trial court's decision to give defendant's background minimal weight was correct.

In the case at bar there is even less evidence of a dysfunctional family than in <u>Spears</u>. Clearly there is nothing about the defendant's upbringing that could explain his vicious, premeditated and unprovoked attack on Trudy Calabrese.

### IV. <u>LACK OF EDUCATION</u>

There is nothing about the defendant's education, or lack thereof, which bears upon his actions in this case. The fact he chose to drop out of school certainly does not explain nor justify his murder of Trudy Calabrese.

### V. <u>DANGEROUSNESS, REHABILITATION AND CHANGED LIFE</u>

The State will address all these allegations in unison. The defendant remains dangerous. The defendant continues to blame his conduct on drugs. This is a cop-out. The defendant's actions were not those of an intoxicated individual. Instead, his actions were planned, premeditated and thought out.

The defendant is now attempting to use his own children as leverage against the death penalty. It was the defendant himself who exposed his children to the most barbaric, horrific acts imaginable. Now he has the audacity to ask this Court for mercy because of the children he put at emotional risk. There can be no mitigation here.

13

The defense alleges that the death penalty would be devastating to the children, but where is the proof?

## VI.  VICTIM'S POSITION

Counsel and Court are well aware of the holding of the Arizona Supreme Court in State v. Trostle, 191 Ariz. 4, 951 P.2d 869 (1997).

Undersigned counsel for the State informed the Court and defense counsel of the holdings of Trostle prior to taking evidence.  Trostle holds that the trial court should not consider the victim's request for leniency in the form of a life sentence as opposed to death.  Requests of victims for death or leniency are irrelevant to the considerations under A.R.S. §13-703(C) and (D). See also A.R.S. §13-703.

Nevertheless, the defense has chosen to ignore the holding of the Arizona Supreme Court and statutory enactment by our legislature.  The defense attempts to gain support for their plea for leniency via the ten year old daughter of the victim.  The action of the defense in this regard is clearly contrary to law and a transparent emotional appeal to the court's sympathies.  While Appellate Courts require "zealous advocacy", they do not allow nor permit ignoring clear holdings of the highest court in the State, nor abandonment of statutory enactments.

There is no relevance to this allegation, and there is no mitigation.

14

## VII. REMORSE

Defense counsel, on page 19 of their sentencing memorandum state:

> "Counsel undersigned has had numerous conversations with John Sansing since February of 1998. We believe that his remorse and acceptance of responsibility are complete and absolutely genuine."

Counsel's vouching for the sincerity of a convicted robber, rapist and murderer does not suffice for evidence proving his remorse. The defendant's own rambling statements to the Court should convince this Court that his true motivation is avoiding the death penalty.

Defense counsel admit that Mr. Sansing cannot undo the pain and suffering he inflicted upon the Calabrese family, yet add to that pain and suffering by attempting to leverage the feelings of Trudy's ten year old little girl into irrelevant considerations of death penalty. Rather than John Sansing accepting responsibility and meeting his fate head on, the defense has stooped to asking for mercy because of defendant's own children (whom he subjected to unspeakable acts of terrorism) and by proffering feelings of the victim's ten year old daughter in spite of law to the contrary. The State submits there is no mitigation here.

### CONCLUSION

The State has proved three aggravating circumstances beyond a reasonable doubt. The mitigation, if present at all, is woefully inadequate to overcome the aggravation. Therefore, the State

15

requests that this Court impose the death penalty, pursuant to
A.R.S. §13-703.

Submitted September 23rd, 1999.

RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY

BY _____
William K. Culbertson
Deputy County Attorney

BY _____
Vince Imbordino
Deputy County Attorney

Copy of the foregoing
mailed\delivered this
23rd day of September, 1999,
to:

The Honorable Ronald Reinstein
Judge of the Superior Court

Mr. Emmet Ronan
Deputy Public Defender
222 East Javelina, Suite 1300
Mesa, AZ 85210-6201

Ms. Sylvina Cotto
Deputy Public Defender
222 East Javelina, Suite 1300
Mesa, AZ 85210-6201

BY _____
William K. Culbertson
Deputy County Attorney

BY _____
Vince Imbordino
Deputy County Attorney

WKC:tlr
reply-se.mem

16

PSER 66

RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY

William K. Culbertson
Deputy County Attorney
Bar ID #:  003390

Vince Imbordino
Deputy County Attorney
Bar ID #: 004291
MCAO Firm #:  00032000
Administration Building
301 W Jefferson St Ste 800
Phoenix, AZ 85003-2143
Telephone:  (602) 506-5849
Attorney for Plaintiff

MICHAEL K. JEANES, CLERK

MICHAEL K. JEA    CLERK, S
BY  C. Osera        DEP
FILED

1999 SEP -3  AM 9: 03

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | NO. CR 98-03520(A) |
| Plaintiff, | ) | STATE'S SENTENCING MEMORANDUM |
| vs. | ) | RE: DEATH PENALTY |
| JOHN EDWARD SANSING, | ) | (Assigned to the Honorable |
| Defendant. | ) | Ronald Reinstein) |

The State of Arizona, by and through undersigned counsel,
submits this sentencing memorandum in support of the State's
request for the maximum punishment of the death penalty, pursuant
to A.R.S. § 13-703.

Submitted September 3rd, 1999

RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY

BY _____
William K. Culbertson
Deputy County Attorney

BY _____
Vince Imbordino
Deputy County Attorney

(96)

MEMORANDUM OF POINTS AND AUTHORITIES

The AGGRAVATION is as follows:

(A)  **The defendant committed the offense in an especially heinous, cruel or depraved manner.  A.R.S. § 13-703 (F)(6);**

(B)  **The defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value.  A.R.S. § 13-703 (F)(5);**

(C)  **The defendant has been previously convicted of a serious offense.  A.R.S. § 13-703 (F)(2).**

The State submits the attached Memorandum of Points and Authorities in support of the Court's finding of these aggravating circumstances.

I.  <u>STATEMENT OF FACTS</u>

On February 24, 1998, Defendant John Edward Sansing placed a telephone call to a church and asked for food to be delivered to his home for his four minor children.  The church passed Sansing's request to Trudy Calabrese, a church member who organized food drives to feed hungry children.  After speaking to Defendant Sansing by telephone, at approximately 4:00 p.m. on February 24, 1998, Trudy Calabrese drove her truck to 3846 West Alice, the home in which Sansing, his wife (co-defendant) Kara Sansing and four children resided courtesy of another church.

Prior to Ms. Calabrese's arrival, Defendant John Sansing told his wife he planned to rob the church lady when she arrived with food.  He solicited Kara's help and told her how he was going to

2

rob the church la⬤.   The four Sansing child⬤n were present and
heard the Defendant's discussions about robbing the church lady.

At approximately 4:10 p.m. that day Trudy Calabrese arrived at
the Sansing home.  It was a cold, rainy February day.  After she
delivered the food, Ms. Calabrese was in the process of having John
Sansing sign a receipt when he snuck up behind her and grabbed her
in a bear hug, then "body slammed" her to the floor.  Once she was
on the floor, the Defendant secured Trudy's hands behind her back
using electrical cords.  Defendant John Sansing told his wife, co-
defendant Kara Sansing, to tie the victim's ankles.  Kara Sansing
tried, but was unable to do so because Trudy was kicking and
resisting.  John Sansing then secured Ms. Calabrese's wrists and
ankles using a power cord from a vacuum sweeper.

Ms. Calabrese resisted their efforts to restrain her as best
she could.  Trudy kicked at Kara Sansing, prohibiting Ms. Sansing
from restraining her.  She fought valiantly to get free from her
captors.  She failed.

Once John Sansing secured Ms. Calabrese's ankles and wrists,
Ms. Calabrese continued to struggle and succeeded in loosening her
restraints.  The Defendant told her to stop resisting or he would
hit her, and then the Defendant did hit Trudy in the head with a
club.  The club was recovered by police and is in evidence.  The
force Defendant used to strike Ms. Calabrese in the head was so
substantial that the club broke into two pieces.

Dr. Mark Fischione testified that there were substantial
injuries caused to Trudy Calabrese's head which were consistent

3

with injuries that ould be caused by that club. The damage to Ms. Calabrese included injuries to her face, particularly around her left eye. Her frenulum was detached. She suffered blows to the back of the head that were administered with such force that she suffered a focal subarachnoid hemorrhage.

After John Sansing beat Trudy Calabrese with a club, he moved her truck to a different area so it would not pinpoint her location at the Sansing home. When he returned from parking the truck, John Sansing moved Trudy Calabrese, who was still bound by her wrists and ankles, to the master bedroom where he undressed her and sexually assaulted her.

Co-defendant Kara Sansing watched as her husband sexually assaulted Trudy. Kara saw the defendant place his penis inside of the victim's vagina. Kara heard the victim and the defendant talking to each other during the sexual assault. Kara testified that Ms. Calabrese was still tied up and restrained at the time she was sexually assaulted.

Next, the Defendant stabbed Trudy Calabrese three times in the abdomen. Kara Sansing observed Defendant stab Trudy on one occasion. Kara saw the defendant "grinding" the knife into the victim's abdomen to get further penetration.

Dr. Mark Fischione testified that all the wounds to the victim certainly caused pain. He also testified that the stab wounds did not cause death quickly. These wounds required a period of time (perhaps minutes) to cause death. After he murdered her, Defendant

4

left Trudy's body ● the bedroom and covered her ● with clothes. All four Sansing children saw Trudy's body in that location.

The Defendant accomplished his plan to rob the victim. After she was restrained, he stole approximately one dollar and 50 cents from her. When asked by one of his children why he had attacked the church lady, he told his son he did it for money.

After he killed Ms. Calabrese, the Defendant twice removed jewelry from her body and traded her jewelry for crack cocaine. The drug dealers with whom he dealt were individuals well known to the family. They came to the home and the drug transactions occurred while the children were in the home.

Throughout this horrific ordeal, the Sansing children were witnesses to a great deal of their father's actions. They saw him restrain Trudy. They saw him tie her up. They observed him strike Ms. Calabrese in the head repeatedly. They also observed her body in the master bedroom after she had been murdered. The children also saw the victim hidden under various items, including a child's toy, by a shed in the rear of their yard.

When the victim's body was found, she was blindfolded and there were plastic bags over her head held secure by ligatures. One ligature was a cord, the other was a necktie.

## II. **AGGRAVATING FACTORS**

Imposition of the death penalty requires aggravating and mitigating circumstances to be weighed. State v. Ross, 180 Ariz. 598, 886 P.2d 1354 (1994) cert. denied, 516 U.S. 878, 116 S.Ct 210 (1995). The weighing process involves consideration of both the

5

quality and the strength of aggravating and mitigating factors, not simply the number of same. State v. Willoughby, 181 Ariz. 530, 892 P.2d 1319 (1995), cert. denied, 116 S.Ct. 725 (1996). The state must prove beyond a reasonable doubt the existence of aggravating circumstances enumerated in A.R.S. §13-703 (F). State v. Gonzales, 181 Ariz. 502, 513, 892 P.2d 838, 849 (1995) cert. denied, 116 S.Ct. 720 (1996). The defendant must prove the existence of mitigating circumstances, be they statutory or nonstatutory circumstances, by a preponderance of evidence. Id. The trial court shall impose sentence based on evidence presented at trial and at the sentencing hearing. Id.

Pursuant to A.R.S. §13-703(E), the court must impose a sentence of death if it finds one or more aggravating circumstances, and there are no mitigating circumstances sufficiently substantial to call for leniency. Arizona courts have upheld the death penalty when the trial court found only one aggravating circumstance. State v. White, 168 Ariz. 500, 815 P. 2d 869, cert. denied, 112 S.Ct. 1199, 117 L.E.2d 439 (1992).

Although this court could impose death upon finding only one aggravating factor, the State contends that Defendant's actions satisfy three of the enumerated aggravating circumstances. The proof of each and every one of these aggravating circumstances substantially outweighs the alleged mitigation Defendant has offered.

Although the trial court must consider all mitigating evidence proffered by the defendant, the trial court has great discretion

6

about the weight to be given to alleged mitigating factors.  <u>State</u>
<u>v. Atwood</u>, 171 Ariz. 576, 832 P.2d 593, <u>cert</u>. <u>denied</u>, 113 S.Ct.
1058, 122 L.Ed.2d 364 (1992); <u>State v. Brewer</u>, 170 Ariz. 486, 826
P.2d 783, <u>cert</u>. <u>denied</u>, 113 S.Ct. 206, 121 L.Ed.2d 147, 61 U.S.L.W.
(1992) (The court found that the defendant's mental impairment,
duress, age, lack of criminal record, upbringing and feelings of
remorse were not sufficient to call for leniency).

**A.**  **Defendant's murder of Trudy Calabrese was committed in an**
**especially heinous, cruel or depraved manner.  A.R.S. §**
**13-703(F)(6)**.

Since the legislature phrased this aggravating circumstance in
the disjunctive, the aggravating circumstance exists when *any* one
of the three conditions are present.  <u>See</u>  <u>State v. Gretzler</u>, 135
Ariz. 42, 51, 659 P.2d 1, 10, <u>cert</u>. <u>denied</u>, 461 U.S. 971, 103 S.Ct.
2444, 77 L.Ed.2d 1327, <u>reh'g</u> <u>denied</u>, 463 U.S. 1236, 104 S.Ct. 32,
77 L.Ed.2d 1454 (1983); <u>State v. Ramirez</u>, 178 Ariz. 116, 871 P.2d
237, <u>cert</u>. <u>denied</u>, 115 S.Ct. 435, 130 L.Ed.2d 347 (1994) (emphasis
added).  The <u>Gretzler</u> court noted,

> [I]t is not necessary that all three
> elements, heinous, cruel, or depraved,
> be present in the murder.  The
> statutory expression is in the
> disjunctive, so either all or one could
> constitute an aggravating circumstance.

<u>See</u> <u>Gretzler</u>, 135 Ariz. at 51, 659 P.2d at 10 (<u>quoting</u>, <u>State v.</u>
<u>Clark</u>, 126 Ariz. 428, 436, 616 P.2d 888, 896 <u>cert</u>. <u>denied</u> 449 U.S.
1067, 101 S.Ct. 796, 66 L. Ed.2d 612, (1980)); <u>State v.</u>
<u>Gulbrandson</u>, 184 Ariz. 46, 906 P.2d 579 (Ariz. 1995), <u>cert</u>. <u>denied</u>,
116 S.Ct 2558 (1996).

7

Arizona's Supreme Court has concluded that a killing can be especially cruel, removing the need to discuss whether it is also especially heinous or depraved. Ramirez, 178 Ariz. at 128-29, 871 P.2d at 259-260. See, also State v. Apelt, 176 Ariz. 349, 861 P.2d 634 (1993). Likewise, the Arizona Supreme Court has held that a killing was especially depraved, and did not separately analyze whether it was also especially cruel. State v. West, 176 Ariz. 432, 862 P.2d 192, cert. denied, 114 S.Ct. 1635, 128 L.Ed.2d 358 (1993). Thus, should the court find that Defendant's conduct satisfies any one of these three elements, this aggravating circumstance is sufficiently proved.

Defendant's conduct satisfies *all three elements* of the especially heinous, cruel or depraved aggravating circumstance. It is important to note that this killing did not arise out of the heat of passion, fear, struggle, or attempt to escape. State v. Willoughby, Id. Nor was this murder "accidental".[1] This murder was not the result of momentary premeditation, but of Defendant's deliberate, carefully conceived, planned, and cold-blooded scheme for robbery and violence. Id. The murder of Trudy Calabrese was ruthless and calculated. Her death was horrific and the acts Defendant perpetrated against her can *only* be described as especially heinous, cruel *and* depraved. As one court noted, ..."first degree murder is by its nature willful, cruel and

---

[1] See State v. Murray, 184 Ariz. 9, 906 P.2d 542 (Ariz. 1995), where the court noted that there was no factual support for the claim that the deaths were unexpected or accidental, and concluded that the evidence was clear that the murders were in furtherance of the goal of pecuniary gain and during the course of, or flight from, the robbery.

8

repugnant. But the facts of this case set it apart from the norm of first degree murders." State v. Gretzler, 135 Ariz. at 53, 659 P.2d at 10 (1983), cert. denied, 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327, reh'g denied, 463 U.S. 1236, 104 S.Ct. 32, 77 L.Ed.2d 1454 (citing State v. Brookover, 124 Ariz. 38, 601 P.2d 1322 (1979)). The same characterization in Gretzler applies to the case sub judice.

Defendant's actions define and personify malignant evil. During his murder frenzy, he lived only for torture, rape, robbery, blood and death. Defendant's actions amount to far more than murder. His actions were despicable and, fortunately, unique to Arizona's jurisprudence.

First to be considered is the element of cruelty. The cruelty factor focuses on the victim's pain and suffering, while heinousness and depravity involve the killer's mental state. State v. Wallace, 160 Ariz. 424, 427, 773 P.2d 983, 986 (1989), cert. denied, 483 U.S. 1011, 107 S.Ct. 3243, 97 L.Ed.2d 48 (1987), aff'd, 494 U.S. 1047, 110 S.Ct. 1513, reh'g denied, 496 U.S. 913, 110 S.Ct. 2607, cert. denied, 499 U.S. 279, 110 S.Ct. 2583, 111 S.Ct. 2067 (1990) (emphasis added).[2] See also State v. Gretzler, 135 Ariz. at 51, 659 P.2d at 10 (1983), cert. denied, 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327, reh'g denied, 463 U.S. 1236, 104 S.Ct. 32, 77 L.Ed.2d 1454; State v. Greenway, 170 Ariz. 155, 166,

---

[2]Although the court found that cruelty was not established because the victims were caught by surprise, the court did find that the defendant's actions amounted to gratuitous violence and evidenced an especially heinous and depraved state of mind. State v. Wallace, 151 Ariz. 362, 367, 728 P.2d 232 (1986), aff'd, 160 Ariz. 424, 773 P.2d 983 (1989).

9

823 P.2d 22, 33 (1991).  Thus, the question of whether Defendant's killing was especially cruel, heinous or depraved begins with an examination of the  physical pain and mental anguish Defendant caused his victim.

    1. **Defendant's conduct was especially cruel:**

        a. **A killing is especially cruel when the victim experiences pain**.

"A murder is especially cruel if the victim consciously experienced physical _or_ mental pain and suffering prior to dying". State v. Murray, 184 Ariz. 9, 906 P.2d 542 (Ariz. 1995).[3]

The accounts of the Sansing children, the testimony of Kara Sansing and Dr. Mark Fischione, prove beyond _any_ reasonable doubt that Trudy Calabrese suffered.  Trudy Calabrese was "body slammed" to the floor by John Sansing.  He held her down and tied her wrists behind her back.  Kara Sansing attempted to tie Trudy's ankles.  When Kara was unable to complete her task, John Sansing finished "hogtying" Trudy Calabrese, thereby rendering her totally at his mercy.

The bindings were very tight.  The marks on Trudy's body as depicted in several autopsy photographs in evidence clearly display

---

[3]When considering the issue of cruelty, court's have looked to whether the victim was conscious during the attack.  For example, in State v. Williams, 183 Ariz. 368, 904 P.2d 437 (Ariz. 1995), the court held that because the state did not prove beyond a reasonable doubt that the victim was conscious throughout the attack, cruelty was not found.

However, the issue of consciousness is easily dispelled in the case at bar, as there is ample evidence that Trudy was conscious during most of the attack against her. In State v. Ramirez, 178 Ariz. 116, 871 P.2d 237 (1994), the court stated, "[c]ruelty can be established by evidence of a prolonged, bloody struggle. . ." See also State v. Medrano, 173 Ariz. 393, 844 P.2d 560 (1992). aff'd, in part, reversed in part, 185 Ariz. 192, 914 P.2d 225 (1996).

10

the degree of pain and suffering she endured as a result of the
restraints and ligatures applied to her by John Sansing. Trudy was
rendered totally helpless and incapable of defending herself.
Nevertheless, she attempted to escape. She struggled to loosen her
bindings. She kicked, but John Sansing hit her in the head with a
club with sufficient force to break the club and cause substantial
neurological damage. This stopped Trudy's attempt to escape.

Trudy begged John Sansing not to hit her, but he hit her even
more. Dr. Fischione testified that the injuries to her head were
significant. His testimony proves that these injuries could have
been life threatening. The beating inflicted by John Sansing
clearly hurt Trudy and caused her great pain and suffering.

But these were not all of the injuries Defendant caused to
Trudy. He injured Trudy's face, her lip, and her hands. The
injuries to her hands are commonly called "defensive wounds." The
injury to the eye was significant and the autopsy and scene
photographs prove the magnitude of force used by the defendant
against Trudy Calabrese. Her frenulum was detached, further
indicating a severe beating to the face.

While Trudy was bound hand and foot, the Defendant either
carried or drug her to another room where he proceeded to pull her
pants and panties down to mid-leg and inserted his penis into her
vagina. Kara Sansing watched this sexual assault and heard the
victim talking to the defendant while he raped her. Surely this
act of sexual assault was demeaning, painful and cruel.

11

The Defendant stabbed Trudy Calabrese three times with a butcher knife. Kara Sansing testified that Trudy Calabrese pleaded "please don't." Instead, the Defendant stabbed her three times, on one occasion "grinding" the knife to get further penetration. We know that her death from the stab wounds was <u>not</u> instantaneous. Dr. Fischione testified that it would take some time for her to expire from these injuries. These injuries surely caused Trudy to experience pain and suffering.

At some point the victim was blindfolded, bags were placed over her head and ligatures and cords were tied around these bags.

We know that Trudy Calabrese suffered physical pain by the nature of her injuries as depicted by photography, and by the testimony of Dr. Fischione. We also know that she suffered cruelty at the hands of the defendant by what the Sansing children saw and heard, and by what Kara Sansing saw and heard. Finally, and perhaps most importantly, we know that Trudy Calabrese suffered physically at the hands of John Sansing by what she said and what she did; and by what Defendant said. The Defendant told Arizona Republic reporter Victoria Harker that Trudy was suffering so he ended her life, because he couldn't handle seeing the condition she was in.

There can be no doubt that Trudy Calabrese suffered extreme physical pain. Cruelty has been proved beyond a reasonable doubt.

> b.  **<u>A killing is especially cruel where the victim experiences mental anguish prior to the moment of death</u>**.

12

The Gretzler Court noted, " [O]ur concept of cruelty involves not only physical pain, but also mental distress visited upon the victims." Gretzler 135 Ariz. at 51, 659 P.2d at 10. "Psychological pain may be the equivalent of the most severe physical torture." State v. Greenway, 170 Ariz. at 165, 823 P.2d at 32 (1992).

Arizona courts have held that victims do not have to be physically tortured for a murder to be especially cruel. State v. Lopez, 175 Ariz. 407, 411, 857 P.2d 1261, 1265, cert. denied, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1993). A killing is especially cruel if the defendant inflicts mental anguish before the victim dies. See State v. Ramirez, 178 Ariz. 116, 871 P.2d 237, cert. denied, 115 S.Ct. 435, 130 L.Ed.2d 347 (1994); State v. Apelt, 176 Ariz. 349, 861 P.2d 634 (1993); State v. Schurz, 176 Ariz. 46, 859 P.2d 156 (1993). A killing is especially cruel when the victim experiences uncertainty over their ultimate fate, and where there is a period of time between the victim's capture by the perpetrator and ultimate death. See State v. Herrera(Jr.), 176 Ariz. 21, 859 P.2d 131 (1993) cert. denied, 114 S.Ct. 398 (1993); State v. Herrera (Sr.), 176 Ariz. 9, 859 P.2d 119 (1993) cert. denied, 114 S.Ct. 446 (1993). A time lag between the defendant's overpowering of a victim and the victim's death has been held to constitute cruelty, since the victim has suffered mental anguish prior to death. Id. In Herrera(Jr.), the victim was a deputy sheriff. The defendants fought with him and caused him to fall down. Herrera(Jr.), 176 Ariz. at 25-26, 859 P.2d at 135-36. During a brief struggle, the officer's revolver was taken from him and

13

defendants ordered him to get on the ground. Id. His radio was also taken and it was used to hit the officer in the head. Id. One of the defendants pointed the revolver at him as the officer begged for his life. Id. The testimony indicated that the deputy lay in that position for 18 seconds before he was shot. Id. This was held to constitute cruelty since he suffered mental anguish prior to death. Id.

The evidence before this court, supplies much more evidence of cruelty than in Herrera (Jr.). Trudy was restrained, tortured, bound, gagged, sexually assaulted and then murdered over the course of an hour. Accordingly, the cruelty in the case sub judice is much greater than the cruelty found to constitute an aggravating circumstance in Herrera (Jr.) because Ms. Calabrese experienced uncertainty as to her ultimate fate for much longer than the victim in Herrera.

In State v. Lopez, evidence that the victim was conscious for the three to fifteen minutes that it took the defendant to kill her proved that she suffered mental anguish over her ultimate fate, and this was found to be especially cruel. State v. Lopez, 175 Ariz. 407, 857 P.2d 1261, cert. denied, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1993). As one court has commented, "[i]t was not only the manner of death, but also the circumstances surrounding it and their effect on the victim that amply warrant the finding of cruelty." State v. Lavers, 168 Ariz. 376, 392, 814 P.2d 333, 349, cert. denied, 502, U.S. 926, 112 S.Ct. 343, 116 L.Ed.2d 282 (1991), quoting, State v. Gillies, 142 Ariz. 564, 570, 691 P.2d 655, 660-61

14

(1984), cert. denied, 470 U.S. 1059, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985).

There is abundant and irrefutable evidence that Trudy Calabrese suffered significant mental anguish (in addition to physical pain) at Defendant's hands, thus firmly establishing the existence of this aggravating circumstance. Defendant caused mental anguish to her because she could anticipate death and she was conscious during all, or at least a good part, of the attack against her.

It is beyond dispute that Trudy Calabrese suffered mental anguish at the Defendant's hands. She could anticipate death from the moment that she was restrained until the time approximately one hour later when she was fatally stabbed three times in the abdomen. In the interim, we know from the physical evidence and the testimonial evidence provided by the Sansing children and Kara Sansing, that Defendant's actions created a justifiable and very real fear by Trudy that she would be murdered. Trudy's response to John Sansing's actions was to beg for help. She begged "God, just help me."

Trudy also begged the Sansing children to call 9-1-1 and to call police. Defendant told them to watch TV. The children were so upset by her begging and pleading that they cried.

Kara testified that she heard Trudy pray, to the effect: "I don't want to die, but if this is the way you want me to come home, I'm ready."

15

We also know that Trudy agonized over her fate by her attempts to free herself.  During one attempt the Defendant told her that he would hit her in the head if she made a move.  She continued to squirm and kick and he hit her again with a club.

Dr. Fischione testified that once the fatal stab wounds had been administered, Trudy did not die immediately.  It took some period of time, perhaps minutes, for her to die.

We know from the Defendant's own mouth that Trudy suffered. The parties stipulated to statements made by the Defendant to Arizona Republic writer Victoria Harker.   He said: "She was suffering.  I wanted to end it.  I wasn't playing God.  I just couldn't handle seeing the condition she was in."

There can be no doubt that Trudy Calabrese suffered extreme mental cruelty and she agonized over her fate for an hour or more while held captive to the ruthless and sadistic demands and actions of John Sansing.

In summary, the Defendant lured this Good Samaritan to his home under the ruse of providing food for his children.  All the while he planned to rob her.  When she arrived, he tied her up, held her hostage for more than an hour, bound her, gagged her, blindfolded her, beat her repeatedly with a club, sexually assaulted her, stabbed her multiple times, and placed plastic bags and ligatures over her head and neck.  The evidence of cruelty is overwhelming. This aggravating circumstance has been proved beyond a reasonable doubt.

16

PSER 82

2. Defendant's conduct was especially heinous or depraved:

The "... statutory concepts of heinous and depraved involve a killer's vile state of mind at the time of the murder, as evidenced by the killer's actions." Gretzler 135 Ariz. at 51, 659 P.2d at 10. The heinous and depraved circumstance focuses on the Defendant's mental state and attitude at the time of the killing as evidenced by his words or actions. State v. Gulbrandson, 184 Ariz. 46, 67, 906 P.2d 579, 598 (1995). Heinous has been defined as ". . .hatefully or shockingly evil. . ." and "depraved" as marked by debasement, corruption, perversion or deterioration." State v. Knapp, 114 Ariz. 531, 543, 562 P.2d 704, 716 (1977) cert. denied, 435 U.S. 908, 98 S.Ct. 1458 (1978).

In Gretzler the court articulated five factors which establish an especially heinous or depraved killing. Id. at 52. Several subsequent Arizona cases have reaffirmed the Gretzler factors. See State v. Barreras, 181 Ariz. 516, 521, 892 P.2d 852, 857 (1995); State v. Williams, 183 Ariz. 368, 904 P.2d 437 (Ariz. 1995). The Barreras court noted,

> Although the Gretzler factors are not absolutely exclusive ... they provide a consistent and rationally reviewable standard for the otherwise vague (F)(6) "especially heinous, cruel or depraved" factor, thus ensuring the continuing constitutionality of our death penalty statute and facilitating our independent review ... We therefore urge trial courts to apply the Gretzler standards when considering this aggravating circumstance.

Barreras, 181 Ariz. at 521, 892 P.2d at 857.

17

The Gretzler court held that heinousness and depravity is proved by a showing that either: (1) the killer relished the murder, (2) the defendant inflicted gratuitous violence on the victim, (3) the defendant needlessly mutilated the victim, (4) the killing was senseless, and (5) the victim was helpless. State v. Gretzler, 135 Ariz. at 51, 659 P.2d 1, 10 (1983). An additional factor focuses on whether defendant's motivation for the killing was to eliminate a witness. See State v. Greenway, 170 Ariz. 155, 823 P.2d 22 (1991); State v. Stanley, 167 Ariz. 519, 809 P.2d 944, cert. denied, 502 U.S. 1014, 112 S.Ct. 660, 116 L.Ed.2d 751 (1991). Defendant's actions satisfy some of the aforementioned elements, by proof beyond a reasonable doubt.

    a.    **A killing has been found to be especially depraved where the killer inflicts gratuitous violence on the victim beyond that necessary to kill.**

The Arizona Supreme Court described this aggravating circumstance as follows.

> . . . . An especially heinous murder is one "that is 'hatefully or shockingly evil' " and a "murder is depraved if marked by debasement, corruption, perversion or deterioration." State v. Cook, 170 Ariz. 40, 821 P.2d 731, cert. denied, 113 S.Ct. 137, 121 L.Ed.2d 90 (1992).

The infliction of gratuitous violence has been held to constitute an especially depraved murder justifying imposition of the death penalty. In Gretzler, the court found this aggravating circumstance when defendant shot a victim numerous times and then beat the already unconscious or dead victim. Id., (citing State v.

18

Ceja, 126 Ariz. 3⬤40, 612 P.2d 491, 496 (19⬤)). The Gretzler

court remarked:

> We think that defendant's conduct in
> continuing his barrage of violence,
> inflicting wounds and abusing his
> victims, beyond the point necessary to
> fulfill his plan to steal, beyond even
> the point necessary to kill, is such an
> additional circumstance of a . . . .
> depraved nature to set it apart from
> the 'usual or the norm'.

Id. quoting Ceja, 115 Ariz. at 417, 565 P.2d at 1278, aff'd, 126

Ariz. 35, 612 P.2d 491, cert. denied, 434 U.S. 975, 98 S.Ct. 533,

54 L.Ed.2d 467 (1977). Other Arizona opinions support the

proposition that killing is especially depraved when the killer

inflicts gratuitous violence. The Arizona Supreme Court has held:

"[c]ertainly, tying the victim up and pummeling his face until many

bones were broken and the victim's hard palate had become detached,

was gratuitous violence far beyond anything necessary to commit

burglary." State v. West, 176 Ariz. 432 at 448, 862 P.2d 192 at

208, cert. denied, 114 S.Ct. 1635, 128 L.Ed.2d 358 (1993). The

violence in West is similar to the ordeal endured by Trudy

Calabrese. She too was tied up and restrained. She too was

pummeled about the face (as depicted in photography and testimony

of Dr. Fischione detailing injuries to her eye, lip and head). Her

frenulum was detached. She was stabbed three times in the abdomen.

Two trash bags were placed over her head and were tied around her

neck and secured with ligatures including a cord and a necktie.

The West court found depravity. This court should also.

19

As stated previously in this memorandum, Causing used at least three different weapons to inflict pain, torture and ultimately death upon Trudy Calabrese. He beat her with a club, he stabbed her with a butcher knife and he placed plastic bags over her head secured by ligatures. He also restrained her with electrical cords and a vacuum sweeper power cord, rendering her totally and utterly helpless. There is ample evidence that he blindfolded her and placed a gag in her mouth at some point during this awful attack.

The violence perpetrated against her was far beyond what was necessary to kill. The beatings to her head and face, the multiple stab wounds, the restraints, and the bags over her head all operated to cause profound pain and suffering over a significant period of time. The Defendant's actions were depraved as defined by Arizona law.

In <u>Murray</u>, the court noted that, "[g]ratuitous violence is supported by the numerous gunshot wounds to the victim's heads with different weapons, displaying violence far beyond that necessary to kill." <u>Murray</u>, 184 Ariz. 9, 906 P.2d 542 (Ariz. 1995), <u>citing</u> <u>State v. Amaya-Ruiz</u>, 166 Ariz. 152, 800 P.2d 1260 (1990). In <u>State v. Gulbrandson</u>, the defendant argued that the fact the victim suffered multiple wounds did not establish a heinous or depraved state of mind, but instead showed that the defendant was "out of control". <u>State v. Gulbrandson</u>, 184 Ariz. 46, 906 P.2d 579 (Ariz. 1995). The court enumerated the many stabbing and blunt force injuries that the victim suffered and concluded, "these facts prove beyond a reasonable doubt that defendant inflicted gratuitous

20

violence on the victim, and this shows an especially heinous or depraved state of mind." Id.

Sansing used several different weapons to inflict pain, physical torture and ultimately death to his victim. He perpetrated violence against Trudy far beyond that necessary to kill, and this is amply supported by undisputed facts. This aggravating circumstance has been proved beyond a reasonable doubt.

**b.   A killing is especially heinous or depraved if the crime was senseless and the victim was helpless.**

The Gretzler court found that either, or both, of these elements when considered with other factors may lead to a conclusion that a murder was especially heinous or depraved. Gretzler 135 Ariz. at 53, 659 P.2d at 11. While the mere senselessness of a crime, or helplessness of a victim, standing alone is not sufficient for finding that the crime is heinous or depraved, taken together with the existence of *other factors* they can warrant a finding of heinousness or depravity. See also, State v. Barreras, 181 Ariz. 516, 523, 892 P.2d 852 (1995); State v. Scott, 177 Ariz. 131, 865 P.2d 792, cert. denied, 130 L.Ed.2d 73 (1993); State v. Milke, 177 Ariz. 118, 865 P.2d 779, cert. denied, 114 S.Ct. 2726, 129 L.Ed.2d 849 (1993); State v. Styers, 177 Ariz. 104, 865 P.2d 765, cert. denied, 115 S.Ct. 159, 130 L.Ed.2d 97 (1994). The facts herein clearly prove that Sansing's actions were both senseless *and* his victim was particularly helpless. As such, the presence of these elements, together with the presence of other circumstances proves that Defendant's crimes fully satisfy this aggravating circumstance.

21

There is ample case law to support a finding that this murder was especially heinous and depraved. See State v. Gallegos, 178 Ariz. 1, 870 P.2d 1097, cert. denied, 115 S.Ct. 330, 130 L.Ed.2d 289 (1994); State v. Milke, Id.; State v. West, Id. In State v. Tison, the Court found the crime to be heinous and depraved, stating:

> [T]he senselessness of the murders, given the inability of the victims to thwart the escape . . . . and the fact that a young child, less than two years old, who posed no threat to the captors, was indiscriminately shot while in the arms of his mother, compels the conclusion that the actual slayers possessed a shockingly evil state of mind.

State v. Tison, 129 Ariz. 526, 543, 633 P.2d 335, 352 (1981), cert. denied, 459 U.S. 882 (1982).

Because there is ample evidence of both the senselessness of these murders and of the helplessness of Defendant's victim, each element will be considered separately. However, the two issues are often integrally related, as they are in the instant case. The first factor considered is the senselessness of the murders.

### i. **Defendant's crime was senseless**:

Especially compelling are cases that find a crime to be particularly senseless where the defendant could have accomplished an illegal act (for example, a sexual assault or theft) without resorting to murder. See State v. Lopez, 175 Ariz. 407, 857 P.2d 1261; State v. Spencer, 176 Ariz. 36, 859 P.2d 146 (1993), cert. denied, 114 S.Ct. 705 (1994). One court noted, "a murder is senseless when it is unnecessary to allow the defendant to complete

22

his objective." ⬤te v. Comer, 165 Ariz. 41⬤429, 799 P.2d 333,

349, cert. denied, 499 U.S. 943, 111 S.Ct. 1404, 113 L.Ed.2d 460

(1990). In a similar case the Arizona Supreme Court remarked:

"[t]he murder was also senseless. Although the defendant clearly

intended to kill the victim, there was no reason to do so. The

sexual assault could have been committed without the murder ..."

Lopez, 175 Ariz. at 421, 857 P.2d at 1266.

In Spencer, the killer forced the victim to withdraw her funds

from an ATM machine and then murdered her. Spencer, 176 Ariz. at

39, 859 P.2d at 149. After murdering her, he attempted to sell her

vehicle. Id. The court stated,

> The murder in this case was senseless
> in that, although carried out to aid
> Spencer's successful completion of the
> theft, it was unnecessary to accomplish
> it ... Spencer had taken [the victim's]
> money and was in control of her car-and
> her-sometime before the murder. There
> was no reason to kill except to fulfill
> his depraved plot.

Id. at 43.

That is precisely the case here. It is important to recall

that Defendant's original motivation was to steal money. Defendant

wasted little time restraining Trudy Calabrese and rendering her

totally helpless. He could have effected his purpose of robbery

without resort to rape and torture, and without resort to murder.

Instead, he chose a course of continued beating, sexual assault,

stabbing and potential suffocation over the next hour.

Ignoring for the moment the vileness of Sansing's behavior, he

could have made the choice to rob, and he could have made the

choice to rape, without resorting to murder. The brutal slaying of

23

this Good Samaritan ● was totally unnecessary ● the defendant to accomplish his goals. His crime was senseless and his conduct satisfies another element establishing that he had a depraved state of mind.

### ii. __Defendant's victim was helpless__:

A victim's age and *degree* of helplessness are elements courts look to in determining whether a victim was helpless, thus adding to the depraved nature of a crime. See State v. Gallegos, 178 Ariz. 1, 870 P.2d 1097; State v. West, 176 Ariz. 432, 862 P.2d 192. When a victim has been shot and disabled and the defendant could escape without shooting him again and killing him, doing so constitutes aggravation. State v. Ross, 180 Ariz. 598, 886 P.2d 1354 (1994) citing State v. Chaney, 141 Ariz. 295, 312-13, 686 P.2d 1265, 1282-83 (1984).

In State v. Lopez the court found helplessness was proved when, in addition to the fact that the killer was much younger and larger in stature than his victim, she had been gagged and was unable to call for help. Lopez, 175 Ariz. at 412, 857 P.2d at 1266. The Lopez court found that a victim is helpless when disabled and unable to resist the murder. Id. Therefore, the circumstance of helplessness is indisputably proved in the murder of Trudy Calabrese. She was "hogtied" with her arms and legs restrained behind her with wires and cords throughout this ordeal, including the time in which she was murdered.

In State v. Gulbrandson, 184 Ariz 46, 906 P.2d 579 (Ariz. 1995) the court found that evidence of the victim having been bound

24

was noteworthy when considering the issue of helplessness. The court remarked, "defendant ultimately rendered [the victim] helpless by binding her . . . . [w]e conclude that the trial court properly found the victim's helplessness was proven beyond a reasonable doubt." Id. at 57.

Defendant Sansing's actions satisfy both prongs of the "senseless/helpless" element of heinous and depraved as described by the Gretzler court. As such, this aggravating circumstance has certainly been proved beyond a reasonable doubt. Especially so when considering that this Good Samaritan was delivering food to the Sansing children at the Defendant's request on a cold, rainy February day. Even more so when considering the totality of the facts and circumstances surrounding her restraint, sexual assault, beating and ultimate murder, and the proximity of Defendant's children to this horrible crime. They too were subjected to the senselessness of the Defendant's actions by watching and listening to their father commit this horrific murder.

> c.  **A killing is especially heinous or depraved if the motivation for the killing was the elimination of a witness.**

In State v. Milke, the court held that in addition to the five Gretzler factors, killing to eliminate a witness may be considered as evidence of depravity. State v. Milke, 177 Ariz. 118, 865 P.2d 779, cert. denied, 114 S.Ct. 2726, 129 L.Ed.2d 849 (1993). Courts have found that a killing motivated by the killer's desire to eliminate a witness who observed, or was aware of, another crime is aggravation. See State v. Greenway, 170 Ariz. 155, 823 P.2d 22

25

(1991); State v. Stanley, 167 Ariz. 519, 809 P.2d 944, cert. denied, 502 U.S. 1014, 112 S.Ct. 660, 116 L.Ed.2d 751 (1991). The Greenway court noted, "[t]o end a person's life just so that individual cannot testify against a defendant shows an utter and 'complete lack of understanding of the value of human life' ". Greenway, 170 Ariz. at 167, 823 P.2d at 34.

However, State v. Barreras questioned the finding of senseless *and* the finding that the murder was committed to eliminate a witness, suggesting that the two elements are mutually exclusive. The Barreras court narrowed the types of cases justifying a finding of witness elimination. State v. Barreras, 181 Ariz. at 522-23, 892 P.2d at 858-59 (1995). The court articulated a three pronged test to determine whether the witness elimination factor applies. Id. According to the Barreras court, the witness elimination factor applies if: (1) the victim witnessed another crime and was killed to prevent testimony about that crime; (2) a statement by the defendant or other evidence of his state of mind shows witness elimination was a motive; or (3) some extraordinary circumstances show the murder was motivated by a desire to eliminate witnesses. Id.

Defendant fully satisfies the second element enumerated by the Barreras court. The Barreras test is satisfied if the Defendant evinces a state of mind indicating a desire to eliminate a witness. The testimony of Kara Sansing proves beyond a reasonable doubt that once the Defendant made the decision to rob and restrain Trudy Calabrese, he felt he had no choice other than to kill her.

26

Instructions on this issue are several of the Defendant's actions and, of course, his comments to Kara. Shortly after he restrained Trudy Calabrese, he moved her truck so that no one would be able to find the house she visited. Shortly after he sexually assaulted the victim, the Defendant told Kara Sansing that he had to rape her so that it would look like a robbery/rape case.

The Defendant's statements to his wife while he was sexually assaulting the victim prove that he planned <u>at</u> <u>that</u> <u>point</u> to eliminate Trudy as a witness. He told Kara that it must be made to look like a robbery, beating and rape. After Trudy had expired, the Defendant drug her body into the rear and hid her behind a shed and covered her with various items to prevent her body from being found.

The Defendant's words and actions prove the heinousness and depravity that establish this aggravating circumstance beyond a reasonable doubt.

B. **The murder of Trudy Calabrese was committed in expectation of the receipt of items of pecuniary value, as per A.R.S. § 13-703 (F)(5).**

The "pecuniary gain" aggravating circumstance is not limited to the "hired gun" or "contract" killing, rather it involves any murder committed for "financial motivation". <u>State v. Gretzler</u>, 135 Ariz. 42, 49, 659 P.2d 1, 8, <u>cert</u>. <u>denied</u>, 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327, <u>reh'g denied</u>, 463 U.S. 1236, 104 S.Ct. 32, 77 L.Ed.2d 1454 (1983), <u>citing</u> <u>State v. Clark</u> 126 Ariz. 428, 436, 616 P.2d 888, 896, <u>cert</u>. <u>denied</u> 449 U.S. 1067, 101 S.Ct. 796, 66 L. Ed.2d 612, (1980).

27

In State v. ●ars, the court held that pecuniary gain may not be found in every case in which "a person has been killed and at the same time defendant has made a financial gain." State v. Spears, 184 Ariz. 277, 292, 908 P.2d 1062, 1077 (Ariz. 1996) citing State v. Correll, 148 Ariz. 468, 479, 715 P.2d 721, 732 (1986). The Spears court noted, "[t]he (F)(5) aggravating factor applies only when pecuniary gain is a motive, cause, or impetus for the murder and not merely the result of the murder". Spears at 30 citing State v. Spencer, 176 Ariz. 36, 43, 859 P.2d 146, 153 (1993), cert. denied, 114 S.Ct. 705 (1994).

In State v. West, 176 Ariz. 432, 862 P.2d 192, cert. denied, 114 S.Ct. 1635, 128 L.Ed.2d 358 (1993) the defendant burglarized his victim's home in order to take various items of electronic equipment, then killed the victim. The court found that these acts were sufficient to satisfy the requirements of this aggravating circumstance. Id.

In State v. Scott, 177 Ariz. 131, 865 P.2d 792, cert. denied, 130 L.Ed.2d 73 (1993) defendant was offered $250 to drive a vehicle involved in a murder plan and the court found that this act alone was adequate to show that the defendant committed the offense in expectation of pecuniary gain.

The Gretzler court found the existence of this aggravating circumstance when the defendant acted as follows: "after killing the Sandbergs, the defendant took their credit cards, blank checks, an expensive camera, and their automobile. These circumstances likewise reflect a financial motivation." Id. at 50, 9. State v.

28

Ross, 180 Ariz. 5⬤, 605, 886 P.2d 1354 (1994⬤ (quoting State v.
Fierro, 166 Ariz. 539, 551, 804 P.2d 72, 84 (1990)), held "when the
defendant kills to facilitate his escape and to permit him to take
and keep stolen items, he furthers his pecuniary gain motive." The
Greenway court found, "the killing and robbery need not occur
simultaneously but the purpose of the killing must be to further
the defendant's motive of pecuniary gain from the robbery."
Greenway, 170 Ariz. 155, 164, 823 P.2d 22, 31 quoting State v.
Walton, 159 Ariz. 571, 588, 769 P.2d 1017, 1034, cert. granted, 493
U.S. 808, 110 S.Ct. 49, 107 L.Ed.2d 18, 493 U.S. 990, 110 S.Ct.
536, 107 L.Ed.2d 534, 493 U.S. 1000, 110 S.Ct. 559, 107 L.Ed.2d
554, aff'd, 497 U.S. 639, 110 S.Ct. 3147, 111 L.Ed.2d 511, reh'g
denied, 497 U.S. 1050, 111 S.Ct. 14, 111 L.Ed.2d 828 (1989).   In
addition, the Greenway court noted, "even if  we infer that the
murders were to eliminate witnesses to the aggravated assault, this
does not preclude the inference that the murders were for pecuniary
gain." Id.

The  circumstances of State v. Murray, 184 Ariz. 9, 906 P.2d
542 (Ariz. 1995) are instructive to the case at bar.  There, the
court found the following facts dispositive when considering this
aggravating circumstance:

> [a]t trial the evidence showed that the
> defendants invaded the cafe and home
> where [the victims] resided and worked.
> They ransacked the buildings and took
> a number of items including cash. When
> they were stopped several hours later
> by DPS officers, the property was found
> in the defendant's vehicle.    The
> murders were committed in the course of

29

and in ⬤rtherance of the robbery ⬤
flight from the robbery.

Id. at 15.

Defendant John Sansing planned to rob Trudy Calabrese and he explained his plan to his wife before Trudy arrived at their house. The children were present and all heard their father's plan to rob the "church lady." Defendant told them that pecuniary gain was his original motivation. In fact, one of the Sansing children told police his father said he did it for a dollar and a half.

Further evidence of the Defendant's motivation for pecuniary gain is found in removing jewelry from the body of Trudy Calabrese on two occasions shortly after she died. On each occasion, Defendant swapped the victim's jewelry for crack cocaine.

The testimony of Kara Sansing and the statements of the Sansing children (received in evidence by stipulation) show beyond reasonable doubt that the Defendant planned to rob the victim. He tied her up and restrained her in furtherance of that plan. He took a small amount of money from her. He also removed jewelry from her body after he had beaten her, sexually assaulted her, stabbed her and murdered her.

Thus, it is evident that he was motivated, at least in part, by the expectation of something of pecuniary value, and a desire for pecuniary gain. Pecuniary gain was a motive, cause or impetus for his crimes, and not merely the result of the murders. See State v. Spears, 184 Ariz. 277, 908 P.2d 1062 (Ariz. 1996). This aggravating circumstance has been proved beyond a reasonable doubt.

30

C.   **The Defendant was previously convicted of a serious offense, whether preparatory or completed.  A.R.S. 13-703(F)(2).**

The Defendant pled guilty to kidnaping, sexual assault and armed robbery.  Each of these convictions are "serious offenses" as defined by Arizona law.  See A.R.S. §13-703(H)(5), (8) and (10).

The State submits that the Defendant's convictions for kidnaping, armed robbery and sexual assault should operate as aggravation pursuant to A.R.S. §13-703(F)(2).  In <u>Gretzler</u>, the Court explained the State's philosophy as follows:

> We have held that our death penalty statute is not a recidivist or enhancement statute, the purpose of which is to serve as a warning to convicted criminals and encourage their reformation. Rather, "[W]e have stated that the 'purpose of an aggravation/mitigation hearing is to determine the character and propensities of the defendant. . .'"*** Convictions entered prior to a sentencing hearing may thus be considered regardless of the order in which the underlying crimes occurred or the order in which the convictions were entered. 135 Ariz. 42, 57 n.2, 659 P.2d 1, 16 n.2 (1983)(Citations omitted).

In <u>State v. Lee</u>, the Court expanded upon the <u>Gretzler</u> holding as follows:

> "This court's holding in <u>Gretzler</u> applies to prior convictions as well as simultaneous convictions. <u>Id</u>. A sentencing court may consider any convictions entered previously without regard to the order of the underlying crimes." 189 Ariz. 590, 604, 944 P.2d 1204, 1218 (1997).

Therefore, this aggravating circumstance has been proved beyond a reasonable doubt.

31

III. **CONCLUSION**:

Defendant John Sansing committed a murder the likes of which the people of Arizona will not soon forget. He shocked the conscience of the community with a despicable and horrific murder of a Good Samaritan who was attempting to render aid to his own children. He forced her to endure extreme physical and mental anguish over the nearly one hour it took to restrain her, kidnap her, beat her mercilessly, sexually assault her, stab her and apply bags and ligatures to her head and neck.

The Defendant's actions satisfy three aggravating factors contained in A.R.S. §13-703 (F). No mitigation is sufficient to call for leniency in this case. The people of the State of Arizona demand, and the evidence supports, the imposition of death as a result of the Defendant's action.

Submitted September 3rd, 1999

RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY

BY _____
William K. Culbertson
Deputy County Attorney

BY _____
Vince Imbordino
Deputy County Attorney


Copy of the foregoing
mailed/delivered this
___ day of September, 1999
to:

32